**UNITED STATES BANKRUPTCY COURT**　　　　**FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------

| | |
|---|---|
| In re: ) | |
| ) | |
| ) | |
| ARAMID ENTERTAINMENT FUND, ) | Chapter 11 |
| LLC, et al., ) | Case No. 14-11802 (SHL) |
| ) | |
| Recognized Debtors.[1] ) | |

----------------------------------------------------------------

| | |
|---|---|
| ) | |
| DAVID MOLNER, ) | |
| ) | |
| Plaintiff, ) | Adv. Proc. No. 20-1313 (DSJ) |
| ) | |
| - against - ) | |
| ) | |
| REED SMITH, LLP, JAMES C. ) | |
| MCCARROLL, GEOFFREY VARGA, ) | |
| JAMES L. SANDERS, FRANCESCA ) | |
| MOK, KURT GWYNNE, JORDAN W. ) | |
| SIEV, DAVID BREE, ROGER HANSON, ) | |
| DONALD W. SEYMOUR, JESS ) | |
| SHAKESPEARE, KINETIC PARTNERS, ) | |
| DUFF & PHELPS, LLC & DMS ) | |
| GOVERNANCE, LTD., ) | |
| ) | |
| Defendants. ) | |
| ) | |

----------------------------------------------------------------

## OPINION AND ORDER DENYING MOTION FOR REMAND BASED ON MANDATORY OR PERMISSIVE ABSTENTION

**A P P E A R A N C E S:**

**BOSKO PC**
*Counsel for David Molner*
10880 Wilshire Boulevard
Suite 1101

---

[1] The Debtors and, if applicable and known, the last four digits of their taxpayer identification numbers are as follows: Aramid Entertainment Fund Limited; Aramid Liquidating Trust, Ltd. (f/k/a Aramid Entertainment Participation Fund Limited); and Aramid Entertainment, Inc. (0704). The Debtors' U.S. address is c/o Duff & Phelps, LLC, 55 East 52nd Street, 31st Floor, New York, NY 10055.

Los Angeles, CA 90024
By:    David I. Bosko, Esq.

**GIBSON, DUNN & CRUTCHER, LLP**
*Counsel for Reed Smith LLP, James C. McCarroll, James L. Sanders, Francisca Mok, and*
*Jordan W. Siev*
200 Park Avenue
50th Floor
New York, NY 10166
By:    David Michael Feldman, Esq.
       Nancy Elizabeth Hart, Esq.
       William John Moccia, Esq.
       Kevin S. Rosen, Esq.

**STEPTOE & JOHNSON, LLP**
*Counsel for Geoffrey Varga, Jess Shakespeare, Kinetic Partners, and Duff & Pheps, LLC*
1114 Avenue of the Americas
New York, NY 10036
By:    Julie Christine Amadeo, Esq.
       Christopher M. Paparella, Esq.
       Jeffery Mark Reisner, Esq.

**SADIS & GOLDBERG**
*Counsel for David Bree*
551 Fifth Avenue
New York, NY 10176
By:    Douglas Hirsch, Esq.
       Jennifer A. Rossan, Esq.

**FOLEY & LARDNER LLP**
*Counsel for David M. Seymour, Roger Hanson, and DMS Governance, Ltd.*
90 Park Ave
29th Floor
New York, NY 10016
By:    Katherine R. Catanese, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion [ECF No. 6] of plaintiff David Molner ("**Molner**") for an

order of abstention and remand of this adversary proceeding to state court, where Molner originally

filed the case. Molner worked for Aramid Entertainment Fund, Limited (the "**Fund**"), one of the

debtors in the underlying Chapter 11 proceedings (the "**Aramid Bankruptcy**"). Molner contends

that a series of actors (the "**Defendants**"), among them Reed Smith, LLP ("**Reed Smith**"), the
Fund's counsel, conspired to oust him from the Fund, just as he was preparing to liquidate the
Fund in the Cayman Islands.  Molner sued the Defendants in New York State Supreme Court (the
"**State Court Action**"), and Reed Smith removed the action.  Molner's motion seeks a remand of
the action to state court, arguing that the requirements for mandatory abstention under 28 U.S.C.
§ 1334(c)(2) are met, or, in the alternative, that the Court should permissively abstain as authorized
by 28 U.S.C. § 1334(c)(1) and order an equitable remand under 28 U.S.C. § 1452(b).  For the
reasons discussed below, the Court denies Molner's motion.

## I.   BACKGROUND

### A.  Pre-Petition Events

Molner managed the Fund pursuant to service provision agreements between the Fund and
two entities: Aramid Capital Partners, LLP ("**ACP**" and the "**ACP Services Agreement**"), and
Asset Resolution Partners, Ltd. ("**ARP**" and the "**ARP Services Agreement**").[2]  *See* Notice of
Removal [AP ECF No. 1].  ACP served as the Fund's only voting shareholder.  *See* Memorandum
in Support of Motion to Abstain and/or Remand [AP ECF No. 6-1] at 9.

Reed Smith represented the Fund, and, although it never represented Molner personally,
Molner alleged that the firm interacted with him "directly" on "more than a hundred occasions in
[Molner's] capacity as the Fund's manager."  [*Id.*]  Through this ongoing relationship, Molner
gained familiarity with a number of Reed Smith's attorneys, including defendants James C.
McCarroll ("**McCarroll**"), James L. Sanders ("**Sanders**"), Kurt Gwynne ("**Gwynne**"), Francisca
Mok ("**Mok**"), and Jordan W. Siev ("**Siev**" and, collectively, the "**Individual Lawyer
Defendants**").  [*Id.*]  For example, when Reed Smith investigated a lawsuit filed against ACP,

---

[2] This opinion refers to docket entries from the Aramid Bankruptcy as "Bankr. ECF" and to docket
entries from this adversary proceeding as "AP ECF."

Molner shared confidential ACP information with the firm, and Molner and Reed Smith signed a Joint Privilege and Common Interest Defense Agreement.  [*Id.*].

In January 2014, Molner approached a subcommittee of the Fund's Board of Directors, comprised of defendants David Bree ("**Bree**") and Roger Hanson ("**Hanson**"), with a plan to voluntarily liquidate the Fund in the Cayman Islands (the "**Voluntary Liquidation Plan**").  [*Id.*] Molner contends that: (1) Reed Smith and the Individual Lawyer Defendants feigned support for the Voluntary Liquidation Plan, making misrepresentations to Molner, the Fund's Board, and the Fund's shareholders; (2) he relied on Reed Smith's recommendation when he hired defendants Geoffrey Varga ("**Varga**") and Jess Shakespeare ("**Shakespeare**") to be the plan's joint voluntary liquidators ("**JVLs**"), along with Varga and Shakespeare's firm, defendant Kinetic Partners (now Duff & Phelps, LLC); (3) he hired DMS Services ("**DMS**") and its founder Donald Seymour ("**Seymour**") to help him prepare the Voluntary Liquidation Plan; and (4) Reed Smith, the Individual Lawyer Defendants, Varga, and Shakespeare all assured Molner that they were working towards liquidating the Fund in the Cayman Islands, and that they would not proceed with a bankruptcy in the United States absent Molner's consent.  [*Id.* at 6 n. 1, 9–11].

Approximately one month before the Aramid Bankruptcy petition date, the parties agreed to terminate the ACP Services Agreement.  [ECF No. 1 at 4].  Thereafter, Molner continued to manage the Fund via the ARP Services Agreement.  [*Id.*]

### B.  The Filing of the Chapter 11 Petition and Molner's Termination

In June 2014, Varga and McCarroll commenced the Aramid Bankruptcy by filing or causing to be filed a Chapter 11 petition in this Court.  [Bankr. ECF No. 1].  The Hon. Sean H. Lane was assigned.

Varga filed a declaration, pursuant to Local Rule 1007-2, that described the Voluntary Liquidation Plan and Molner's role with the Fund as follows.  [Bankr. ECF No. 2].  The Fund was

an investment fund organized under the laws of the Cayman Islands that provided short and medium-term liquidity to producers and distributors of entertainment assets. *Id.* at 5–6. The Fund owned debtor Aramid Entertainment, Inc., which worked on the Fund's activities in the United States. [*Id.* at 6–7]. Debtor Aramid Liquidating Trust, Limited had no business operations, but it had the right to all equity distributions from the Fund. [*Id.* at 4 n.2]. The Fund's board retained non-debtor ACP—the entity Molner managed—to, *inter alia*, refer investment opportunities and prepare due diligence reports on certain investments. [*Id.* at 7–8]. The parties terminated ACP prior to the petition date. [*Id.* at 8]. Also prior to the petition date, the Fund retained ARP to help monetize assets and pursue or defend certain legal proceedings. [*Id.*]

Varga further declared that the Debtors faced liquidity concerns based on the inability to collect on certain loans and litigation stemming from those loans. [*Id.* at 9]. Another factor was that ACP, through Molner, had brought a "multitude of litigation" on behalf of the Debtors or caused the Debtors to appear as defendants, which resulted in substantial litigation expenses. [*Id.* at 10–18].

From Molner's perspective, the filing of the Chapter 11 petition came as an unwelcome surprise. [*See* AP ECF No. 6-1 at 11]. He also alleged that it precipitated his termination from the Fund:

> At the moment the filing was submitted, Molner went from being the leader of a carefully thought through Voluntary Liquidation Plan strategically limited to the Cayman Islands (as well as a plan that investors were supportive of and which Molner believed would maximize the return to creditors), to being the obsolete and vulnerable manager of a bankrupt entity. After the bankruptcy filing, Plaintiff was thrown to the dogs. He was fired, ousted, sued, and deprived of all the financial and reputational benefits the Defendants promised him.

[*Id.*] Specifically, in October 2014, the Debtors moved under 11 U.S.C. § 365(a) to reject an executory contract between the Debtors and ARP, which they argued the business no longer

needed.  [Bankr. ECF No. 127 at 1–3].  The Court authorized the agreement's rejection.  [Bankr. ECF No. 217].

Molner, ACP, and ARP—with Molner acting on ACP and ARP's behalf— separately filed proofs of claim during the Aramid Bankruptcy.  [*See* Claims Register Nos. 41, 42, 44]; [Bankr. ECF No. 521].  The Debtors objected to all three claims.  [Bankr. ECF Nos. 521 (Molner), 522 (ACP), 523 (ARP)].  As to Molner's claim, the Debtors argued, *inter alia*, that Molner engaged in misconduct that was not indemnifiable:

> Indeed, the numerous Molner Litigations referred to in the Molner Claims are directly related to, if not the product of, Molner's misconduct, including, but not limited to breaching his obligations owed to the Debtors under the ACP Services Agreement and the ARP Services Agreement, managing the Debtors in a manner inconsistent with their investment guidelines and objectives, aiding and abetting breaches of fiduciary duties by the Debtors' former services providers, taking improper and exorbitant fees from the Debtors without conferring corresponding value to the Debtors, and setting the Debtors upon a course of hopeless and, ultimately, liability-generating litigations.   Indeed, Molner's misconduct and stewardship was a substantial contributing factor in the Debtors' Chapter 11 cases.

[Bankr. ECF No. 521. at 9–10].

In February 2016, while these three Molner-related claims remained pending, the Court confirmed the Debtors' Modified First Amended Joint Liquidating Plan of Reorganization (the "**Plan**").  [Bankr. ECF No. 710 (the "**Confirmation Order**"); *see* Bankr. ECF No. 667 (the Plan)].  The Plan provided for the establishment of a Distribution Trust to resolve all disputed claims and interests of the estate.  [Bankr. ECF No. 667 at 23–26].  The Plan also contained exculpation provisions for "released parties" that protected them from liability for any act taken or omitted in connection with the Debtors' post-petition activity.  [*Id.* at 32].   The Confirmation Order determined, *inter alia*, that the Debtors proposed the Plan in good faith.  [Bankr. ECF No. 710 at 4].  It also identified three defendants in Molner's current lawsuit—Varga, Shakespeare, and Reed Smith—as released parties [*id.* at 62]; provided for the appointment and compensation of Varga

and Shakespeare as Distribution Trustees [*id.* at 5, 11]; and approved the Distribution Trust Agreement, which indemnified Varga, Shakespeare, and Reed Smith [*id.* at 5, 10–11; *see* Bankr. ECF No. 667-1 at 3 (defining indemnified parties)].

Also in February 2016, the Debtors commenced an adversary proceeding against, *inter alia*, Molner and ACP (the "**Recoupment Proceeding**"), seeking to recoup $150.5 million in losses they allegedly incurred as a result of litigation fees and transactions caused by Molner's alleged misconduct.   [Bankr. S.D.N.Y. 16-ap-1025 ("**Recoupment ECF**") No. 1.]   In the Recoupment Proceeding, the Debtors raised claims for breach of fiduciary duty, gross negligence, and unjust enrichment.  [*Id.* at 70–76].  In May 2016, the parties consented to proceed to arbitration before the London Court of International Arbitration.   [Recoupment ECF No. 16].   Under that agreement, the Debtors consented to withdraw the Recoupment Proceeding, and the parties held in abeyance any decision on the Molner Claims in the Aramid Bankruptcy pending the final resolution of the arbitration.  [*Id.*]

In May 2020, the parties submitted a consent order that expunged, with prejudice, the Molner and ACP claims against the Aramid Bankruptcy estate (the "**Expungement Order**").  [*See* Bankr. ECF No. 1018].  The Court entered the Expungement Order.  [Bankr. ECF No. 1020].

### C.  The State Court Action, Removal, and Transfer to This Court

Days after the entry of the Expungement Order, Molner brought the State Court Action. *See* Reed Smith's Notice of Removal, containing Molner's state court summons [AP ECF No. 1 at 55 (pdf pag.)].  He filed a summons with notice (the "**Summons**") in New York State Supreme Court, in New York County.  [*Id.*].  He has not filed a complaint.  He named as Defendants Reed Smith, the Individual Lawyer Defendants (McCarroll, Sanders, Gwynne, Mok, and Siev), the Fund's Board members to whom he presented the Voluntary Liquidation Plan (Bree and Hanson), and entities and individuals with whom he worked in preparing the Voluntary Liquidation Plan

(Varga, Shakespeare, Kinetic Partners, Duff & Phelps, Seymour, and DMS).  [*Id.* at 55–56].

Molner alleged in the Summons that, even as he prepared the Voluntary Liquidation Plan, the Defendants executed an alternative plan to oust him from his managerial position in liquidating the Fund and "install themselves as the control persons."  [*Id.* at 57, 60].  Molner also alleged the Defendants, in taking control of the Fund's liquidation, enriched themselves at the expense of Molner and the Fund's shareholders.  [*Id.* at 60–61].  He further alleged that he brought the State Court Action "exclusively in regard to [the Defendants'] pre-petition conduct."  [*Id.* at 61].

Also in the Summons, Molner characterized his claims in the State Court Action as follows:

> Plaintiff's causes of action against all Defendants include fraud, fraudulent concealment, constructive fraud, breach of confidence, unjust enrichment, aiding and abetting fraud, and aiding and abetting breach of fiduciary duty.  Plaintiff's additional causes of action against Reed Smith, McCarroll, Sanders, Mok, Gwynne and Siev include breach of fiduciary duty and breach of the written Joint Defense Agreement.  Plaintiff will also seek punitive damages.

[*Id.*].  Molner alleged that both ACP and ARP assigned to him their claims against the Defendants. [*Id.*]

Reed Smith removed the action under 28 U.S.C. §§ 1334(b), 1446 and 1452(a) and Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 9027, to the United States District Court for the Southern District of New York.  [*Id.* at 1; *see* S.D.N.Y. Case No. 20-cv-8760 ("**Removal ECF**")].  Reed Smith asserted that the District Court had jurisdiction over the State Court Action under Section 1334(b) because it arose in and was related to the Aramid Bankruptcy.  [AP ECF No. 1 at 33–35].  Specifically, Reed Smith contended that the court resolving the State Court Action would need to: (a) interpret and enforce the Plan and several bankruptcy court orders; (b) adjudicate whether Molner's claims were barred as a collateral attack on the Plan; (c) determine whether the doctrines of waiver and estoppel precluded Molner's claims; (d) rule on whether the proofs of claim filed by Molner, ACP, and ARP barred the claims raised by Molner here; and (e)

decide whether this Court retained exclusive jurisdiction to adjudicate those claims. [*Id.* at 35–49].

Upon removing the case, Reed Smith also asked the District Court to transfer the action to this Court pursuant to 28 U.S.C. § 157(a) and the Amended Standing Order of Reference. [*Id.*]. The District Court granted the transfer motion. [Removal ECF No. 17]. The transfer order caused the opening of this adversary proceeding. [AP ECF No. 1].

### D. The Pending Motion

Molner now moves for abstention and remand. [AP ECF No. 6]. He argues that this Court does not have either "arising in" or "related to" jurisdiction over the claims asserted in the State Court Action against eleven of the fourteen Defendants, *i.e.*, all of the Defendants with the exception of Reed Smith, Varga, and Shakespeare, [AP ECF No. 6-1 at 12–13]; that the distribution trust's indemnification obligations apply only to the same three defendants, [*id.* at 14]; and that the State Court Action does not concern the Aramid Bankruptcy, but only pre-petition fraudulent conduct, [*id.* at 14–15].

As to abstention, Molner contends that this Court lacks any type of jurisdiction over his claims against eleven of the Defendants, and it has only "related to" jurisdiction over the remaining three (Reed Smith, Varga, and Shakespeare). [*Id.* at 15]. Molner argues that this Court accordingly must abstain from hearing the State Court Action. [*Id.* at 16–23]. He argues that this case meets the standard for mandatory abstention because: (a) the motion is timely; (b) state law claims form the basis of the State Court Action; (c) at most some, but not all, of the claims in the action are "related to" the Aramid Bankruptcy, and none of his claims "arise in" that proceeding or "arise under" the Bankruptcy Code; (d) 28 U.S.C. § 1334 provides Reed Smith's sole basis for federal jurisdiction; (e) he commenced the State Court Action in state court; and (f) the state court can

timely adjudicate the State Court Action.  [*Id.*]

In the alternative, Molner contends that the Court should exercise permissive abstention and order an equitable remand of the action to state court.  [*Id.* at 24–34].  He argues that the "key factors" that courts consider in deciding whether to permissively abstain apply here: (1) the claims are based solely on prepetition conduct; (2) they arise only under state law; and (3) the claims are not core proceedings, and even if they were, they must be adjudicated by an Article III court and jury.  [*Id.* at 25–27].  Molner also argues that twelve "other factors" that courts consider also favor abstention and remand.  [*Id.*]

In opposition, Reed Smith argues that it properly removed the State Court Action because this Court has both "arising in" and "related to" jurisdiction under Section 1334.  [AP ECF No. 12 at 11].  It argues that the Court has arising in jurisdiction because: (1) Molner's claims allege damages that arose during the Aramid Bankruptcy; (2) there is an issue whether waiver, estoppel, and collateral attack doctrines bar Molner's claims; (3) Molner asserts derivative claims that belong to the Debtors' estates; (4) the action requires this Court to interpret and enforce its prior orders, including those regarding professional engagement and compensation and the Plan's release and exculpation provisions; (5) the action presents the question of whether the *Barton* doctrine bars the claims against Reed Smith, Varga, and Shakespeare; (6) the Court must also consider whether quasi-judicial immunity bars the claims against those same three defendants; and (7) defendants Hanson, Bree, and DMS have an indemnity reservation of rights in their proofs of claim that the State Court Action may trigger.  [*Id.* at 11–23].  Reed Smith further argues that Molner effectively conceded related to jurisdiction by not disputing it in his motion.  [*Id.* at 12–13].

Thus, Reed Smith argues both that Molner cannot meet his burden of establishing that

mandatory abstention applies, [*id.* at 24–27], and that neither permissive abstention nor equitable remand apply to this case, [*id.* at 28–40]. Eight additional defendants have joined in Reed Smith's opposition to Molner's abstention and remand motion. [*See* AP ECF Nos. 13 (joinder of defendants Varga, Shakespeare, Kinetic Partners, and Duff & Phelps LLC (the "**Liquidator Defendants**")), 14 (joinder of defendants DMS Governance, Seymour, Hanson, and Bree)].

In reply, Molner argues that it is Reed Smith, and not he, who must establish federal-court jurisdiction over each of the fourteen Defendants. [AP ECF No. 19 at 5]. He also argues that, while the Summons references the Aramid Bankruptcy, it does not depend upon it. [*Id.* at 8]. He argues that the removed claims do not raise issues of waiver, estoppel, or collateral estoppel, and thus, they do not create arising in jurisdiction. [*Id.* at 9–10].

Molner's reply also disputes Reed Smith's arguments for finding arising in jurisdiction as to subsets of his claims, as follows: adjudicating his claims will not require interpreting or enforcing the prior orders on fees or the Plan's release and exculpation provisions, because Molner does not challenge those prior orders and instead limits his claims to prepetition bad acts, [*id.* at 11–14]; his claims do not implicate the *Barton* doctrine, which applies only to court-appointed trustees and other fiduciaries for actions taken in their capacities as such, [*id.* at 14–15]; and, for the same reason, quasi-judicial immunity does not apply, [*id.* at 15–16]. Finally, Molner asserts that even if Hanson, Bree and/or DMS have potential indemnity claims relating to the State Court Action, that does not create arising in jurisdiction, because the potential indemnity claims would have only a conceivable effect on the bankruptcy cases, which is insufficient to create arising in jurisdiction. [*Id.* at 16.]

The Court heard argument on March 10, 2021.

## II.    Discussion

### A.  Jurisdiction

District courts have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  Each district court "may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or related to a case under title 11 shall be referred to the bankruptcy judges for the district."  28 U.S.C. § 157(a).  The United States District Court for this District has done so.  *See* Amended Standing Order of Reference, M10-468 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.).    Further, bankruptcy judges "may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section. . . ."  28 U.S.C. § 157(b).

As this statutory framework makes plain, the statutory term "core proceedings" encompasses both those "arising under title 11" and those "arising in" cases under title 11.  *See Stern v. Marshall*, 564 U.S. 462, 474–75 (2011); *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 674 (Bankr. S.D.N.Y. 2011).  Proceedings arise under title 11 "when the cause of action or substantive right claimed is created by the Bankruptcy Code."  *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. at 674; *In re AOG Ent., Inc.*, 569 B.R. 563, 574 (Bankr. S.D.N.Y. 2017).  Proceedings arise in a bankruptcy action if they "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy."  *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010) (per curiam) (internal quotations marks and brackets omitted); *In re Tronox*, 603 B.R. 712, 719 (Bankr. S.D.N.Y. 2019).  Section 157(b)(2) of title 28 sets forth a non-exclusive list of core proceedings that "provides courts with ready examples of such matters."  *Stern*, 564 U.S. at 476.

Non-core proceedings, meanwhile, encompass "related to" proceedings whose claims do

not arise in a bankruptcy case or arise under the Bankruptcy Code, but whose outcome may have a "conceivable effect" on the bankruptcy case. *See Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011); *Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 225 (Bankr. S.D.N.Y. 2019).

In determining whether jurisdiction is proper over a removed case, the Court "look[s] only to the jurisdictional facts alleged in the Notice[] of Removal." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007).

## B. Legal Standards for a Motion to Abstain and Remand

### 1. Mandatory Abstention

Section 1334(c)(2) of title 28 governs mandatory abstention, and the principles of mandatory abstention apply to a removed action. *See Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 446–47 (2d Cir. 2005). The mandatory abstention doctrine requires federal courts to abstain from hearing non-core bankruptcy matters concerning state law issues in certain circumstances. Specifically:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).

Under this provision, abstention is required if each of six conditions is met: (1) the abstention motion is timely; (2) the action is based on a state law claim; (3) the action is "related to" but does not "arise in" a bankruptcy case or "arise under" the Bankruptcy Code; (4) section 1334 provides the sole basis for federal jurisdiction; (5) an action is commenced in state court; and (6) that action can be "timely adjudicated" in state court. *See N.Y.C. Emps.' Ret. Sys. v. Ebbers*

*(In re WorldCom, Inc. Secs. Litig.)*, 293 B.R. 308, 331 (S.D.N.Y. 2003), *aff'd sub nom. Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86 (2d Cir. 2004); *Renaissance Cosms., Inc. v. Dev. Specialists Inc.*, 277 B.R. 5, 12 (S.D.N.Y. 2002); *In re Dreier*, 438 B.R. 449, 457 (Bankr. S.D.N.Y. 2010).   Under the third factor, core proceedings are deemed to involve "arising in" or "arising under" jurisdiction, such that mandatory abstention does not apply.  *In re Petrie Retail, Inc.*, 304 F.3d 223, 232 (2d Cir. 2002) ("[W]here a matter constitutes a core proceeding, the mandatory abstention provisions of section 1334(c)(2) are inapplicable.").

The party opposing mandatory abstention bears the burden of showing that such abstention is not warranted.  *See In re AOG Ent., Inc.*, 569 B.R. at 573.

### 2.  Permissive Abstention and Equitable Remand

Section 1334(c)(1) governs permissive abstention.  It provides that "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1).  The Court has discretion whether to permissively abstain.  *Hellas Telecomms. (Luxembourg) II SCA v. TPG Cap. Mgmt., L.P. (In re Hellas Telecomms. (Luxembourg) II SCA)*, 535 B.R. 543, 589 n.36 (Bankr. S.D.N.Y. 2015).  Courts typically consider one or more of twelve factors in determining whether to abstain from hearing a proceeding presenting state-law claims on permissive abstention grounds: (1) the effect or lack thereof on the efficient administration of the estate if the Court recommends abstention; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable state law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the jurisdictional basis if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the

feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of the court's docket; (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of non-debtor parties. *In re Tronox*, 603 B.R. at 726 (collecting cases).

Courts assessing possible permissive abstention have considered one or more of these factors, and not necessarily all twelve. *Id.* (citing *In re Cody, Inc.*, 281 B.R. 182, 190 (S.D.N.Y. 2002)). A court thus "need not plod through a discussion of each factor in the laundry lists developed in prior decisions." *In re Tronox*, 603 B.R. at 726 (internal quotation marks omitted).

Because federal courts have an obligation to exercise the jurisdiction properly given to them, "there is a presumption in favor of the exercise of federal jurisdiction and against abstention." *Rahl v. Bande*, 316 B.R. 137, 135 (S.D.N.Y. 2004). And "[t]he movant bears the burden of establishing that permissive abstention is warranted." *In re Residential Cap., LLC*, 515 B.R. 52, 67 (Bankr. S.D.N.Y. 2014).

A court also may remand an action that was removed under section 1334 on any equitable ground. *See* 28 U.S.C. § 1452(b). When deciding whether to equitably remand under section 1452(b), courts consider factors substantially similar to those considered under the section 1334(c)(1) permissive abstention analysis. *Rahl*, 316 B.R. at 135. Frequently considered factors include comity with state courts, prejudice to the involuntarily removed parties, and the potential for duplicative use of judicial resources. *See, e.g.*, *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*, No. 04 Civ. 708 (GEL), 2004 WL 1048239, at *3 (S.D.N.Y. May 7, 2004); *CAMOFI Master LDC v. U.S. Coal Corp.*, 527 B.R. 138, 143 (Bankr. S.D.N.Y. 2015); *In re River Ctr.*

*Holdings, LLC*, 288 B.R. 59, 68 (Bankr. S.D.N.Y. 2003).

### C.  Analysis

 With the limited exception of an argument that a federal preemption doctrine transforms otherwise state-law claims into federal ones, discussed below, there is no dispute that the first, second, or fifth prongs of the mandatory abstention standard are satisfied, because Molner brought state-law claims in state court and promptly moved for abstention and remand upon the case's removal.  The parties dispute whether the third, fourth, and sixth prongs are satisfied.

As to the third prong—whether the action arises in a bankruptcy proceeding such that mandatory abstention does not apply, as opposed to being merely "related to" a bankruptcy proceeding such that mandatory abstention may apply—Reed Smith's notice of removal asserts that both types of jurisdiction exist.  [*See* AP ECF No.1 at 12].  Molner disputes that his action constitutes a core proceeding, and, relatedly, that this Court has "arising in" jurisdiction over his case.

Case law characterizes the scope of core proceedings arising in Title 11 cases as "not entirely clear."  *Baker*, 613 F.3d at 350-51 (citing *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987)); *In re Tronox*, 603 B.R. at 719.  Nevertheless, the term arising in "plainly covers" matters that require the interpretation or enforcement of orders issued during a bankruptcy case, and it "generally covers" core matters.  *In re Tronox*, 603 B.R. at 719 (citing *Mt. McKinley Ins. Co*, 399 F.3d at 447–48).  Another articulation is that a claim arises in a title 11 case where the "gravamen of the proceeding arises in the particular bankruptcy case and would have no existence outside of the bankruptcy."  *Baker v. Simpson*, 413 B.R. 38, 43 (Bankr. S.D.N.Y. 2009); *see Lothian Cassidy, LLC v. Lothian Expl. & Dev. II, L.P.*, 487 B.R. 158, 162 (Bankr. S.D.N.Y. 2013) (observing that common law claims may arise in title 11 where they closely connect to the administration of a bankruptcy).

16

Here, Reed Smith's notice of removal asserts that resolving Plaintiff's claims necessarily will entail, among other things, the interpretation or enforcement of orders issued during Aramid's bankruptcy case. [*See* AP ECF No. 1 at 15, 17–18]. Molner disputes this contention, arguing that he confined his allegations in the State Court Action to pre-petition bad acts of the Defendants so as to avoid overlap with the Aramid Bankruptcy. [AP ECF No. 6-1 at 5]. Defendants in turn contend that despite Molner's effort to do so, his action fails to steer clear of events in the bankruptcy, and that his claims in various ways necessarily implicate the interpretation of several post-petition orders and the proceeding that led to them—for example, this Court's findings in approving fee applications for professional services during the bankruptcy, its approval of the rejection of the professional services agreement under which Molner was compensated, and its findings in its confirmation order that the Plan was proposed in good faith and not for any improper purpose. [AP ECF No. 12 at13–20].

Molner's own court filings belie his attempt to characterize his lawsuit as disconnected from the Aramid Bankruptcy. His Summons—again, he has not yet filed a complaint so the Summons is the best available statement of his claims—reveals that the State Court Action and the Aramid Bankruptcy are inseparably intertwined:

> This bankruptcy filing was simply Defendants' means of taking control out of Plaintiff's hands and into their own. With the stroke of a pen, Defendants sidelined the voluntary liquidation Plaintiff had been working on (and investors had put their hopes in) and left Plaintiff immediately vulnerable to being fired and sued[—] which Defendants then made good on. Plaintiff never knew about the Chapter 11 filing until McCarroll and Varga called him to inform him about it the next day—June 14, 2014.
>
> In the weeks and months that followed, Defendants worked together against Plaintiff, ensuring that he would lose the income, business opportunities, and other compensation he was entitled to, and instead have to pay millions in fees associated with the bankruptcy filing and related litigation. Plaintiff also suffered years of reputational and emotional harm as he weathered the loss of business, and the sting of the unnecessary bankruptcy itself.

[AP ECF No. 1 at 60–61].

Molner's own description of his claims thus shows that the claims arise in the underlying Aramid Bankruptcy and that events within that bankruptcy are integral to his claims. Molner complains that the bankruptcy itself was "Defendants' means of taking control out of Plaintiff's hands," and caused him to incur fees and reputational harm resulting from the bankruptcy itself. *Id.* Molner places conduct and injuries he complains of as occurring over "the weeks and months that followed" the bankruptcy petition, [AP ECF No. 1 at 60–61]—again, confirming that his claims depend on allegations of post-petition events notwithstanding Molner's emphasis on his allegations of pre-petition preparatory activity. *C.f., e.g.*, *Young v. Williams*, 47 A.D.3d 1084, 1086 (3d Dep't 2008) (elements of fraud claim under New York law include causation and pecuniary loss); *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 640 (S.D.N.Y. 2015) (fraudulent concealment claim requires showing of reliance by and damages to plaintiff); *Levin v. Kitsis*, 82 A.D.3d 1051, 1054 (2d Dep't 2011) (constructive fraud elements include justifiable reliance and damages); *Litvinoff v. Wright*, 150 A.D.3d 714, 715 (2d Dep't 2017) (damages are element of breach of fiduciary duty claim); *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005) (same as to aiding and abetting a breach of fiduciary duty); *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (*"Diesel Props"*) (unjust enrichment claim requires that "defendant was enriched").

Thus, Molner's claims and theories are inseparable from the Aramid Bankruptcy, giving rise to arising in jurisdiction of this Court. *See In re Tronox*, 603 B.R at 721 ("[C]laims that functionally challenge the outcomes of bankruptcy cases, and that question whether orders entered in bankruptcy cases were proper or were instead the result of misconduct, are textbook examples of disputes that implicate the integrity of the bankruptcy process"). Even though the Summons

purports to advance common-law claims that could be brought outside of bankruptcy, those claims so closely involve the administration of the Aramid Bankruptcy, and at least in substantial part depend on proof of events that occurred in that proceeding, that they qualify for "arising in" jurisdiction. *See Lothian Cassidy, LLC*, 487 B.R. at 162.

This conclusion is borne out by the Summons's explanation of alleged damages, which clearly arose at least in large part during the bankruptcy. Again, Molner complains that the bankruptcy itself caused him to lose income, most directly by the Court-approved termination of the services contract that led to his compensation [Bankr. ECF No. 217], as well as due to his personal need to incur fees "associated with" the bankruptcy and "related litigation." [AP ECF No. 1 at 60-61].

Beyond the bankruptcy's centrality to the claims here as Molner himself describes them, his contentions also make clear that his claims will require consideration of whether proofs of claim that Molner and parties affiliated with him unsuccessfully advanced in the bankruptcy would bar the State Court Action. As noted by the Defendants, Molner actively participated in the Aramid Bankruptcy on behalf of himself and on behalf of ACP and ARP, and he waited until days after the Expungement Order to bring the State Court Action. [AP ECF No. 12 at 1–2]; *see Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375 (2007) (discussing a bankruptcy court's "broad authority" to "take any action that is necessary or appropriate 'to prevent an abuse of process'"); *In re Kerivan*, No. 09-14581 (AJG), 2010 WL 2472674, at *3 (Bankr. S.D.N.Y. June 15, 2010).

Additional specific aspects of the Aramid Bankruptcy that will be at issue in resolving Molner's claims include Debtors' very decision to restructure in a U.S. bankruptcy proceeding rather than through the strategy that Plaintiff recommended and pursued; the Court-authorized termination of the services agreement through which Plaintiff was compensated [Bankr. ECF No.

217]; and this Court's approval of numerous fee requests for services that the Court necessarily found were reasonable and benefitted the estate, *see* 11 U.S.C. §§ 330–31, Fed. R. Bankr. P. 2016, [Bankr. ECF Nos. 135, 346 (approving retention of Reed Smith and subsequently modifying terms of retention); 136 (order authorizing Debtors to employ and compensate Varga and Shakespeare as joint liquidators); 205, 367, 468, 501, 758, 822 (orders authorizing Debtors' payment of compensation and expenses to Reed Smith)].

Further, this Court's Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Liquidating Plan of Reorganization of the Debtors and Debtors in Possession, dated January 18, 2016, [Bankr. ECF No. 710], made a multitude of findings and conclusions that the Court likely must consider to adjudicate Molner's claims.  These include the finding that "Debtors have proposed the Plan in good faith" and implementing documents "have been negotiated in good faith and at arms' length," [*id.* at 4]; authorizing "the JVLs and the Distribution Trustee" to "take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan" and finding that the "Debtors have exercised reasonable business judgment in determining whether to assume or reject Executory Contracts," [*id.* at 7]; finding that the "Plan has been proposed in good faith" and "was not proposed by any means forbidden by law," that "the appointment or continuation in office of the JVLs . . . is consistent with public policy and the interests of Creditors and Interest holders, as required by section 1129(a)(5)," and that "Debtors and their directors, officers, employees, members, agents, advisors, and Professionals are entitled to the protections of section 1125(e) of the Bankruptcy Code in connection with their respective activities" as specified, and "[a]ll parties have had a full and fair opportunity to litigate all issues raised, or which might have been raised, in any objection to the [Plan], and all such objections (whether formal or informal) have been withdrawn, waived, settled, or fully and fairly litigated,"

[*id.* at 21]; and directing that the "releases and exculpations set forth in [the Plan] are approved and shall be effective," and "are an integral and necessary part of the Plan," and ordering that "all Persons . . . are hereby enjoined from the commencement or prosecution of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action . . . released pursuant to the Plan," [*id.* at 39].

As this survey reveals, any review of Molner's claims would in part require the interpretation of this Court's orders throughout the Aramid Bankruptcy and an assessment of how if at all those orders affect Molner's entitlement to relief here. That analysis may well in turn require consideration of the events and submissions that led to those orders. All these aspects of the Aramid Bankruptcy are integral mechanisms by which the scheme Plaintiff alleges actually was carried out and caused whatever harm (if any) that he can show, and they are indispensable to Molner's damages claims (not to mention to numerous defenses that defendants have identified).[3] Thus, no matter how he characterizes his claims, Molner's state-court proceeding in reality "ar[ose] in" the Aramid Bankruptcy. *See In re Tronox*, 603 B.R. at 721; *Lothian Cassidy, LLC*, 487 B.R. at 162; *cf. In re Petrie Retail, Inc.*, 304 F.3d at 230 ("A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders."); *Chenault v. Gen. Motors LLC*, No. 16-CV-3764 (RA), 2017 WL 698387, at *3 (S.D.N.Y. Feb. 21, 2017) (collecting cases and noting that a bankruptcy court may use an adversary proceeding to enforce a prior order). In fact, Molner's counsel acknowledged during oral argument on the motion that the bankruptcy filing and

---

[3] To the extent Plaintiff's State Court Action complains of shareholders not receiving value while the Defendants took in fees, that claim—which in any event necessarily arises in the bankruptcy— belongs to the Trustee or estate, not to Plaintiff. The established law in this Circuit is that if a party raises a general claim with no particularized injury that any creditor could have brought, then the Trustee is the proper person to assert it. *See In re Tronox Inc.*, 855 F.3d 84, 99 (2d Cir. 2017); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989).

the subsequent contract rejection motion caused his termination from the Fund.  [AP ECF No. 27 at 80].  Molner's counsel also stated that he does not contend as a legal matter that the Court cannot weigh "the potential bankruptcy effects of all of the bankruptcy related issues that Reed Smith described in their papers and in their argument in assessing whether arising in jurisdiction exists here." [*Id.* at 82].  These concessions further establish the close ties between the State Court Action and the bankruptcy.

Another way in which the Summons arises in the Aramid Bankruptcy is that Molner asserts a claim for unjust enrichment, seemingly in connection with his assertion that the Defendants "took control of Aramid's books, records and treasury, and set about looting the assets through their control of the bankruptcy process and the hefty fees they charged." [AP ECF No. 1 at 61].  This claim will require a court to interpret and consider the enforcement of the distribution trust agreement, the Plan, and the Confirmation Order, which provided for the fees of JVLs Varga and Shakespeare.  *See Diesel Props*, *supra* (elements include the "enrichment" on which the claim is based); *Moelis & Co., LLC v. Wilmington Tr. FSB (In re Gen. Growth Props., Inc.*), 460 B.R. 592, 598 (Bankr. S.D.N.Y. 2011) (determining that bankruptcy court had subject matter jurisdiction over a controversy that implicated the enforcement or construction of its confirmation order).  And, as noted by Reed Smith in the notice of removal, Molner controlled ACP, ACP owned 100 percent the Fund's securities, and, thus, the State Court Action requires interpreting the language of the Plan, which released all claims of the Debtor's affiliates.  [Bankr. ECF No. 710 at 54].

Molner repeatedly emphasizes that a number of defendants did not appear in the Aramid Bankruptcy.  [*E.g.*, AP ECF No. 6-1 at 8–10].  But the nature and elements of his claims and the defenses being advanced make clear that the Aramid Bankruptcy is integral to the resolution of his claims, no matter which defendants Molner chose to name, or not to name.

The applicability of "arising in" jurisdiction alone prevents the application of mandatory abstention. *See* 28 U.S.C. § 1334(c)(2) (mandatory abstention applies to matters that are "related to a case under title 11 but not arising under title 11 or arising in a case under title 11"); *In re Petrie Retail, Inc.*, 304 F.3d at 232; *see also In re Tronox*, 603 B.R. at 725 (finding that mandatory abstention rules "plainly do not apply" in case that arises in title 11.)  The Court therefore notes but need not reach one other question presented, which is whether, under the fourth prong of the mandatory abstention test, there exists any basis for federal-court jurisdiction that does not rely on section 1334.

Defendants argue that an independent basis for federal-court jurisdiction exists here by virtue of the "complete preemption" doctrine, which holds that if a claim is completely preempted by a body of federal law, then that complete preemption itself gives rise to federal-court jurisdiction.  [AP ECF No. 12 at 24–27 & n.15].  The complete preemption doctrine provides that some federal statutes "so completely preempt" state law claims "that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64 (1987).  Some courts have considered facially state-law claims that are subject to this type of complete preemption to raise a federal question that is also subject to removal. *See Rodriguez v. Newmark & Co. Real Estate, Inc.,* No. 19-CV-9607 (KMW), 2020 WL 3073259, at *2 (S.D.N.Y. June 10, 2020).

Defendants, however, dedicate just a single footnote in their opposition to the complete preemption issue, backed by just one Second Circuit decision that applied the doctrine in a non-bankruptcy context. *See Arditi v. Lighthouse Int'l*, 676 F.3d 294, 298–99 (2d Cir. 2012).  Reed Smith also did not raise the issue in the notice of removal as is typically required to assert a jurisdictional basis to resist a remand application. *See MTBE*, 488 F.3d at 124.  Because

Defendants did not fully develop this issue and may have failed to properly present it at all, and because the existence of "arising in" jurisdiction here precludes mandatory abstention, the Court need not determine whether this asserted independent basis for federal-court jurisdiction exists.[4]

Finally, Molner has failed to establish grounds for the alternative basis of his motion, namely, his contention that the court should permissively abstain or equitably remand the matter even if mandatory abstention does not apply.  As noted, the Court is not obliged to go through all twelve judicially recognized factors in assessing whether to permissively abstain from hearing the matter, or to assess a possible equitable remand.  *In re Tronox*, 603 B.R. at 726; *Rahl*, 316 B.R. at 135.  Briefly, the second factor—the extent to which state law issues predominate over bankruptcy issues—counsels strongly against permissive abstention or remand, because, as detailed above, this action is inextricably intertwined with the Aramid Bankruptcy and this Court's prior rulings.  Meanwhile, the state-law theories that Molner advances involve well developed areas of law.  Similarly, the sixth permissive abstention factor—the degree of relatedness of the proceeding to the main case—favors keeping the adversary proceeding in bankruptcy court in light of the interrelatedness of Plaintiff's theories with the underlying Aramid Bankruptcy.  The directive of the seventh factor to focus on the substance rather than the form of the pleading at issue makes clear that Molner's drafting choice to assert only state-law theories does not override the substantive centrality of the Aramid Bankruptcy to Molner's claims.  The eighth factor also weighs against remand, because Molner's allegations cast doubt as to whether the Court could sever his purported state law claims from those that arise in bankruptcy.  And Molner's emphasis on the tenth factor, regarding the possible existence of forum shopping, does not help him because he is

---

[4] The Court also need not reach whether the action can be "timely adjudicated" in state court, *see N.Y.S. Emps.' Ret. Sys.*, 293 B.R. at 331, a factor that Defendants question, but one about which they have not presented pertinent or persuasive data.

at least as guilty of forum shopping as Defendants may be.  Molner had notice and an opportunity to be heard in the prior bankruptcy proceeding, and, to the very large extent he chose not to participate in the bankruptcy, that knowing choice and his subsequent effort to engineer a supposedly distinct state-court action can be characterized as forum-shopping.

Even if some other recognized factors are neutral or favor Molner's position, bankruptcy-related issues predominate here, such that it would be inappropriate to permissively abstain from hearing this action.  One factor Molner emphasizes warrants mention, and does not weigh heavily in favor of remand.  Molner seeks a jury trial and, relatedly, he indeed initially filed his action in state court.  But these considerations pale compared to the many reasons for keeping the case in this Court; as Judge Lynch put it in another case, "[u]nder all these circumstances, common sense dictates the conclusion that the Bankruptcy Court is the proper forum for resolving these disputes." *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No 07 Civ. 4634 (GEL), 2007 WL 4323003, at *6 (S.D.N.Y. Dec. 10, 2007); *see also In re Adelphia Commc'ns Corp.*, 285 B.R. 127, 147 (Bankr. S.D.N.Y. 2002) (observing that the right to a jury trial "tilts in favor of remand, but only to a very minor extent").

## CONCLUSION

For the foregoing reasons, Molner's motion is denied.  IT IS SO ORDERED.

Dated: New York, New York
    April 30, 2021

_s/ David S. Jones_
UNITED STATES BANKRUPTCY JUDGE