UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
 In re:

 ARAMID ENTERTAINMENT FUND LIMITED,                Chapter 11

 et al.,                                           Case No. 14-11802 (DSJ)

                          Debtors.
----------------------------------------------------------------X
DAVID MOLNER,

                          Plaintiff,               Adv. Proc. No. 20-01313 (DSJ)

- against –

REED SMITH, LLP, JAMES C. MCCARROLL,
GEOFFREY VARGA, JAMES L. SANDERS,
FRANCISCA MOK, KURT GWYNNE, JORDAN
W. SIEV, DAVID BREE, ROGER HANSON,
DONALD M. SEYMOUR, JESS SHAKESPEARE,
KINETIC PARTNERS, DUFF & PHELPS, LLC
& DMS GOVERNANCE, LTD.,

                          Defendants.
----------------------------------------------------------------X

## DECISION AND ORDER GRANTING MOTIONS TO DISMISS

**APPEARANCES:**

**DAVID MOLNER**
*Plaintiff, Pro se*
New York, NY

**GIBSON, DUNN & CRUTCHER LLP**
*Counsel for Defendants Reed Smith LLP,*
*James C. McCarroll, Francisca Mok,*
*James L. Sanders, Kurt Gwynne and Jordan W. Siev*
333 South Grand Avenue
Los Angeles, CA 90071-3197
By:    Kevin S. Rosen, Esq.

**FOLEY & LARDNER LLP**
*Counsel for Defendants Waystone Governance Ltd.*
*f/k/a DMS Governance, Ltd.,*

*Don M. Seymour and Roger Hanson*
90 Park Ave.
New York, New York 10016
By:    Katherine R. Catanese, Esq.

**SADIS & GOLDBERG LLP**
*Counsel for David Bree*
551 Fifth Avenue, 21st Floor
New York, NY 10176
By:    Jennifer Rossan

**STEPTOE AND JOHNSON LLP**
*Counsel for Defendants Geoffrey*
*Varga, Jess Shakespeare, Kinetic*
*Partners, and Duff & Phelps LLC*
1114 Avenue of the Americas
New York, New York 10036
By:    Chris Paparella, Esq.
       Jeffrey Reisner, Esq.
       Justin Ben-Asher, Esq.
       Evan Goldstick, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

This memorandum opinion and order (this "**Decision**") decides four separate motions to dismiss (together, the "**Motions to Dismiss**" or "**MTDs**") the First Amended Complaint, ECF No. 67 ("**FAC**"), of Plaintiff David Molner ("**Molner**" or "**Plaintiff**"), which asserts that fourteen defendant attorneys, directors, and liquidators orchestrated an elaborate scheme to oust Molner from control of the investment fund he co-founded and to assume control of the fund's liquidation, just as he was preparing to liquidate the fund in a manner he preferred. Molner alleges damages of not less than $300 million.

Molner asserts nine varieties of causes of action: (1) fraud; (2) fraudulent concealment; (3) constructive fraud; (4) breach of confidence; (5) unjust enrichment; (6) aiding and abetting fraud; (7) breach of fiduciary duty; (8) aiding and abetting breach of fiduciary duty; and (9) breach of

contract. These claims and the defendants subject to each are summarized in chart form below. *See infra* p. 6.

Defendants Reed Smith, LLP ("**Reed Smith**"), James C. McCarroll ("**McCarroll**"), James D. Sanders ("**Sanders**"), Francisca Mok ("**Mok**"), Kurt Gwynne ("**Gwynne**"), Jordan W. Siev ("**Siev**"), (together, the "**Reed Smith Defendants**," and McCarroll, Sanders, Mok, Gwynne, and Siev, collectively referred to herein as the "**Individual Reed Smith Defendants**") filed motions to dismiss the claims asserted against them pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012(b).[1]

Other defendants – David Bree ("**Bree**"), Roger Hanson ("**Hanson**"), Donald M. Seymour ("**Seymour**"), and Waystone Governance Ltd. f/k/a DMS Governance Ltd. ("**DMS**")[2] (Bree, Hanson, Seymour and DMS collectively referred to herein as the "**DMS Defendants**")—each filed a motion to dismiss the claims against them under Fed. R. Civ. P. 12(b)(2), (4), (5) and (6).[3] In addition to raising service, time bar, and personal jurisdiction arguments, the DMS Defendants join the Reed Smith Defendants' motion to dismiss and adopt the arguments made therein.[4]

Defendants Geoffrey Varga ("**Varga**"), Jess Shakespeare ("**Shakespeare**") (together, "**JVLs**"), Kinetic Partners, Ltd. ("**Kinetic**"), and Duff & Phelps, LLC ("**Duff & Phelps**") (Varga, Shakespeare, Kinetic and Duff & Phelps collectively referred to herein as the "**Liquidator Defendants**") join the Reed Smith Defendants' motion to dismiss the FAC and adopt and

---

[1] *See* Reed Smith LLP's Memorandum of Law in Support of the Reed Smith Defendants' Motion to Dismiss, ECF No. 73 ("**Reed Smith Mem.**"); The Individual Reed Smith Defendants' Memorandum of Law in Support of the Reed Smith Defendants' Motion to Dismiss, ECF No. 74 ("**Indiv. Reed Smith Defs.' Mem.**").

[2] The DMS Defendants note that Defendant DMS Governance Ltd. is a Cayman Islands entity and is now known as Waystone Governance LTD. *See* DMS Defendants' Memorandum of Law in Support of Motion to Dismiss ("**DMS Defs.' Mem.**") 1 n.1, ECF No. 79-2. For ease of reference, the Court will refer to DMS Governance Ltd. as "DMS."

[3] *See* DMS Defs.' Mem**.**

[4] *See* Joinder to Reed Smith Defendants' Memorandum of Law in Support of the Reed Smith Defendants' Motion to Dismiss by Defendants Waystone Governance Ltd., f/k/a DMS Governance, Ltd., Don M. Seymour, Roger Hanson and David Bree, ECF No. 80.

incorporate by reference briefs and other papers submitted by the Reed Smith Defendants in support of their motion.[5]

Molner filed lengthy oppositions[6] to which defendants[7] have replied.[8] Subsequent to the Motions and in support of his opposition, Molner submitted an Affidavit ("**Molner Aff.**" or "**Molner Affidavit**"), intended to amend and supplement the facts alleged in the FAC and in response to the Motions to Dismiss. Molner Aff. Ex. A ¶ 9, ECF No. 82. The Court heard oral argument on December 14, 2023, and took the matter under advisement.

For the reasons detailed below, not all of which apply to each Defendant, the Court grants the Motions to Dismiss. By way of incomplete preview, Molner's claims are preempted by federal bankruptcy law because all of his allegations could and should have been raised under the Bankruptcy Code during the long-running bankruptcy case, in the course of which this Court made repeated findings that the case was brought in good faith, that many of the Defendants were conflict-free and eligible to be retained by the estate and compensated for their efforts, and that the confirmed plan of liquidation was a good-faith proposal that was in the best interest of creditors and the estate. In addition, Molner fails to sufficiently allege at least one element of each of his causes of action, notably including the scienter element that is required to state a fraud claim.

---

[5] *See* Liquidator Defendants' Memorandum of Law in Support of Their Motion to Dismiss the First Amended Complaint, ECF No. 77-1 ("**Liq. Defs.' Mem.**").

[6] *See* Memorandum of Law in Opposition to the [Reed Smith] Defendants' Motion to Dismiss, ECF No. 82 ("**Pl. Opp'n to Reed Smith MTD**"); Memorandum of Law in Opposition to the DMS Defendants' Motion to Dismiss, ECF No. 84 ("**Pl. Opp'n to DMS Defs.' MTD**"); Memorandum of Law in Opposition to Liquidator Defendants' Motion to Dismiss, ECF No. 83 ("**Pl. Opp'n to Liq. Defs.' MTD**").

[7] Unless otherwise defined, this Decision will hereinafter refer to the defendants collectively as "**Defendants**."

[8] *See* the Reed Smith Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss, ECF No. 89 ("**Reed Smith Reply**"); Liquidator Defendants' Reply Memorandum of Law in Support of Motion to Dismiss First Amended Complaint, ECF No. 91 ("**Liq. Defs.' Reply**"); DMS Defendants' Amended Reply in Further Support of Motion to Dismiss, ECF No. 96 ("**DMS Defs.' Am. Reply**"); and Joinder to Reed Smith Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss by Defendants Waystone Governance Ltd., F/K/A/ DMS Governance, Ltd., Don M. Seymour, Roger Hanson, and David Bree, ECF No. 94.

Further, because the Court has afforded Molner extensive opportunities to amend his complaint and because the Court has considered his supplemental submissions which function as an unauthorized attempt to further amend Molner's complaint in light of defendants' arguments for dismissal, the complaint's dismissal is with prejudice and without leave to further amend the complaint.

## JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding and the Motions to Dismiss under 28 U.S.C. §§ 157(a)–(b) and 1334(b), the Amended Standing Order of Reference, dated January 31, 2012, and the reservation of jurisdiction in the Plan and Confirmation Order. *See In re Aramid Ent. Fund Ltd.*, No. 14-11802 (Bankr. S.D.N.Y. June 13, 2014) (the "**Main Case**") Modified First Am. Plan of Reorganization (the "**Plan**") Article VIII "Retention of Jurisdiction," ECF No. 667; Order Confirming First Am. Plan of Reorganization (the "**Confirmation Order**") ¶ 50, ECF No. 710.

## FACTUAL BACKGROUND

### A. Procedural History

The Court assumes familiarity with the procedural history of this case, including the Court's previous decision in this proceeding denying a motion for remand, *In re Aramid Ent. Fund, LLC*, 628 B.R. 584 (Bankr. S.D.N.Y. 2021), and the factual discussion therein. Nevertheless, this Decision extensively discusses background that is pertinent to the issues raised by the Motions to Dismiss.

Molner initiated this action by the filing of a summons with notice ("**Summons with Notice**") on June 11, 2020, in the Supreme Court of the State of New York, County of New York. Ex. 2, ECF No. 1-1. The Summons with Notice was not accompanied by a pleading styled as a

5

complaint. On October 20, 2020, Reed Smith removed the action from the Supreme Court of the

State of New York, County of New York to the United States District Court, Southern District of

New York, based on a claim of federal question jurisdiction. *See* Notice of Removal, ECF No. 1.

The action was referred to this Court on November 5, 2020. Molner, who at the time was

represented by counsel, moved for remand based on the doctrines of mandatory or permissive

abstention. Mot. to Abstain or Remand, ECF No. 6. On April 30, 2021, the Court denied Molner's

motion for abstention and remand. *See* 628 B.R. 584.

Following extended inactivity in the case, the Court entered an order to show cause and

notice of possible dismissal. Order to Show Cause, ECF No. 38. Molner responded that he wished

to pursue the case, and the Court established a deadline for Plaintiff to file a complaint. Mem.

Endorsed Order, ECF No. 40. On May 4, 2023, Molner filed a complaint (the "**Complaint**")

against the Defendants in the above-captioned adversary proceeding. ECF No. 42.

The Court conducted a status conference on May 23, 2023, at which the Defendants stated

that they intended to move to dismiss the Complaint. In order to afford Molner a chance to attempt

to cure perceived deficiencies in his case, the Court entered a scheduling order that required the

Defendants to serve letters upon Molner previewing their arguments for dismissal; the order set

related deadlines. Sched. Order, May 26, 2023, ECF No. 50. Following service of the Defendants'

letters and Molner's response indicating that he wished to amend the Complaint, the Court entered

a subsequent scheduling order. *See* Letter, June 15, 2023, ECF No. 57; Sched. Order, July 6, 2023,

ECF No. 63. Molner then filed the FAC on September 18, 2023.[9] The Motions to Dismiss

followed.

---

[9] Molner filed the FAC seven days late. On September 21, 2023, the Court entered a stipulation filed by the parties
permitting the late filed FAC and revising the briefing schedule. *See* Stip., Sept. 21, 2023, ECF No. 70.

**B.  The Causes of Action**

The FAC asserts the following types of claims against the Defendants indicated:

| Count | Claim | Defendant(s) | FAC ¶ |
|---|---|---|---|
| I | Fraud | All Defendants | ¶¶ 288–303 |
| II | Fraudulent Concealment | All Defendants | ¶¶ 304–316 |
| III | Constructive Fraud | All Defendants | ¶¶ 317–332 |
| IV | Breach of Confidence | All Defendants | ¶¶ 333–339 |
| V | Unjust Enrichment | Reed Smith<br>James C. McCarroll<br>Francisca Mok<br>James L. Sanders<br>Kurt Gwynne<br>Jordan W. Siev<br>Duff & Phelps<br>Kinetic Partners<br>Geoffrey Varga<br>Jess Shakespeare | ¶¶ 340–345 |
| VI | Aiding and Abetting Fraud | All Defendants | ¶¶ 346–355 |
| VII | Breach of Fiduciary Duty | Reed Smith<br>James C. McCarroll<br>Francisca Mok<br>James L. Sanders<br>Kurt Gwynne<br>Jordan W. Siev<br>DMS Governance Ltd.<br>David Bree<br>Roger Hanson<br>Donald M. Seymour | ¶¶ 356–367 |
| VIII | Aiding and Abetting Breach of Fiduciary Duty | All Defendants | ¶¶ 368–373 |
| IX | Breach of Contract | Reed Smith<br>James C. McCarroll<br>Francisca Mok<br>James L. Sanders<br>Kurt Gwynne<br>Jordan W. Siev<br>David Bree<br>Roger Hanson | ¶¶ 374–383 |

## C.  The Factual Allegations of the Complaint

Unless otherwise noted, the facts herein are drawn from the FAC and Molner Affidavit which, aside from any conclusory allegations or legal conclusions couched as factual allegations, are accepted as true for purposes of the Motions to Dismiss before the Court. *See In re Tops Holding II Corp.*, 646 B.R. 617, 637 n.1 (Bankr. S.D.N.Y. 2022) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). This Decision also follows the requirement that a court must liberally construe the complaint where a plaintiff proceeds pro se and "interpret [it] to raise the strongest arguments that [it] suggest[s]." *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (internal quotation marks and citations omitted). The Court also considers the exhibits attached to the FAC to the extent they are consistent with allegations in the Complaint. *See Pearson v. Walden Univ.*, 144 F. Supp. 3d 503, 508 (S.D.N.Y. 2015) (internal quotation marks and citation omitted) ("[I]n deciding a motion to dismiss a pro se complaint, it is appropriate to consider 'materials outside the complaint to the extent that they are consistent with the allegations in the complaint.'"). Because Molner is proceeding pro se and thus is entitled to have his complaint liberally construed, the Court treats the factual allegations in the Molner Affidavit as an amendment to the FAC. *Id.* (citing *Walker v. Schult*, 17 F.3d 119, 122 n.1 (2d Cir. 2013)).

### 1.  Aramid Entertainment Fund and Aramid Capital Partners

Molner was a co-founder and the controlling shareholder of Aramid Entertainment Fund, Ltd. ("**AEF**" or the "**Fund**"), which was formed in 2006 to provide loans and occasionally equity investments to a variety of counterparties in the motion picture industry. FAC 2, ¶ 3; ¶ 35.[10] AEF was a Cayman Islands exempt company. FAC ¶ 35 n.3. AEF had both individual and institutional

---

[10] Paragraphs 1–11 of Molner's complaint span pages 2–4. On page 4, Molner starts again with paragraph 1. The Court will refer to the applicable page and paragraph number when citing to pages that have duplicative numbering. Additional references to page numbers in this Decision will be to the page number on the original document rather than the ECF-numbered page.

investors. FAC ¶ 35. At all times relevant to the FAC, AEF had four directors: Thomas B. McGrath, Timothy P. Levy, Roger Hanson and David Bree. FAC ¶¶ 38–42. By the terms of its charter, only the directors of AEF (or its voting shareholder) could make decisions that legally bound the Fund. FAC ¶ 43.

Aramid Capital Partners LLP ("**ACP**") was the advisory entity that identified, diligenced, negotiated and administered AEF's loans and investments. FAC ¶ 36. From 2007 through early June 2014, Molner was the chairman and controlling shareholder of ACP. FAC ¶¶ 4, 45. ACP had the exclusive role of finding and overseeing transactions, while only AEF could approve them. FAC ¶ 36. ACP was the sole voting shareholder of AEF in that it controlled one hundred percent of AEF's voting shares. FAC ¶ 37. ACP authorized the appointment of the AEF directors and ACP also had the power to remove AEF's directors. FAC ¶ 37.

### 2. The Years of Litigation

The biggest concentration risk in the AEF portfolio was a series of loans to borrowers that were ultimately owned or controlled by a company called R2D2, LLC. FAC ¶ 47. The principals of R2D2 were David Bergstein ("**Bergstein**") and Ronald L. Tutor ("**Tutor**"). FAC ¶ 48. As of mid-2009, AEF had nine (9) separate unpaid loans to R2D2-controlled entities, representing approximately $52 million in aggregate principal exposure to AEF. FAC ¶ 49. After months of unsuccessful attempts to restructure the R2D2 loans, the Fund filed a number of civil lawsuits in multiple jurisdictions to enforce its asserted rights. FAC ¶ 50. By the end of 2009, in the wake of the global financial crisis, AEF's directors decided to suspend the rights of AEF shareholders to redeem their shares on the terms stated in the Fund's offering memorandum and subscription agreements. FAC 3, ¶ 8; ¶ 51. This meant that shareholders could not redeem their shares for their then-current value and that the Fund could not accept any new money. FAC ¶ 51. In the years that

followed, the Fund faced constant pressure from its shareholders to lift the suspension. FAC 3, ¶ 9.

In March 2010, AEF simultaneously filed five involuntary bankruptcy petitions in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, against the five major holdings companies owned or controlled by Bergstein and Tutor. FAC ¶ 52. On or around November 2010, the judge overseeing the California bankruptcy cases entered orders for relief against all five companies and appointed a chapter 11 trustee. FAC ¶ 53.

### a.   The Wimbledon Lawsuit

Bergstein and Tutor aggressively defended against AEF's litigation efforts. FAC ¶ 57. In early September 2010, an AEF investor called Wimbledon Financing Master Fund III SPC (the "**Wimbledon Fund**") filed suit in Los Angeles Superior Court against ACP, AEF and various of their control persons, including Molner, alleging a range of misconduct (the "**Wimbledon Lawsuit**"). FAC ¶ 58. The Wimbledon lawsuit was withdrawn in November 2010. FAC ¶ 62. Notwithstanding the lawsuit's withdrawal, AEF's directors continued to field questions from AEF shareholders as to whether the Wimbledon allegations had any merit. FAC ¶ 63. For this reason, Bree recommended that AEF hire Reed Smith LLP to conduct a full-scale internal investigation into the allegations made in the Wimbledon Lawsuit (the "**Wimbledon Inquiry**"). FAC ¶ 64.

### b.   AEF's Engagement of Reed Smith LLP

AEF engaged Reed Smith LLP and was responsible for paying the firm's fees. FAC 6, ¶ 10; ¶ 66. Reed Smith lawyers McCarroll, Sanders and Mok conducted the Wimbledon Inquiry. FAC ¶ 65. In October 2010, AEF, ACP and Reed Smith entered into a Common Interest and Confidentiality Agreement (the "**CICA**"). FAC Ex. C, ¶ 67-2. The CICA was entered between and among (a) the committee of non-management-affiliated Directors of AEF (including Bree and

Hanson); (b) Molner; (c) Screen Capital International, Inc.; and (d) ACP. FAC Ex. C. Relevant signatories to the CICA were Molner, in his individual capacity and on behalf of Screen Capital International Corp. (a part owner of ACP that Molner controlled), and Bree and Hanson together as Directors of AEF. *Id.* at 1. The CICA enabled the directors of AEF, the members and employees of ACP and their various legal advisors to share sensitive information with one another while protecting against broader disclosures. FAC ¶ 67. The Wimbledon Inquiry lasted about three months. FAC ¶ 69. In December 2010, Reed Smith summarized its findings in a written report that exonerated Molner and ACP (the "**Wimbledon Report**"). FAC ¶ 69. Molner was never given a copy of the Wimbledon Report. FAC ¶ 69. In January 2011, Reed Smith presented its substantive findings to a gathering of AEF shareholders in London. FAC ¶ 70.

After they completed the Wimbledon Inquiry, attorneys from Reed Smith remained involved in the affairs of ACP and AEF for the next four and a half years. FAC ¶ 73. Following the Wimbledon Inquiry, McCarroll socialized with Molner on several occasions and made various business introductions. FAC ¶¶ 79–87. By the beginning of 2014, the affairs and interests of AEF were "deeply intertwined" with those of ACP. FAC 6, ¶ 10. Molner alleges that the more the Reed Smith attorneys learned about the complex relationship between AEF and ACP, courtesy of the CICA, the more the firm actively expanded the scope of its role as counsel to AEF. FAC 6, ¶ 10. During this time, "through the misuse of [the CICA], McCarroll and the other Defendants became privy to the most intimate details of [Molner] and [AEF], as well as their operations and vulnerabilities. McCarroll and the other Reed Smith Defendants gathered and kept close track of this information, in order to use it to their advantage in luring [Molner] into a classic bait-and-switch." FAC ¶ 15.

11

### c.   The "Molner Plan"

By January 2014, the cost of protracted litigation with Bergstein and Tutor posed a material risk to AEF. FAC ¶¶ 55–56. During a January 6, 2014, teleconference (the "**January 6 Call**"), Molner presented a plan to AEF's directors and advisors that he believed would end years of costly, complex litigation and clear the way for an orderly liquidation of AEF's assets, which in turn would allow for the return of capital to its shareholders. FAC 2, ¶ 5 (termed the "**Molner Plan**"). The January 6 Call's participants included Molner, all four directors of AEF, and Reed Smith attorneys McCarroll, Mok and Sanders. FAC 6, ¶¶ 9–10. The Molner Plan called for putting AEF into voluntary liquidation under Cayman law. FAC 3, ¶ 6. Molner's original intent was to pursue the voluntary liquidation alone using the resources of the companies he controlled. FAC 3, ¶ 6.

In presenting the Molner Plan to AEF's directors, Molner alleges that he gave them a "clear choice: (i) they could choose the Molner Plan, which [Molner] would manage and control or (ii) [Molner] would resign and the Fund would be free to implement [Molner's] detailed strategy (or any other strategy) without him." FAC 3, ¶ 7. The Molner Plan had three elements: (i) Molner was to be solely in charge; (ii) the liquidation of AEF was to occur in the Cayman Islands; and (iii) a U.S. bankruptcy filing of any kind was explicitly ruled out. FAC 3, ¶ 10. If AEF's directors chose to support the Molner Plan, however, it would mean the end of their jobs as well as those of AEF's advisors. FAC 3, ¶ 11. Molner told the January 6 Call participants that if AEF were to move forward with the Molner Plan, he alone would make the final decisions as to whom he worked with and that he intended to limit expenses to the greatest extent possible. FAC 3, ¶ 11.

### d.   The "Big Lie"

On the January 6 Call, Director Hanson asked "which Cayman-based insolvency practitioner would be involved." FAC 4, ¶ 1. Director Bree responded that "it was a must." *Id.*

McCarroll concurred that involving a Cayman insolvency practitioner was a legal requirement and offered to make some recommendations. *Id*. The Molner Affidavit amends the FAC and alleges that Bree and Hanson first told the "lie" during the January 6 Call, and McCarroll repeated the lie at a meeting on or about January 15. *See id.*, Molner Aff. ¶ 140. According to Molner, Bree's statement was a lie because "[a] director or officer of a company can act as the voluntary liquidator. Anyone can. There are *no* qualifications required, either as to professional background or residency. The only requirements are that the person acting as voluntary liquidator consent to the appointment and certain notices are to be given or published within prescribed time periods." FAC 4, ¶ 1. Molner further alleges that "Hanson, Bree and McCarroll had decades of experience in Cayman-based hedge funds and many years of working closely with [Molner] in a relationship of trust and confidence. They knew that [Molner] would trust their false assertion about the requirements of a voluntary liquidator and they knew that [Molner] would incorporate the participation of a Cayman-based insolvency practitioner into the Molner Plan. Their purpose in making the false representation was to position an individual in the liquidation who could upend the Molner Plan and allow Defendants to profit at [Molner's] expense. Their deception worked." FAC 5, ¶ 5. By assuming control of the liquidation, the Defendants were able to "make tens of millions of dollars in fees that they would never have received had the Molner Plan been implemented." FAC ¶ 293.

AEF's directors unanimously approved the Molner Plan and authorized Molner to undertake the actions necessary to give it legal effect. FAC 5, ¶ 6. That process continued until May 2014. *Id.* Molner claims that McCarroll, Mok and Sanders indicated their support for the Molner Plan "but their support was insincere and they were, in fact, already working to defeat the Molner Plan, because it would otherwise spell the end of one of their highest paying engagements."

FAC 5, ¶ 7. Molner further claims that "as soon as they could, Defendants threw [Molner] overboard, after months of his hard work, financial expenditure and reputational investment." FAC 5, ¶ 8.

### e. AEF's Engagement of Kinetic, a Cayman-Based Insolvency Firm

On January 15, 2014, McCarroll, who was a Reed Smith attorney, met with Molner in McCarroll's office in New York and urged him to engage Geoffrey Varga of Kinetic Partners as the purportedly required Cayman-based licensed insolvency practitioner. FAC ¶¶ 12, 14. McCarroll told Molner that the requirement had to do with "standing" and that absent such a practitioner the Cayman court would not even consider AEF's application. FAC ¶ 13. McCarroll insisted that Varga was the ideal candidate because Varga could not only be trusted, but that he could be "controlled" and was "in the family." FAC ¶¶ 14, 98. At the time, Molner had no reason to doubt McCarroll. FAC ¶ 13. Molner alleges that "McCarroll and Varga's true intention was to position Varga 'on the inside' in order to scuttle the Molner Plan altogether, as soon as Varga had legal standing to do so. All they needed to do was continue to deceive [Molner] into actually engaging Varga, Varga's partner Jess Shakespeare and his Firm (Kinetic)." FAC ¶¶ 14, 100. Molner selected Kinetic, and Varga specifically, as voluntary liquidator. FAC ¶¶ 16, 18.

Between mid-February and mid-May 2014, Molner worked with AEF's Cayman counsel to restructure AEF as well as with Varga and Kinetic to negotiate and draft the agreements necessary for their limited participation. FAC ¶ 112. Reed Smith, specifically McCarroll, played a central role in advising Molner throughout the complicated process of bringing the various parts of the Molner Plan together into a set of signature-ready documents. FAC ¶ 112. Throughout this process, Reed Smith continued to bill AEF tens of thousands of dollars per month. FAC ¶ 112. Molner trusted Reed Smith after their many years of working together and McCarroll's many acts

of seeming friendship such that Molner believed McCarroll was genuinely acting to advance the Molner Plan. FAC ¶ 114.

In March 2014, the Molner Plan was presented to AEF's shareholders, who overwhelmingly supported it. FAC ¶¶ 18–19. In May 2014, Molner signed a written resolution on behalf of ACP that authorized placing AEF into voluntary liquidation. FAC ¶ 22. Molner alleges that he signed the resolution in reliance on the alleged false representations of McCarroll, Varga, Bree and Hanson that the Molner Plan could not be implemented without the appointment of a Cayman-based insolvency practitioner, that Varga was best suited because he could be trusted and controlled, and that Bree, Hanson, Varga, McCarroll, Sanders and Mok were committed to seeing the Molner Plan through. FAC ¶ 22. But for these allegedly fraudulent representations, Molner asserts he would not have signed the resolution or any other implementing documents, and the liquidation would never have occurred with Varga and Shakespeare as joint voluntary liquidators. FAC ¶¶ 22–23.

### 3.  The Voluntary Liquidation

The voluntary liquidation commenced on May 7, 2014, with the filing of a Declaration of Solvency at the office of the Cayman Registrar. FAC ¶ 24. With the commencement of the voluntary liquidation, the old AEF ceased to exist legally and was replaced by an entity whose name indicated that it was "in voluntary liquidation." FAC ¶ 24. Reed Smith's "cash cow client was no more." FAC ¶ 24.

Molner began to work on a schedule meant to pay AEF's then existing creditors (the "**Vendor Payment Plan**"). FAC ¶ 25. Varga told Molner that he agreed with the Vendor Payment Plan. FAC ¶ 25. Molner asserts that Varga nevertheless "secretly" paid off Reed Smith's then

outstanding invoice of $750,000 so that he could then hire the firm back and position Varga and McCarroll to oust Molner from control of the liquidation. FAC ¶ 26.

## D. The Bankruptcy

On June 13, 2014, AEF, Aramid Liquidating Trust, Ltd. and Aramid Entertainment, Inc. (collectively, the "**Debtors**") filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the Southern District of New York. Molner acknowledges he learned of the bankruptcy filing on June 14, 2014, FAC ¶ 149, and within a week, Molner was among the creditors and interested parties who were served with a Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines, Main Case, ECF No. 15. On the case's first day, Debtors filed applications seeking Court approval to retain Reed Smith as bankruptcy counsel, Main Case, ECF No. 5, and Kinetic as "Crisis Managers" (and Varga and Shakespeare as JVLs), Main Case, ECF No. 6. Both applications included proposed orders seeking findings in connection with the proposed retentions. Main Case, Proposed Order to Retain Reed Smith, ECF No. 5-2; Main Case, Proposed Order to Retain Kinetic, ECF No. 6-2. Following an adjournment of the initially scheduled hearing, on October 3, 2014, the Court granted the Debtors' application to retain and employ Reed Smith as bankruptcy counsel. *See* Main Case, Order Retaining Reed Smith, ECF No. 135. The Reed Smith retention approval order included findings taken verbatim from the text of the proposed order that had been submitted along with the application, ECF No. 5-2, that "Reed Smith represents no interest adverse to the Debtors or to its estate in the matters upon which Reed Smith is to be engaged and Reed Smith is disinterested within the meaning of section 101(14) of the Bankruptcy Code," and that "Reed Smith's employment is necessary and would be in the best interests of the Debtors' estate, its creditors, and other parties in interest." *Id.* ¶¶ 2–3. The Court also granted the Debtors' application following notice, ECF No. 6-2, to employ and compensate Varga and

16

Shakespeare in their capacities as Joint Voluntary Liquidators providing that "[t]he JVLs represent

no interest adverse to the Debtors or to their estates in the matters upon which the JVLs are to be

engaged and the JVLs are disinterested within the meaning of section 101(14) of the Bankruptcy

Code," and that "[t]he JVL's employment is necessary and would be in the best interests of the

Debtors' estates, their creditors, and other parties in interest." Main Case, Order Auth. Debtors to

Employ and Compensate Jt. Liqs. ¶¶ 2–3, ECF No. 136. Molner did not object to either application

or to the requested findings that were set forth in the proposed orders that accompanied each

application.

As the case progressed, Debtors worked to achieve a confirmable plan. In support of such

a plan, on December 15, 2015, Debtors filed a first amended disclosure statement, Main Case, ECF

No. 593 ("**Disclosure Statement**"), that, along with an associated proposed plan, highlighted the

findings necessary for the Court to confirm the Debtors' Plan, including a finding that the Plan

was proposed in good faith. Disclosure Statement § IV.L.3. As with the earlier retention

applications, Molner did not object. Debtors sought plan confirmation and, on February 19, 2016,

again with no objection from Molner, the Court entered the Confirmation Order, explicitly finding

and concluding (as Debtors had requested on notice) that the Debtors proposed their Plan in good

faith. *See* Confirmation Order §§ C, D, VI, XXIV, ¶¶ 44, 57. Molner did not object to the Debtors'

Disclosure Statement or Plan, nor to the entry of the Confirmation Order that included the good-

faith findings.

Although Molner did not object to Debtors' retention applications, did not move to dismiss

the case, and did not eventually oppose the Disclosure Statement or confirmation, Molner and

related parties filed proofs of claim during the bankruptcy, to which Debtors filed objections on

October 30, 2015, months before the Disclosure Statement hearing or confirmation. *See* Main

Case, Motion[s] for Obj. to Claim(s), ECF Nos. 521–22, 524–25. By Consent Order on June 8,

2020, the Court expunged with prejudice proofs of claim that Molner and related entities had filed

in the Debtors' bankruptcy case. Main Case, Consent Order, ECF No. 1020. Three days later,

Molner filed the Summons with Notice in state court. Ex. 2, ECF No. 1.

The FAC asserts causes of action against the Defendants as summarized in chart form

above. *See supra*, at 7. In essence, Molner contends that numerous Defendants, particularly the

Reed Smith firm and many of its attorneys as well as other retained advisors and the Cayman

liquidators, designed and carried out a scheme that divested Molner of control over the liquidation,

cost Molner reputational and financial harm, and enriched many or all Defendants by enabling

them to bill for substantial professional costs that would not have been incurred under the

originally envisioned Molner Plan. The FAC disavows placing post-petition conduct at issue in

this action. FAC ¶ 33.

### E.  Service of Process on the DMS Defendants

The Summons with Notice was delivered to 20 Genesis Close, Grand Cayman, and

received by a woman named "Jennifer" on October 5, 2020. *See* Decl. of Roger Hanson ¶ 19, ECF

No. 79-4 ("**Hanson Decl.**"). DMS did not have an office at the aforementioned address at the time

of service. *Id.* ¶ 20.

Following removal of the state court action to this Court on November 5, 2020, and the

filing of the Complaint on May 4, 2023, the Clerk's Office issued a revised summons and notice

of pre-trial conference on June 14, 2023 (the "**Revised Summons and Complaint**"). ECF No. 56.

On June 14, 2023, the DMS Defendants were personally served with the Revised Summons and

Complaint by an attorney of the Grand Court of the Cayman Islands.[11] *See* Molner Aff. ¶ 153; *see*

---

[11] An individual who identified himself as the managing director of, and authorized signatory for DMS accepted
service for DMS. *See* Molner Aff. Ex. C. The same individual accepted service for Bree. *See id.* As discussed *infra*,

*also* Molner Aff. Ex. C. The FAC was transmitted to counsel for the DMS Defendants electronically through the Court's ECF system on September 19, 2023. *See* FAC, ECF No. 67.

## F.  The Motions to Dismiss

The Reed Smith Defendants[12] argue collectively that the FAC should be dismissed because the claims alleged (1) are preempted because all of Molner's alleged damages arose from the filing of the chapter 11 petition, (2) are barred by waiver, collateral attack, and quasi-judicial immunity, (3) fail to state a claim, and (4) are barred by the *Barton* doctrine. The Individual Reed Smith Defendants largely argue that claims alleged in the FAC fail for lack of particularized allegations about each of the Individual Reed Smith Defendants' participation in or knowledge of the alleged scheme to oust Plaintiff. Rather, they object, the FAC impermissibly groups together the Reed Smith Defendants and the Individual Reed Smith Defendants while raising only general and conclusory allegations. In their separate motion, the Individual Reed Smith Defendants also argue that Plaintiff's claims fail for the same reasons outlined by the Reed Smith Defendants, with specific references to instances where Plaintiff failed to plead with particularity.

The DMS Defendants join the arguments of the Reed Smith Defendants. Further, they argue that the Plaintiff has failed to allege any facts establishing that this Court has personal jurisdiction (general or specific) over the DMS Defendants, all of whom are based in the Cayman Islands. They also argue that the Court lacks jurisdiction over them because Molner did not serve them with either the Summons with Notice or the FAC in accordance with Rule 5 of the Federal

---

Bree's counsel consented to service upon Bree at the DMS offices in the Cayman Islands. *See* Hr'g Tr. 25:4–11, June 28, 2023, ECF No. 61.

[12] Reed Smith filed two memoranda of law in support of their Motion to Dismiss—the Reed Smith Mem. and the Indiv. Reed Smith Defs.' Mem. Their arguments apply to the Reed Smith Defendants as a whole, and certain arguments relate directly to the Individual Reed Smith Defendants. To the extent certain arguments are only applicable to the Individual Reed Smith Defendants, the Court will differentiate where necessary.

Rules of Civil Procedure. The DMS Defendants further contend that Plaintiff's claims against the

DMS Defendants are time-barred by applicable statutes of limitations.

The Liquidator Defendants join the Reed Smith Defendants' Motion to Dismiss the FAC,

while also arguing that the Plaintiff fails to allege fraud by the Liquidator Defendants, fails to

allege misconduct by Defendant Shakespeare, and fails to allege any basis for liability as against

Defendant Duff & Phelps.

Molner's oppositions assert that he has addressed all purported deficiencies by submission

of his Affidavit and his opposition papers. The arguments of parties and the allegations in the FAC

and Affidavit relevant to each argument are more fully described below.[13]

## DISCUSSION

### A.  Legal Standards

Bankruptcy Rule 7012(b) incorporates Federal Rule of Civil Procedure 12(b). Relevant

portions of that rule provide as follows.

### 1.  Federal Rule of Civil Procedure 12(b)(2)

Courts have procedural leeway when deciding a pretrial motion to dismiss for lack of

personal jurisdiction and may "determine the motion on the basis of affidavits alone." *Dorchester*

*Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (citation omitted). If the court

declines to hold an evidentiary hearing and instead to decide the motion to dismiss on the basis of

affidavits alone, "all allegations are to be construed in the light most favorable to the plaintiff and

doubts are to be resolved in the plaintiff's favor[.]" *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d

---

[13] The FAC consists of 87 pages of allegations, exclusive of exhibits. The Molner Affidavit consists of an additional 40 pages, exclusive of exhibits, amending the facts alleged in the FAC. While Molner did a thorough job providing context and information relating to AEF and ACP and his many years of work and efforts related to those entities, many of his allegations are repetitive and, in some instances, not directly related to his claims. Nevertheless, the Court endeavored to consider each of them either directly or by grouping by category.

196, 208 (2d Cir. 2001) (citation omitted). The plaintiff must make a prima facie showing that "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). In making its determination, the court does not "draw argumentative inferences in the plaintiff's favor," nor must the court "accept as true a legal conclusion couched as a factual allegation." *Id.* (internal citations omitted). If the parties submit conflicting affidavits, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary evidence by the moving party." *Id.* (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). "However, conclusory allegations are not enough to establish personal jurisdiction." *CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 380 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).

### 2. Federal Rule of Civil Procedure 12(b)(5)

Rule 12(b)(5) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed for insufficient service of process. In considering a Rule 12(b)(5) motion to dismiss, "a Court must look to matters outside the complaint to determine whether it has jurisdiction." *Darden v. Daimler Chrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002).

"On a Rule 12(b)(5) motion to dismiss, the plaintiff bears the burden of establishing that service was sufficient." *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010). "Upon a finding of insufficient service, the Court may dismiss the case or may, in its discretion, retain the case, quash service, and direct that service be effectuated properly." *Vega v. Hastens Beds, Inc.*, 339 F.R.D. 210, 217 (S.D.N.Y. 2021) (citation omitted).

### 3. Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits a party to seek dismissal of a claim at the pleading stage if it does not state a claim upon which relief can be granted. To survive a motion under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a motion to dismiss under Rule 12(b)(6), the court should "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010) (internal quotation marks and citations omitted).

The Court is to evaluate the sufficiency of a complaint by applying two principles established by the Supreme Court in *Iqbal*. 556 U.S. at 678–79. First, a court may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Courts are not obligated to accept plaintiff's legal conclusions and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" as true. *Id.* at 678. Instead, the Court must identify the elements of the applicable cause of action, and determine whether the complaint states sufficient facts, not legal conclusions, to support it. *Id.* at 679.

Second, the Court must assess whether the factual allegations "plausibly give rise to an entitlement to relief." *Id.* at 679. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Although the complaint need not show a probability of plaintiff's success, "it must evidence more than a mere possibility of a right to relief." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d

Cir. 2013) (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556). Facts that are "'merely consistent' with a defendant's liability" will not satisfy the plausibility requirement. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). In deciding a Rule 12(b)(6) motion, a court may look to the facts alleged in the complaint and also to those "[d]ocuments that are attached to the complaint or incorporated in it by reference[.]" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

Additionally, as noted, where a plaintiff proceeds pro se, a court must liberally construe the complaint and "interpret [it] to raise the strongest arguments that [it] suggest[s]." *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (internal quotation marks and citations omitted). However, the pro se complaint still must state a plausible claim for relief. *See Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (citation omitted). The Court must consider that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks and citation omitted).

### 4.  Federal Rule of Civil Procedure 9(b)

Allegations of fraud also must meet the pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, applicable here pursuant to Bankruptcy Rule 7009. A party must "state with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Assertions of intent must be "supported by facts giving rise to a strong inference of fraudulent intent." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 579 (2d Cir. 2005) (citation omitted). A strong inference of fraudulent intent may be established by alleging facts that show "defendants had both motive and opportunity to commit fraud . . . [or that] constitute 'strong circumstantial evidence of

conscious misbehavior or recklessness.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (citation omitted).

To plead with particularity, a plaintiff ought to allege specific facts to support the claims of fraud, including the time, place, speaker, and sometimes content of the misrepresentations. *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986). Where multiple defendants are asked to respond to allegations of fraud, "group pleading is generally forbidden because each defendant is entitled to know what [they are] accused of doing." *In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. 231, 257 (Bankr. S.D.N.Y. 2008) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). Finally, when fraud is alleged against multiple defendants, a plaintiff cannot "simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b)." *In re Aegean Marine Petroleum Network, Inc.*, 529 F. Supp. 3d 111, 147 (S.D.N.Y. 2021) (citation omitted).

### 5. Choice of Law

Bankruptcy courts generally apply the choice of law principles of the forum state. *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601–02 (2d Cir. 2001) ("[B]ankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."); *see also Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP)*, 673 F.3d 180, 186–88 (2d Cir. 2012). The Court therefore looks to the choice of law rules of New York, the forum state in this case, when it needs to determine what state law should apply.

Under New York's choice-of-law rules, where the parties' briefs assume that a given state's law controls, "such implied consent . . . is sufficient to establish choice of law." *Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) (citation omitted); *see also Loreley Fin. (Jersey) No. 3 Ltd. v.*

*Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) (applying parties' choice of law where neither party objected). By relying on New York law in their briefing and arguments to the Court, the parties have impliedly consented to the application of New York law, which the Court accordingly applies without engaging in a substantive choice-of-law analysis. *See Chartwell RX, LLC v. Inmar, Inc.*, 620 F. Supp. 3d 59, 71 (S.D.N.Y. 2022) (holding that where there was no choice of law dispute as to Plaintiff's claims for fraud, unjust enrichment, tortious interference with a contract, and unfair competition, implied consent was sufficient to establish New York as the applicable law). Here, all parties' briefing applies New York law to Molner's causes of action (notwithstanding that Molner's central allegation in the FAC is that Defendants misstated Cayman law), and no party presents any choice-of-law analysis suggesting that some other state's law should be applied.

## B.  Analysis

This Decision first addresses the DMS Defendants' arguments asserting a failure to serve pursuant to Federal Rule of Civil Procedure 12(b)(5) and a lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The Decision next considers the DMS Defendants' MTD based on an asserted lack of timeliness. As more fully stated below, the Court concludes that Molner effected proper service, that it has personal jurisdiction over the DMS Defendants with the exception of Seymour, and that Molner's claims against the DMS Defendants are not time-barred.

The Decision then turns to whether Molner's claims are barred by federal preemption doctrine and concludes by addressing the Defendants' Motions to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court ultimately concludes that the Motions to Dismiss should be granted pursuant to federal preemption doctrine as an impermissible attempt to assign post-bankruptcy liability to issues that were adjudicated and that

Molner could and should have litigated during the bankruptcy. In the alternative, Molner's claims also are dismissed for failure to state a claim. These two independent grounds for dismissal make it unnecessary for the Decision to resolve in detail the Defendants' remaining arguments concerning application of the *Barton* doctrine, waiver, quasi-judicial immunity, and bars on collateral attack of prior judgments.

### 1.  DMS Defendants' MTD for Failure to Serve Pursuant to Rule 12(b)(5)

The Court concludes that Molner met his burden of showing proper service of the FAC on the DMS Defendants. Thus, the Court denies the DMS Defendant's MTD on the basis of failure to properly serve under Rule 12(b)(5) for the reasons stated below.

### a.  Summary of Parties' Arguments

The DMS Defendants argue that the FAC should be dismissed for failure to serve them with the Summons with Notice and the FAC.[14] *See* DMS Defs.' Mem. 27; DMS Defs.' Am. Reply 13. The DMS Defendants argue that service on them was not proper pursuant to Federal Rule of Civil Procedure 4(h)(2) because Molner did not serve the DMS Defendants pursuant to the Hague Convention's[15] requirement that a plaintiff provide the documents to be served to the designated Hague Convention Central Authority in the Cayman Islands. *See id.* Further, they note that the Summons with Notice was delivered to an address that was neither the home nor business address of any DMS Defendant. *See id.*; *see also* Decl. of David Bree ¶ 10, ECF No. 79-5 ("**Bree Decl.**"); Hanson Decl. ¶ 20. Finally, the DMS Defendants argue that even though Molner did eventually serve the Complaint upon the DMS Defendants, service is still not proper because the DMS

---

[14] The DMS Defendants briefly refer to Federal Rule of Civil Procedure 12(b)(4) in support of their MTD for failure to serve them. DMS Defs.' Mem. 27. Because "an objection under Rule 12(b)(4) concerns the form of process rather than the manner or method of its service," the Court will construe the DMS Defendants' arguments pursuant to Rule 12(b)(5). *See Vega v. Hastens Beds, Inc.*, 339 F.R.D. 210, 216 (S.D.N.Y. 2021) (citation omitted).

[15] *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361 ("**Hague Convention**").

Defendants were never served with the FAC, which they contend is the operative pleading in this case. *See* DMS Defs.' Am. Reply 13. Thus, the DMS Defendants argue that the Court lacks personal jurisdiction over the DMS Defendants because they were never properly served.[16]

Molner contends that service of process upon the DMS Defendants was proper for three reasons: 1) service of the Summons with Notice was properly delivered to the address that DMS maintained for years, 2) any purported defects in service were superseded by his subsequent service by the Cayman counsel that Molner hired to personally serve the DMS Defendants, and 3) the FAC was properly served upon the DMS Defendants electronically (via ECF).[17] *See* Pl. Opp'n to DMS Defs.' MTD ¶¶ 4–6. Molner also argues that he relied on the DMS Defendants' arguably stated or implied consent to the method of service executed for the Complaint on the record during a status conference held on June 28, 2023. *Id.* ¶ 6; *see also* Hr'g Tr. 117:24–25; 118:1–10, Dec. 14, 2023, ECF No. 97.

### b. Applicable Law

When as here a case is removed to federal court after having been commenced in state court, if service of process "has not been perfected prior to removal, or the process served proves to be defective, such process or service may be completed or new process issued pursuant to [the Federal Rules of Bankruptcy Procedure]." Fed. R. Bankr. P. 9027(f); *see also Sander v. Off. of the Comptroller*, No. 15-CV-5879, 2016 U.S. Dist. LEXIS 206782, at *14 (S.D.N.Y. Sept. 29, 2016)

---

[16] The DMS Defendants move to dismiss the FAC for improper service of process upon them pursuant to Federal Rule of Civil Procedure 12(b)(5) and assert that this Court thereby lacks personal jurisdiction over the DMS Defendants. Although "the actual existence of personal jurisdiction should be challenged by a Rule 12(b)(2) motion," *Hastens.*, 339 F.R.D. at 217–18 (citation omitted), courts generally find that the distinction does not impede a merits-based determination. *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1353 (4th ed. 2024).

[17] Molner also argues that the DMS Defendants should have raised any purported defect of the Summons with Notice at the time the Summons with Notice was served and prior to removal. However, removal does not waive later arguments based on service of process. *See Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 157 n.4 (2d Cir. 1996) ("Removal does not waive any Rule 12(b) defenses.").

("Where an action is removed to federal court before the plaintiff accomplishes service of the initial complaint, Rule 4 governs service of process.").

Service on an individual in a foreign country or a foreign corporation in bankruptcy court is governed by Fed. R. Civ. P. 4(f) and (h)(2), made applicable by Fed. R. Bankr. P. 7004, which authorizes service as follows:

> (f) Serving an Individual in a Foreign Country.
>> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.

Fed. R. Civ. P. 4(f) (in relevant part). Service of a corporation outside of the United States is governed by Federal Rule of Civil Procedure 4(h), which authorizes service pursuant to Rule 4(f).

"Rule 5 governs service of pleadings after proper service of the original complaint, and provides that such later pleadings may be served 'by sending [them] to a registered user by filing [them] with the court's electronic filing system.'" *Adams v. City of New York*, No. 21-CV-3956, 2023 WL 2734611, at *3 (E.D.N.Y. Mar. 31, 2023) (alteration in original) (citing Fed. R. Civ. P. 5(b)(2)(E)).

### c. Application

Although the parties have provided little argument or authority regarding the sufficiency of service of process, the Court must address the issue in some detail, focusing on proper service of process upon a foreign defendant under Federal Rule of Civil Procedure 4(f) and the Hague Convention.

Because the DMS Defendants object to the method of service of process on them, Molner bears the burden of showing the adequacy of service. *See George v. Pro. Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 432 (S.D.N.Y. 2016) (citation omitted). However, the DMS Defendants' objection to Molner's service "must be specific and must point out in what manner the plaintiff

has failed to satisfy the requirements of the service provision utilized." *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 312 (S.D.N.Y. 2008) (citations omitted) (denying Rule 12(b)(5) motion to dismiss due to failure to identify specific legal provision or provide supporting affidavit). For the reasons stated below, the Court concludes that Molner met his burden of proving adequate service of process upon the DMS Defendants.

The DMS Defendants argue that Molner did not adequately serve them with the Summons with Notice (or the FAC). However, whether this Court obtained personal jurisdiction over the DMS Defendants turns on the adequacy of Molner's service of the Revised Summons and Complaint, not the earlier state-court Summons with Notice. *See* Fed. R. Bankr. P. 9027(f); *see, e.g.*, 1 Norton Bankruptcy Law and Practice 3d § 7:1 (2024) ("If all defendants have not been served prior to removal, process may be completed in accordance with Part VII of the Bankruptcy Rules."); *Cont'l Indem. Co. v. Bulson Mgmt. LLC*, No. 20-CV-3479, 2022 WL 1747780, at *2 (S.D.N.Y. May 31, 2022) (citation omitted) ("[O]nce a court has obtained personal jurisdiction over a defendant pursuant to service of process, it 'need not be obtained anew each time an amendment of the complaint is served.'"). If the Court finds that service of the Revised Summons and Complaint that this Court issued was proper pursuant to Federal Rule of Civil Procedure 4, then subsequent electronic service of the FAC was proper pursuant to Rule 5. *See Adams*, 2023 WL 2734611, at *3 (alteration in original) (citation omitted) ("Rule 5 governs service of pleadings after proper service of the original complaint, and provides that such later pleadings may be served 'by sending [them] to a registered user by filing [them] with the court's electronic filing system.'"); *Arigna Tech. Ltd. v. Bayerische Motoren Werke AG*, 697 F. Supp. 3d 635, 641 (E.D. Tex. 2023) (finding that service of an amended complaint via the Court's electronic filing system was proper under Rule 5 following effective service under Rule 4).

The DMS Defendants do not provide declarations or legal argument addressing service of process of the Revised Summons with Notice. Instead, they argue summarily that asserted improper service of the Summons with Notice and the FAC cause this Court to lack personal jurisdiction over the DMS Defendants. *See* DMS Defs.' Mem. 28; DMS Defs.' Am. Reply 13–14.

The Court disagrees. Rather, Molner's service of the Revised Summons and Complaint, following removal, complied with Federal Rule of Civil Procedure 4 and the provisions of the Hague Convention. *See* Fed. R. Civ. P. 4(f) and (h); *see also* Fed. R. Bankr. P. 9027(f).

The Cayman Islands (through the United Kingdom) is a signatory to the Hague Convention.[18] *See Baskett v. Autonomous R. LLP*, No. 17-CV-9237, 2018 WL 4757962, at *12 (S.D.N.Y. Sept 28, 2018) (noting that the United Kingdom is a signatory to the Hague Convention). The Hague Convention requires "the designation of a 'Central Authority' of each signatory state through which requests for service of process may be routed[.]" *See Koehler v. Dodwell*, 152 F.3d 304, 307 (4th Cir. 1998) (citation omitted). However, member states are also "free to consent to additional methods of service within their own borders." *Id.* Articles 8 and 10 of the Hague Convention provide for additional methods of service and permit member states to signify whether they object to those methods. *Id.* (citing Hague Convention arts. 8 and 10). Applicable here, Article 10(c) allows "any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials, or other competent persons of the State of destination." *Id.* (citing Hague Convention art. 10(c)). The United Kingdom (on behalf of its member states) expressed a limited objection to paragraph (c) of Article 10 stating that "documents for service through official channels will be accepted in [*inter alia*, the Cayman

---

[18] Hague Conference on Private International Law, United Kingdom – Other Authorities (Art. 18), available at https://www.hcch.net/en/states/authorities/details3/?aid=681 (including the Cayman Islands as a territory of the United Kingdom).

Islands] by the designated authority and only from judicial, consular or diplomatic officers of other

Contracting States." *Id.* (emphasis omitted); *see also Fla. State Bd. of Admin. v. Am. Int'l Grp. (In re Am. Int'l Grp., Inc.)*, 240 F.R.D. 608, 609 (S.D.N.Y. 2007) (citation omitted) ("The United

Kingdom . . . took a very limited reservation with regard to paragraphs (b) and (c) of Article 10[.]").

Molner served the Revised Summons and Complaint on July 4, 2023, through an attorney

of the Grand Court of the Cayman Islands. *See* Molner Aff. Ex. C. Because Molner executed

service through an attorney, rather than through "official channels," the United Kingdom's limited

objection to paragraph (c) of Article 10 is not implicated. *See Koehler*, 152 F.3d at 307 ("[Plaintiff]

forewent 'official channels' by forwarding the papers directly from his attorney to a private process

server[.]"); *see also Am. Int'l Grp.*, 240 F.R.D. at 609 (citation omitted) ("This narrow exception

only applies to documents sent through 'official channels.'"). Therefore, the remaining question

for the Court is whether Molner served the Revised Summons and Complaint in a manner

consistent with Article 10(c) of the Hague Convention, i.e., did Molner "effect service of judicial

documents directly through the judicial officers, officials, or other competent persons of the State

of destination." Hague Convention art. 10(c).

A Cayman Islands public notary notarized Molner's proof of service, and the receiving

DMS Defendants signed a receipt confirming service. *See* Molner Aff. Ex. C. It is possible that

the affiant, as an "attorney-at-law of the Grand Court of the Cayman Islands," may be considered

a "judicial officer" of the Cayman Islands, which is an authorized server of process pursuant to

Article 10(c) of the Hague Convention. *See id.*; *see also* Hague Convention, art. 10(c). Even if the

affiant is not considered a "judicial officer," the Court agrees with the numerous courts that have

addressed service of process in the United Kingdom or territories thereof under the Hague

Convention and have found that service is proper by "other competent person[s]," including

process servers. *See Koehler*, 152 F.3d at 307 (concluding that a private process server in the United Kingdom is a "competent person" under the Hague Convention, which liberally permits even service by mail); *Am. Int'l Grp.*, 240 F.R.D. at 610 (holding that personal service on the defendant by private process server in Bermuda, a territory of the United Kingdom, constitutes a competent person under Rule 10 of the Hague Convention); *Baskett*, 2018 WL 4757962, at *13 (finding that service of foreign process in the UK pursuant to the Hague Convention may be accomplished by a solicitor or process server) (citing cases); *Brown-Thomas v. Hynie*, 367 F. Supp. 3d 452, 464–65 (D.S.C. 2019) (same). Thus, Molner's service of the Revised Summons and Complaint upon the DMS Defendants complies with Federal Rule of Civil Procedure 4(f), and subsequent electronic service of the FAC was proper pursuant to Federal Rule of Civil Procedure 5(b)(2)(E).[19]

Despite the DMS Defendants' protestations, this conclusion comports with notions of fairness and due process. From early in the litigation, Molner was engaged with the DMS Defendants. Molner asserts that he executed service of the Revised Summons and Complaint based upon representations made by the parties at the June 28, 2023 status conference in this case. *See* Pl. Opp'n to DMS Defs.' MTD 4, ¶ 6 ("The DMS Defendants told this Court . . . that service of the original summons would be "mooted" by (i) Plaintiff's hiring (at his expense) counsel in the Cayman Islands to personally meet with the Cayman-based Defendants and effect service . . . which counsel did[.]"); *see also* Hr'g Tr. 28:4–7, June 28, 2023, ECF No. 61 (agreeing to service of Bree at Waystone's office in the Cayman Islands); *id.* at 23:12–13 (stating that service of the

---

[19] The DMS Defendants do not argue that service of process was improper pursuant to any particular provision of the Grand Court Rules of the Cayman Islands, and the Court's own review suggests that service of process upon the DMS Defendants as described herein is not inconsistent with the Grand Court Rules. *See* Cayman Islands Grand Court Rules, Vol. 1 – Orders (rev. 2015), available at https://www.judicial.ky/wp-content/uploads/GrandCourtRules-VolI-Orders_2022-Consolidation.pdf; *see also Koulkina*, 559 F. Supp. 2d at 312 (stating that objection to service must be specific).

Complaint may be mooted by the filing of the FAC). Further, the DMS Defendants conceded that the Complaint was eventually served upon them. *See* DMS Defs.' Am. Reply 13. The DMS Defendants either had actual notice of Molner's claim against them or chose to avoid further communication despite knowing Molner was pursuing claims against them. Either way, the Court cannot credit any claim that the DMS Defendants would be prejudiced by the Court's declining to dismiss on service grounds.

### 2.  Personal Jurisdiction (Rule 12(b)(2)) (The DMS Defendants)

Turning next to personal jurisdiction issues that are raised by some but not all Defendants, for reasons stated below, the Court concludes that it lacks *general* personal jurisdiction but does have *specific* personal jurisdiction over the DMS Defendants, with the exception of DMS Defendant Seymour.

### a.  Summary of Parties' Arguments

The DMS Defendants contend that the Plaintiff has failed to allege any facts establishing that this Court has personal jurisdiction over them. First as to "general personal jurisdiction," the DMS Defendants argue that the FAC fails to allege any facts showing that any DMS Defendant was "at home" in New York. Specifically, they contend that the FAC does not allege that DMS was incorporated in New York or maintained its principal place of business in New York, nor does the FAC show that DMS's contacts with New York were continuous and systematic. *See* DMS Defs.' Mem. 10–12. The DMS Defendants further argue that the Court lacks general jurisdiction over Bree and Hanson because those two individuals are domiciled in the Cayman Islands, *id.* at 12–13, and because the FAC contains no allegations that Bree and Hanson were acting in their individual capacities, which the DMS Defendants say is required to establish general jurisdiction over them under the New York Civil Practice Law and Rules ("**CPLR**"). *Id.* at 13.

33

The DMS Defendants further argue that the Court lacks specific jurisdiction over them. First, they argue that Molner abandoned any argument that specific jurisdiction exists by failing to respond to their argument in this regard. *See* DMS Defs.' Am. Reply 2. Second, they contend that Molner has not demonstrated that the DMS Defendants had sufficient contact with New York to satisfy any of the elements of personal jurisdiction required pursuant to the CPLR and, even if he had, there was no nexus between the business Molner claims was conducted in New York and the claims asserted in the FAC against DMS. *See* DMS Defs.' Mem. 16.

Finally, the DMS Defendants argue that even if the Court were to find that the requisite minimum contacts exist, the exercise of personal jurisdiction over them would not be reasonable. *Id.* at 25–26.

Molner responds that the Court does have personal jurisdiction over the DMS Defendants. He argues, in relevant part and as further detailed below, that both AEF and all of the DMS Defendants were "at home" in New York due to persistent, systematic, and purposeful business contacts with various New York counterparties. *See, e.g.*, Pl. Opp'n to DMS Defs.' MTD 3, ¶¶ 1–2. These include DMS's ongoing business providing services to New York companies, DMS's affiliation with a clearinghouse entity based in New York, Bree's and Hanson's service on multiple boards of companies that have "control persons" that reside or work in New York, and Seymour's control of DMS. *See, e.g.*, *id.* at 7–16; Molner Aff. ¶¶ 10–33.

### b.  Applicable Law

Bankruptcy Rule 7004(f) governs whether a bankruptcy court has personal jurisdiction once a case is removed from state court to federal court. *See SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018). Rule 7004(f) provides:

> [i]f the exercise of jurisdiction is consistent with the Constitution and law of the United States, serving a summons or filing a waiver of service in accordance with

> this rule . . . is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

Fed. R. Bankr. P. 7004(f). The Court has explained, *supra*, that Molner validly caused service of process pursuant to Federal Rule of Civil Procedure 4(f). Therefore, pursuant to Bankruptcy Rule 7004(f), the DMS Defendants are subject to personal jurisdiction so long as "each defendant passes the constitutional threshold for personal jurisdiction: that each defendant has purposefully established minimum contacts with the *United States*, and that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115, 2013 WL 4077586, at *3 (S.D.N.Y. Aug. 2, 2013) (emphasis added) (citation omitted) (applying Bankruptcy Rule 7004(f)). Courts evaluate "the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (citation omitted). When considering what constitutes fair play and substantial justice, "[i]n the international context, the emphasis is on the fairness and reasonableness of requiring a defendant to appear in the United States." *Levin v. Javeri (In re Firestar Diamond)*, 654 B.R. 836, 899 (Bankr. S.D.N.Y. 2023) (citation omitted).

In assessing minimum contacts, courts differentiate between "general or all-purpose jurisdiction, and specific or case-linked jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction over foreign corporations is proper when the corporation's "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum state." *Daimler v. Bauman*, 571 U.S. 117, 119 (2014) (internal quotation marks and citation omitted). Specific jurisdiction often goes by the name "purposeful availment," where the defendant "must take some act by which [it] purposefully avails itself of the privilege of conducting activities with the [forum]" and deliberately "reach[es] out beyond its

35

home." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (internal quotation marks and citation omitted).

Once minimum contacts have been established, the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023) (citation omitted). In assessing reasonableness, courts must determine whether exercising personal jurisdiction over a defendant would "offend 'traditional notions of fair play and substantial justice.'" *Asahi Metal Indus. Co. v. Super. Ct. Cal.*, 480 U.S. 102, 113 (1987) (citation omitted).

### c.  Application

The DMS Defendants contend that Molner abandoned any assertion of specific jurisdiction by failing to specifically respond to this portion of their Motion to Dismiss. Molner does, however, emphasize facts he has alleged he contends establish a prima facie showing of personal jurisdiction "notwithstanding any controverting presentation." *Dorchester Fin. Sec., Inc. v. Banco BRJ. S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (finding error where the district court "relied on the principle that where a defendant rebuts a plaintiff's unsupported allegations with direct, highly specific testimonial evidence regarding a fact essential to jurisdiction—and the plaintiff does not counter that evidence—the allegation may be deemed refuted."). Accordingly, the Court will consider whether Molner has made a prima facie showing of personal jurisdiction.

As a threshold matter with little consequence here, the parties mistakenly focus on whether the minimum contacts test is satisfied by the DMS Defendants' contacts with New York in particular, rather than with the United States as a whole. *See, e.g.*, Molner Aff. 3–34; DMS Defs.' Mem. 9–25; FAC ¶¶ 260–87 (referencing contacts with New York and applying the New York

CPLR). In the bankruptcy context, courts apply a *nationwide* minimum contacts test. *See, e.g.*, *In re Hellas Telecomm. (Luxembourg) II SCA v. TPG Cap. Mgmt, L.P.*, 524 B.R. 488, 505–06 (Bankr. S.D.N.Y. 2015) (citing cases); *Enron Corp. v. Arora (In re Enron Corp.)*, 316 B.R. 434, 444–45 (Bankr. S.D.N.Y. 2004). The *Enron* court noted, in the context of Rule 7004, that:

> the question of whether [the defendant] had minimum contacts with [the forum state] is irrelevant . . . because when an action is in federal court on related to jurisdiction, the sovereign exercising authority is the United States, not the individual state where the federal court is sitting and, therefore, a court need only ask whether [the defendant] has the minimum contacts with the United States such that subjecting it to personal jurisdiction does not offend the Due Process Clause of the Fifth Amendment to the United States Constitution.

*Enron*, 316 B.R. at 444 (internal quotation marks omitted) (quoting *Owens-Ill. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630 (4th Cir. 1997)); *see Firestar*, 654 B.R. at 899 (citation omitted) ("Bankruptcy courts have applied the [nationwide] minimum contacts test to foreign corporations and persons."). Thus, pursuant to Bankruptcy Rule 7004(f), the relevant test for the Court to apply is that which considers DMS Defendants' minimum contacts with the United States as a whole, not just New York.

Here, the outcome is not changed by a proper focus on the Defendants' U.S. contacts, because even if the Court were to assess personal jurisdiction based upon the DMS Defendants' minimum contacts solely with New York, the Court's conclusion would be the same.

### i. General Jurisdiction

Molner has not made a prima facie showing of general jurisdiction over the DMS Defendants. Molner does not allege that the United States is the domicile, place of incorporation, or principal place of business for any of the DMS Defendants, which is required to comport with due process. *See* FAC ¶¶ 41–42 (DMS is a "Cayman Islands based firm" that "provided fiduciary services to the investment industry," and its employees are all Cayman Island citizens); *Goodyear*,

564 U.S. at 924 (recognizing that "the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.") (citation omitted). Only in an "exceptional case" may an individual's contacts in a non-paradigmatic forum "be so substantial and of such a nature as to render the corporation at home in [the forum]." *BNSF Ry. Co. v. Tyrell*, 581 U.S. 402, 413 (2017) (citation omitted).[20] Molner does not allege facts in the FAC or the Molner Affidavit establishing that the DMS Defendants' contacts are so substantial as to make this the "exceptional case" in which these Defendants are at home in the United States despite Molner's failure to plead a "paradigmatic" basis for general jurisdiction.[21] Accordingly, Plaintiff did not meet his prima facie burden to establish this Court's general jurisdiction over the DMS Defendants.

### ii. Specific Jurisdiction

**DMS Defendants DMS, Bree and Hanson[22]**

Molner contends that this Court has specific jurisdiction over the DMS Defendants by virtue of the DMS Defendants', as well as AEF's, "systematic" and "purposeful" contacts with the State of New York. Molner Aff. ¶ 5. First, he argues that DMS transacted business in New York through Bree and Hanson by their engagement as directors of AEF. Second, he contends that DMS regularly conducted non-AEF business activity by representing hundreds of hedge funds whose control persons reside or work in New York.[23]

---

[20] The Second Circuit has recognized that in an "exceptional case" general jurisdiction may be proper notwithstanding domicile elsewhere if an individual's contacts are "so extensive." *Reich v. Lopez*, 858 F.3d 55, 63 (2d Cir. 2017) (citing *Daimler*, 571 U.S. at 139 n.19). However, the Court further stated that the "Second Circuit has yet to find such a case." *Id.*

[21] Molner references Exhibit N of the FAC, noting that DMS operates "in the Cayman Islands, Luxembourg, London, Dublin, Sao Paolo, Hong Kong, and New York." *See* Molner Aff. ¶ 126; *see also* Molner Aff. Ex. C. But "a corporation that operates in many places can scarcely be deemed at home in all of them." *BNSF Ry. Co.*, 581 U.S. at 414 (citing *Daimler*, 571 U.S. at 139 n.20).

[22] In this subsection, the Court's references to the DMS Defendants apply to DMS, Bree, and Hanson.

[23] Molner raises wide-ranging and additional arguments in his Affidavit and brief, including that the DMS Defendants owned and managed *another entity* that uses a New York-based bank to clear wire transfers on behalf of clients, that Hanson and Bree were involved in unrelated litigation in New York, and other allegations in support of

Specifically, Molner argues that the DMS Defendants transacted business in New York on a routine and ongoing basis. Molner alleges that Bree and Hanson conducted business in New York in their capacity as Directors of AEF by frequent phone calls and meetings with ACP, its investment management advisor, and Molner, as chairman of ACP. *See, e.g.*, Pl. Opp'n to DMS Defs.' MTD 7–10; Molner Aff. ¶¶ 12–14, 21–22. In other words, Bree and Hanson's roles as Directors of AEF (roles they obtained by virtue of the engagement agreement with DMS) necessitated contacts and meetings in New York.

The DMS Defendants argue that Molner's allegations in the FAC and Affidavit relating to AEF's contacts with New York are irrelevant because AEF is not a party to this action, and the activities of third parties, or activities conducted through a local branch, do not factor into the analysis of jurisdiction. *See, e.g.*, DMS Defs.' Am. Reply 4.

To meet the first prong of the specific jurisdiction test, Molner must make a prima facie showing that the DMS Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities with [the United States]" and "reached out beyond" their home into the United States. *See Ford Motor Co.,* 592 U.S. at 359 (citations omitted). "The inquiry [of] whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) (citation omitted). The "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts[.]" *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (internal quotation marks and citation omitted). Molner's allegations easily clear this hurdle by alleging

---

his argument that the DMS Defendants were "at home" in New York in support of *general* jurisdiction. *See, e.g.*, FAC ¶¶ 280, 283–85; Molner Aff. ¶¶ 109–26; Pl. Opp'n to DMS Defs.' MTD 12–16; 21–22. For efficiency purposes, and liberally construing Molner's contentions because Molner is pro se, the Court will address those arguments that appear to support an exercise of specific jurisdiction.

with specificity facts showing that the DMS Defendants, with the exception of Seymour, purposefully and regularly reached out to the United States by virtue of their U.S.-based or U.S.-dependent business activities.

Molner's strongest arguments in support of specific jurisdiction relate to the DMS Defendants' transaction of business in New York (and thus the United States). Molner alleges that DMS as a matter of course transacted business in New York through its provision of fiduciary services to entities in New York, primarily to serve on company boards. Examples include:

- DMS was . . . a Cayman Islands based firm that provided 'fiduciary services' to the investment industry, *i.e.*, its employees, all of them Cayman Island citizens, were available (for a fee) to serve on the boards of companies seeking to incorporate in the Cayman Islands. FAC ¶ 41.
- [DMS consists of] affiliated companies within a group (the DMS Group), comprising a number of separate, but related, entities operating, principally under the DMS brand, in the Cayman Islands, Luxembourg, London, Dublin, Sao Paolo, Hong Kong, *and New York*. FAC ¶ 269 (emphasis in original) (citing DMS's description at FAC Ex. N).
- DMS served the community of international hedge fund, private equity and other types of investment managers that use offshore vehicles . . . . A review of DMS phone, email and fax records for communications originating from its offices in the Cayman Islands will show that, on any given day, a substantial portion of its communication traffic is between persons in the DMS offices on Genesis Close in the Cayman Islands and persons in New York (or who regularly commute to New York to conduct business). DMS could not afford to maintain its overhead – then or now – if its New York based clients were to disappear. FAC ¶ 271.

Molner cites examples of how DMS's business of providing fiduciary services, and Bree's and Hanson's service in that regard to AEF (as DMS employee-directors of AEF), constituted the transaction of business in New York. *See* FAC ¶¶ 41–42; *see also* FAC ¶ 182 ("Hanson and Bree rendered fiduciary services to AEF in their capacity as full-time employees of DMS (now part of Waystone).").

Molner further alleges that Bree and Hanson conducted AEF and other business in New York, citing various meetings and phone calls. FAC ¶¶ 273–74; Molner Aff. ¶¶ 21–23. Molner alleges that he met with Bree more than eight times in New York to conduct AEF business, and

that he spoke with Bree and Hanson at least bi-weekly from New York in order to conduct AEF business. FAC ¶¶ 272–74. Specifically, Molner alleges that Hanson conducted business in New York at least weekly from 2010–2014 through his phone calls with Molner in Hanson's capacity as a director of AEF. Molner Aff. ¶ 23. Although less frequently than Hanson, he alleges that Bree conducted business in New York with Molner by phone, including business related to AEF, about three times per month. *Id.* ¶ 27. Their business discussions allegedly related to governance, audit issues, liquidity, regulatory issues, investor relations, litigation matters, and disposal of assets. *Id.* ¶¶ 23–25; 27–28.

Further, Molner alleges that DMS conducted business in New York because ACP (Molner) had a standing call with AEF directors every two weeks. Molner Aff. ¶ 29. Their conversations resulted in the conduct of business in the United States by AEF at the direction of Bree and Hanson. *Id.* ¶¶ 31–33. The Court concludes that, based on the allegations noted herein, the alleged activities of DMS, Bree, and Hanson were purposeful and amounted to the conduct of business in New York. Even if the DMS Defendants are and were not physically present in New York, they conducted enormous amounts of business in and with New York and New York-based commercial actors. Indeed, as Molner plausibly alleges, these interactions with New York and other U.S.-based commercial actors were exactly the business that the DMS Defendants were in. *See, e.g.*, FAC ¶¶ 271–75; Molner Aff. ¶¶ 21–23.

The DMS Defendants cite New York case law holding that phone calls to a party in New York are insufficient to confer jurisdiction, and that the meetings among Bree, Hanson, and Molner are not "significant or substantive enough to confer jurisdiction." *E.g.*, DMS Defs.' Mem. 19; DMS Defs.' Am. Reply 9. But this contention fails to acknowledge the extent or essence of the DMS Defendants' contacts and the crux of Molner's lawsuit. And even if phone calls alone might be an

insufficient basis for personal jurisdiction applying constitutional minimal contacts standards, as applicable here, the "guiding principle is whether the suit *relates* to the defendant's contacts with the forum."[24] *TFS-ICAP, LLC*, 415 F. Supp. 3d at 383 (emphasis added) (internal quotation marks and citation omitted). Here, it does; Molner alleges that the scheme undertaken by DMS, through Bree and Hanson, was carried out by virtue of their role as directors of AEF, and specifically that their role as directors was the reason they were on the January 6 Call. *See, e.g.*, FAC 3, ¶ 11; 4, ¶ 1. These allegations suffice to state a nexus between work done for, with, or through AEF and the asserted scheme about which Molner complains. Specifically, the alleged actions of DMS, Bree, and Hanson arise out of DMS' provision of financial services that are heavily integrated with financial markets centered in New York, and with New York-based investors and enterprises, including services that Bree and Hanson provided as directors of AEF. It is hard to imagine that, while pursuing the business of providing financial services to New-York-based and other global markets, DMS would not have expected to be "haled into court" in New York where much of their business and revenue originated. *See Ford Motor Co.*, 592 U.S. at 362 ("[The suit must] arise out of *or relate to* the defendant's contacts with the forum.") (emphasis in original) (citation omitted). Molner therefore has met his prima facie burden of showing sufficient minimum contacts with the U.S.

Once the Court determines that a defendant purposefully established minimum contacts, the Court must consider whether "the assertion of personal jurisdiction would comport with fair play and substantial justice." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161,

---

[24] The DMS Defendants also argue that the allegations in the FAC and Molner Affidavit relating to phone call-business between the DMS Defendants and Molner are irrelevant to the exercise of specific jurisdiction because, they contend, the calls largely pre-date the tortious conduct alleged. *See* DMS Defs.' Am. Reply 9. However, as at least one District Court within the Second Circuit has found, for purposes of the nationwide (as opposed to the forum state) minimum contacts, "there is no set time period." *TFS-ICAP, LLC*, 415 F. Supp. 3d at 383–84 (determining that, in a federal question suit where nationwide minimum contacts are applicable, the court may consider contacts that pre-date the relevant conduct.).

170 (2d Cir. 2013) (citation omitted). The latter standard is often considered the "reasonableness inquiry." *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 243 (2d Cir. 1999) (internal quotation marks and citation omitted) (concluding that once minimum contacts and purposeful availment are established, "the court also considers whether the assertion of jurisdiction comports with traditional notions of fair play and substantial justice – that is, whether it is reasonable under the circumstances of a particular case.").

The DMS Defendants argue that even if their minimum contacts were sufficient to support specific jurisdiction, exercising jurisdiction over the DMS Defendants would be unreasonable. DMS Defs.' Am. Reply 12. In assessing this type of contention, courts in the Second Circuit typically consider five factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*In re Platinum*, 61 F.4th at 273 (citation omitted). The Second Circuit applies a sliding scale approach when evaluating reasonableness. *See id.* "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing – a strong (or weak) showing by the plaintiff on 'minimum contacts' reduces (or increases) the weight given to 'reasonableness.'" *Id.* The burden is on the DMS Defendants to show that the exercise of jurisdiction would be unreasonable. *See id.* ("Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present a compelling case that the presence of some other consideration would render jurisdiction unreasonable.").

The DMS Defendants have not met their burden of showing unreasonableness. The DMS Defendants largely argue that their status as international defendants makes the exercise of

jurisdiction inappropriate. *See* DMS Defs.' Mem. 25–26 (citing *Asahi Metal Indus. Co.*, 480 U.S. at 115). They contend that they have not interjected themselves into New York and would be prejudiced if forced to appear in New York. *Id.* at 26. However, as previously discussed, Molner's allegations show that the DMS Defendants have interjected themselves into New York (the United States), and their reasonableness arguments ring hollow given the reality that "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *In re Platinum*, 61 F.4th at 273. Their remaining argument that the Cayman Islands has a greater interest in this dispute than New York [or the United States] is likewise unavailing. As previously set forth, DMS, Bree, and Hanson regularly conducted business in New York, and it would not be unreasonable for them to anticipate "being haled into court there." *Licci*, 732 F.3d at 170. Even if the interest of the Cayman Islands is also strong, this dispute is not "the 'exceptional situation' where exercise of jurisdiction is unreasonable even though minimum contacts are present." *In re Platinum*, 61 F.4th at 274 (citation omitted). Finally, the DMS Defendants contend that, because portions of the FAC reference the application of Cayman Islands law, the Cayman Islands has an even greater interest. *See* DMS Defs.' Mem. 26. However, as previously determined, Molner and the Defendants primarily assert arguments based on New York law and thus New York law is applicable to the FAC's causes of action. Thus, the DMS Defendants have failed "to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *In re Platinum*, 61 F.4th at 273.

In sum, viewing Molner's pleadings and affidavits in the light most favorable to him, with all doubts resolved in his favor, the Court concludes that Molner has made a prima facie showing that the Court has personal jurisdiction over the DMS Defendants, other than Seymour. Here, the Court need not address whether jurisdictional discovery or an evidentiary hearing is necessary for

Molner to more conclusively establish personal jurisdiction beyond making a prima facie showing, because Molner's claims fail on independent merits grounds for reasons outlined below. *See SPV Osus Ltd. v. AIA LLC*, No. 15-cv-619, 2016 WL 3039192, at *5 (S.D.N.Y. May 24, 2016) (finding personal jurisdiction after construing plaintiff's material in the light most favorable to it while noting that further inquiry is pointless due to the existence of independent grounds to dismiss).

**DMS Defendant Seymour**

Unlike his contentions as to the other Defendants, Molner fails to allege facts making out a prima facie case for personal jurisdiction with respect to DMS Defendant Seymour. Molner's asserted basis for personal jurisdiction over Seymour is that Seymour supervised employees who engaged in conduct in New York. *See, e.g.*, FAC ¶ 278; Molner Aff. ¶¶ 127–131; Pl. Opp'n to DMS Defs.' MTD 14. The FAC alleges that Seymour is the chief executive officer and "control person" of AEF, but there are no non-conclusory allegations of his having individually (even on behalf of DMS) transacted business in New York.

Molner alleges that Seymour is the founder, CEO, and controlling shareholder of DMS. Molner Aff. ¶ 130. He also contends that "[o]n information and belief, Mr. Seymour knew what was transpiring with AEF throughout the first half of 2014." *Id.* ¶ 131. As further example, Molner alleges that Seymour "had the same knowledge of Bree and Hanson because they kept him timely informed, as required, of material events relating to their directorial mandate at AEF." FAC ¶ 183. "Seymour had powers equal to or greater than those of Bree or Hanson[.]" FAC ¶ 183. These allegations are conclusory and insufficient to support the conclusion that any of Seymour's actions were purposeful or relate to Molner's causes of action.[25] *See In re Terrorist Attacks*, 714 F.3d at

---

[25] Molner alleges that Seymour hosted a dinner for DMS clients in New York in 2011. *See* FAC ¶ 279. However, while Molner's allegation does lend support to his argument that DMS conducted business in the United States, it is too attenuated to stand on its own and show a sufficient relationship between Seymour and Molner's causes of action. Molner further alleges that in 2017 and 2022 Seymour participated in prosecution-based litigation in New

681 (citation omitted) ("[I]t is well established that individual officers and employees of a corporation are not automatically subject to personal jurisdiction in New York simply because a court can exercise jurisdiction over the corporation.").

The Court thus concludes that Molner has not met his prima facie burden of showing that the Court may properly exercise personal jurisdiction over Seymour. Thus, the Court dismisses the FAC solely as to Seymour under Rule 12(b)(2) while denying the remaining DMS Defendants' Motion to Dismiss to the extent based on Rule 12(b)(2). As noted above and developed below, additional grounds for dismissal exist.

### 3. DMS Defendants' MTD Based Upon Asserted Untimeliness of Claims

For the reasons stated below, the Court denies the portion of the DMS Defendants' Motion to Dismiss that contends Molner's claims are time-barred.

### a. Summary of Parties' Arguments

The DMS Defendants argue that the FAC should be dismissed because all of Molner's claims against them are time-barred. Their rationale is that any alleged fraudulent conduct by them must have occurred prior to May 1, 2014, when Bree and Hanson were terminated as directors of AEF and their powers ceased. *See* DMS Defs.' Mem. of Law 28. They assert that even the longest potentially applicable statute of limitation on any claim against them would have expired on May 1, 2020—six years after Bree's and Hanson's termination, and prior to Molner's filing of the Summons with Notice on June 11, 2020. Molner contests the DMS Defendants' assertions and argues that his claims against the DMS Defendants are not time-barred because there was no defect in his service upon them. *See* Pl. Opp'n to DMS Defs.' MTD 5.

---

York, and currently conducts business in New York as part of Waystone Governance Ltd. FAC ¶ 281. These additional allegations are also insufficient to demonstrate a nexus between Seymour's U.S. contacts and Molner's allegations.

### b. Applicable Law

Courts may decide a statute of limitations defense on a Rule 12(b)(6) motion "if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014). Under New York law, "the time within which an action based upon fraud must be commenced is the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." *Koch v. Christie's Int'l. PLC*, 699 F.3d 141, 154 (2d Cir. 2012) (citing CPLR 213(8)).

### c. Application

The Court is unpersuaded by the DMS Defendants' argument that the claim accrual date necessarily is no later than May 1, 2014. For the reasons explained *infra*, the gravamen of Molner's FAC is his allegations of fraud, which have a six-year statute of limitations from the date the cause of action accrued. *See id.*; *see also* DMS Defs.' Mem. 28, n.13. Molner alleges a course of conduct by the Defendants that he argues was not completed until June 14, 2014, when Molner was made aware of the bankruptcy petition that was filed the day before. *See* FAC ¶ 149; *see also, e.g.*, FAC ¶¶ 29, 217; Molner Aff. ¶ 138. Although the DMS Defendants argue that the accrual date is May 1, 2014, most of the Defendants in the case concede, at least for purposes of this Motion, that Molner become aware of the alleged fraudulent actions on June 14, 2014, and that the filing of the U.S. bankruptcy petition was the culminating event of the asserted fraudulent scheme. *See* Hr'g Tr. 28:23–25, Dec. 14, 2023, ECF No. 97. The Court therefore concludes that the FAC's allegations support a plausible inference that Molner's fraud claims accrued with the filing of the petition and/or Molner's learning of the bankruptcy, *i.e.*, on June 13 or 14, 2014. *See Koch*, 699 F.3d at 154. Because the FAC was filed on June 11, 2020, just less than six years after the plausibly

alleged claim accrual date, Molner's fraud claims are not subject to dismissal as time-barred. *See id*. at 155 ("[W]here it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts.") (internal quotations and citation omitted).

### 4. Defendants' MTD Based upon Federal Preemption

Turning to the merits-based arguments for dismissal, the Court concludes that Molner's claims are barred by federal preemption doctrine for reasons stated below.

#### a. Summary of Parties' Arguments

The Defendants argue that Molner's claims are barred by federal preemption on the theory that Molner's claims cannot succeed unless he can establish that the U.S. bankruptcy petition was filed in bad faith or for an improper purpose. *See* Reed Smith Mem. 12–14; Reed Smith Reply at 7.[26] Further, the Defendants contend that all of the damages Molner alleges arose after and because of the bankruptcy filing, such that even his claims that are ostensibly based upon pre-filing conduct are preempted. *Id.*

Molner disagrees, stating that he has confined his allegations in the FAC to conduct that occurred *prior* to the petition. *See* Pl. Opp'n to Reed Smith MTD 4–6. Thus, he contends, preemption does not apply.

#### b. Applicable Law

Federal law may preempt state law and state-law claims by three means – "conflict," "express," or "field" preemption. *N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018). These categories are not "rigidly distinct." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (citation omitted).

---

[26] As previously noted, the DMS and Liquidator Defendants join in the Reed Smith Defendants' MTD.

"Preemption is always a matter of congressional intent, even where intent must be inferred." *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 82 (2d Cir. 2019) (citation omitted). "[C]ourts do not readily assume preemption." *Affordable Hous. Found., Inc. v. Silva*, 469 F.3d 219, 238 (2d Cir. 2006). When considering whether preemption can be inferred, courts typically consider "the weight to be given to the lack of an express statement overriding state law." *Tribune*, 946 F.3d at 82. Relevant here, the Constitution expressly grants to Congress the power to enact bankruptcy laws, U.S. Const. art. I, § 8, cl. 4, and "[o]nce a party enters bankruptcy, the Bankruptcy Code constitutes a wholesale preemption of state laws regarding creditors' rights." *Tribune*, 946 F.3d at 82 (citations omitted).

Field preemption occurs "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *N.J. Thoroughbred*, 584 U.S. at 479. "[A]n Act of Congress may touch a field of law in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 120 (2d Cir. 2001).

The Second Circuit and other courts within it have suggested that Congress' involvement in the field of bankruptcy law gives rise to a broad scope of preemption. *See Astor Holdings v. Roski*, 325 F. Supp. 2d 251, 262 (S.D.N.Y. 2003) (citing *E. Equip.*, 236 F.3d at 120). The Second Circuit considered factors relating to all aspects of the bankruptcy process:

> (1) Congress placed bankruptcy jurisdiction exclusively in the district courts under 28 U.S.C. § 1334(a); (2) Congress created a lengthy, complex and detailed Bankruptcy Code to achieve uniformity; (3) the Constitution grants Congress exclusive power over the bankruptcy law, *see* U.S. Const. art. I, § 8, cl. 4; (4) the Bankruptcy Code establishes several remedies designed to preclude the misuse of the bankruptcy process; and (5) the mere threat of state tort actions could prevent individuals from exercising their rights in bankruptcy, thereby disrupting the bankruptcy process.

49

*E. Equip.*, 236 F.3d at 121. Under the principles of federal preemption, a claim that could have been made "under the Bankruptcy Code cannot be the subject of regulation by state statutory or common-law remedies." *Astor Holdings, Inc.*, 325 F. Supp. 2d at 262.

### c. Application

The Defendants do not specify which preemption doctrine they are relying upon. In light of their arguments and the case law presented, the Court construes the Defendants' arguments as asserting field preemption.

Molner attempts to confine the FAC's allegations to conduct that occurred prior the petition and argues that by doing so he has avoided putting at issue here the filing of, or conduct during, the bankruptcy case. But he incorrectly characterizes the controlling legal question. Rather, as explained below, the Court must examine whether Molner's claims necessarily call into question the underlying bankruptcy filing and associated rulings. If so, and if there were remedies available to Molner within the bankruptcy case (and there were), the field preemption doctrine would preclude Molner's claims.

The Defendants rely primarily upon preemption case law from the Second and Ninth Circuits. *See, e.g.*, *Astor*, 325 F. Supp. 2d at 262; *Steward Fin., LLC v. Bral (In re Bral)*, 622 B.R. 737, 744 (B.A.P. 9th Cir. 2020); *Nat'l Hockey League v. Moyes*, No. CV-10-01036, 2015 WL 7008213, at *5 (D. Ariz. Nov. 12, 2015); *MSR Expl., Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 915 (9th Cir. 1996). Each of these cases supports the conclusion that, to the extent Molner's claims and related damages arise as a result of the bankruptcy filing, his claims are preempted.

The Court's analysis here closely tracks then-District Judge Lynch's opinion in *Astor Holdings*, which held that, if the Bankruptcy Code provides a remedy for a plaintiff's state law claims, then the events at issue "cannot be the subject of regulation by state statutory or common-

law remedies." 325 F. Supp. 2d at 262. In *Astor Holdings*, Astor, which was a corporate sponsor of robotic combat events, brought state law claims against a robot builder and founder of a promotional company, Roski, after numerous rounds of litigation stemming from a multi-party failed business relationship and the bankruptcy filing of the original father (Thorpe) of "robot wars." Astor alleged that Roski had tortiously interfered with two contractual agreements that Astor had executed with Thorpe and that Roski had aided and abetted Thorpe in breaching fiduciary duties that Thorpe owed to Astor. *Id.* at 253. Astor sought damages for loss of revenue "as a result of Thorpe's and Roski's conduct, which allegedly injured its reputation among the robot builders its business depends upon." *Id.* The District Court reviewed case law examining the application of preemption to state tort claims that are "predicated upon the invalidity of 'an action taken in a bankruptcy proceeding.'" *Id.* at 262 (quoting *Phx. Elec. Contracting, Inc. v. Lovece*, No. 93 Civ. 4340, 1993 WL 512917, at *3 n.1 (S.D.N.Y. Dec. 9, 1993)). The District Court further noted that the fact that the defendant in the state court action was not the debtor "is a distinction without a difference." *Id.* The District Court in *Astor* ultimately determined that Astor's claims were preempted because any judgment for plaintiff on the state law claims would require a finding that Thorpe filed bankruptcy in bad faith or for an improper purpose, which is "a claim that could have been made, and for which a remedy is provided, under the Bankruptcy Code[.]" *Id.*

The District Court in *Astor* relied upon the Second Circuit's suggestion of the broad scope of bankruptcy preemption due, *inter alia*, to the constitutional grant of exclusive power over bankruptcy law, and Congress' corresponding extensive regulation in the bankruptcy field. *Astor*, 325 F. Supp. 2d at 262 (citing *E. Equip.*, 236 F.3d at 121). In *Eastern Equipment*, the Second Circuit noted the Bankruptcy Code's "comprehensive federal system of penalties and protections

to govern the orderly conduct of debtors' affairs and creditors' rights" and determined that the Code preempted state law claims for violation of the automatic stay. 236 F.3d at 120.

The cases cited by the Reed Smith Defendants from the Ninth Circuit are similar. For example, in *Bral*, the Ninth Circuit's Bankruptcy Appellate Panel affirmed the "Circuit's commitment to the broad application of federal preemption to bar all state law causes of action for alleged misconduct occurring as part of the bankruptcy process." *Bral*, 622 B.R. at 747. The Panel recognized the distinction between "prepetition claims and those for a wrongfully-filed bankruptcy, *which accrue only upon the filing of the bankruptcy and are inextricably intertwined with the bankruptcy process*." *Id.* (emphasis added) (citation omitted).

Molner contends that all of the cases cited by the Reed Smith Defendants turn on when the alleged conduct by the defendants occurred. If the alleged conduct occurred prior to the filing of the bankruptcy petition, Molner contends, then the cited cases support the conclusion that the claims are not preempted. *See* Pl. Opp'n to Reed Smith MTD 6. Molner's argument reads the cases too narrowly and ignores that his own claims turn on the eventual filing and pursuit of the bankruptcy case. While Molner is likely correct that claims that solely involve prepetition actions among nondebtors and do not call into question the filing of the bankruptcy petition may not implicate preemption, that does not defeat the principle that where "state law tort claims call into question whether a bankruptcy was filed for an improper purpose or in bad faith, these claims are preempted by federal bankruptcy law[.]" *Nat'l Hockey League*, 2015 WL 7008213, at *5 (citing *MSR Expl.*, 74 F.3d at 913). That is the case here, because the filing of the bankruptcy was the culmination of the alleged scheme and the central cause of Molner's asserted injuries.

Lastly, Molner argues that a recent case from the New York Court of Appeals supports his position. Pl. Opp'n to Reed Smith MTD 6 (citing *Sutton 58 Assocs. LLC v. Pilevsky*, 164 N.E.3d

984, 994 (N.Y. 2020)). However, *Sutton* does not compel the result Molner seeks. The Court of

Appeals in *Sutton* refused to apply the preemption doctrine to plaintiffs' claims that were asserted

against defendants who were not in bankruptcy and when the claims at issue were premised upon

pre-petition conduct. The court commented, however, that "where a tort claim is premised upon a

bankruptcy filing . . . the obstacle presented by state tort remedies is more readily discerned."

*Sutton*, 164 N.E.3d at 994 (affirming that no question was raised as to the propriety of the

bankruptcy filing). And that is the situation here: the bankruptcy is inextricably related to the

alleged fraudulent scheme which culminated with the bankruptcy case and which caused Molner's

asserted injuries. *Sutton* thus is inapposite and, in fact, acknowledges that the case for preemption

"is more readily discerned" in circumstances similar to those here. *See id.* ("[T]he Bankruptcy

Code provides remedies for such claims as asserted between debtors and creditors by, for example,

authorizing dismissal of bad-faith filings and empowering the Bankruptcy Court to take measures

to prevent any abuse of process."). Further, unlike the facts here, nothing in *Sutton* suggests that

the plaintiff there could have or should have pursued relief during the underlying bankruptcy case.

*See id.* (noting that no question was raised as to the propriety of the bankruptcy proceeding because

the underlying claims "are peripheral to, and do not impugn, the bankruptcy process.").

    This conclusion is borne out by many aspects of the FAC. Molner's claims all allege

conduct inextricably intertwined with his contention that the Defendants conceived, commenced,

and carried out the AEF bankruptcy case in bad faith through self-interested actions in a way that

compensably harmed Molner—with the eventual bankruptcy as the alleged scheme's centerpiece

and the source of Molner's alleged harms. *See* Decl. of Geoffrey Varga in Support of Chapter 11

Pet. and First Day Pleadings ¶¶ 1, 10–13, FAC Ex. K.; *see also* Order of Referral, ECF No. 1-15

(S.D.N.Y. Nov. 3, 2020) ("Plaintiff alleges Defendants deceived him into relinquishing control

over [the Fund] and then fraudulently commenced chapter 11 proceedings for [the Fund] so they could usurp control of the company in bankruptcy and redirect its assets to themselves."). Part of the Molner Plan was explicitly *not* to file bankruptcy, FAC 3, ¶ 10.c., and the core of Molner's claims, and the resulting damages he alleges, is that the JVLs ultimately determined that a bankruptcy filing was necessary due to the "extraordinary burden" of pending litigation. *See* FAC ¶ 153 (citing Decl. of Geoffrey Varga, FAC Ex. K). Numerous examples of the linkage between Molner's allegations and the wresting of control of the liquidation from him (which ultimately occurred by the bankruptcy filing) are present in the FAC and Affidavit, including:

- Defendants lure[d] Plaintiff into a trap that would enable Defendants to sideline Plaintiff and assume control of the liquidation themselves and enrich themselves by more than fifty million dollars ($50,000,000). FAC 2, ¶ 2.
- Varga hire[d] [Reed Smith] back and position[ed] Varga and McCarroll to oust Plaintiff from control of the liquidation. FAC ¶ 26.
- Defendants wrest[ed] control of the liquidation of AEF from Plaintiff for their own benefit. FAC ¶ 68.
- Loss of equity: Had Plaintiff remained in charge of the liquidation of AEF as agreed and expected, then recoveries for Participating Shareholders would have meant significant funds for Plaintiff (who owned approximately 6% of the equity in AEF). FAC ¶ 229.
- Contingent Compensation: Had Plaintiff remained in charge of the VL and been allowed to manage the liquidation of AEF as agreed, Plaintiff stood to make 20% of proceeds above a hurdle. FAC ¶ 230.
- [T]heir plan all along was to put themselves in charge of the liquidation of AEF, instead of Plaintiff. FAC ¶ 155.

Molner's FAC avoids statements explicitly contesting the bankruptcy filing itself. But despite this strategic pleading choice, Molner acknowledges the centrality of the bankruptcy case by alleging that, by virtue of the bankruptcy filing, Molner was no longer "in charge" and the "coup was complete." FAC ¶ 29. Molner's attempt to frame this action as seeking redress for conduct and harms that were independent of the bankruptcy filing—and that instead constituted a pre-bankruptcy wresting of control of the liquidation from him—is a legal characterization or conclusory contention that cannot overcome the central role of the bankruptcy and issues already

resolved by this Court relating to the scheme Molner alleges. Rather, Molner's allegations make clear that the asserted scheme and conduct preceding and within the bankruptcy are one and the same.

Molner acknowledges he learned of the bankruptcy case by the day after it was filed, FAC ¶ 149, and he had many opportunities to seek relief throughout the case (but failed to do so). From the case's inception, Molner had the option of moving to dismiss the bankruptcy case for cause, with one available basis being to contend that the bankruptcy case was commenced in bad faith or for an improper purpose. *See* 11 U.S.C. § 1112(b); *see also, e.g., C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310–11 (2d Cir. 1997) (bad-faith filing is a basis for dismissing under Section 1112(b)); *In re AAGS Holdings LLC*, 608 B.R. 373, 382 (Bankr. S.D.N.Y. 2019) (same). Molner never moved to dismiss the case. Rather, he proceeded to participate in the case by making appearances, litigating, and filing proofs of claim. *See, e.g.*, Main Case, [Molner's] Notice of Mot. For Clarification and/or Relief from Stay, ECF No. 932; Consent Order, June 8, 2020, ECF No. 1020.

During the bankruptcy case, Molner also had the opportunity but failed to object to the Debtors' retention of Reed Smith and Kinetic (and Varga and Shakespeare as JVLs)—entities and individuals he now sues for a fraud that he asserts had been culminated to his financial detriment before they filed their retention applications. *See* FAC ¶ 29 ("As of mid-June 2014 . . . the coup was complete."). Yet Molner never objected even to specific proposed findings that this Court adopted that the retained professionals "represent[ed] no interest adverse to the Debtors or to [their] estates" and were "disinterested," and that their employment was "necessary and would be in the best interests of the Debtors' estates, [their] creditors, and other parties in interest." Main Case, Order Retaining Reed Smith ¶¶ 2–3, ECF No. 135; Main Case, Order Auth. Debtors to Emp. and

Compensate Jt. Liqs. ¶¶ 2–3, ECF No. 136. Molner also never objected to any applications for

professional fee compensation pursuant to Sections 330 and 331 of the Bankruptcy Code. *See, e.g.*,

Appls. for Compensation of Reed Smith, ECF Nos. 165, 322, 658, 786.

As the case went on, Molner also failed to object to the Disclosure Statement or Plan, either

generally or with respect to Debtors' specific request for a finding that the Plan was proposed in

good faith. *See* Disclosure Statement § IV.L.3; *see also* 11 U.S.C. § 1129(a)(3) ("The court shall

confirm a plan only if . . . [t]he plan has been proposed in good faith[.]"). The Court's February

19, 2016, Confirmation Order found and concluded that the Debtors had proposed their plan in

good faith. *See* Confirmation Order §§ C, D, VI, XXIV; ¶¶ 44, 57. As previously noted by the

Court:

> [T]his Court's Findings of Fact, Conclusions of Law, and Order Confirming the First
> Amended Joint Liquidating Plan of Reorganization of the Debtors and Debtors in
> Possession . . . made a multitude of findings and conclusions that the Court likely must
> consider to adjudicate Molner's claims. These include the finding that "Debtors have
> proposed the Plan in good faith" and implementing documents "have been negotiated in
> good faith and at arms' length," authorizing "the JVLs and the Distribution Trustee" to
> "take such actions as may be necessary or appropriate to effectuate and implement the
> provisions of the Plan" and finding that the "Debtors have exercised reasonable business
> judgment in determining whether to assume or reject Executory Contracts," finding that
> the "Plan has been proposed in good faith" and "was not proposed by any means forbidden
> by law," that "the appointment or continuation in office of the JVLs . . . is consistent with
> public policy and the interests of Creditors and Interest holders, as required by section
> 1129(a)(5)," and that "Debtors and their directors, officers, employees, members, agents,
> advisors, and Professionals are entitled to the protections of section 1125(e) of the
> Bankruptcy Code in connection with their respective activities" as specified, and "[a]ll
> parties have had a full and fair opportunity to litigate all issues raised, or which might have
> been raised, in any objection to the [Plan], and all such objections (whether formal or
> informal) have been withdrawn, waived, settled, or fully and fairly litigated," and directing
> that the "releases and exculpations set forth in [the Plan] are approved and shall be
> effective," and "are an integral and necessary part of the Plan," and ordering that "all
> Persons ... are hereby enjoined from the commencement or prosecution of any claims,
> obligations, suits, judgments, damages, demands, debts, rights, causes of action ... released
> pursuant to the Plan."

*See Aramid*, 628 B.R. at 597–98 (citations omitted). Molner had explicit notice that these findings

were sought; in fact, these findings and conclusions were included in a proposed confirmation

order that Debtors submitted prior to the confirmation hearing. *See* Notice of Filing of Proposed

Findings of Fact, Conclusions of Law, and Order Confirming Modified First Am. J. Liq. Plan of

Reorganization §§ C, D, F(xiv), H, VI, VIII, XXIV, XXVI; ¶¶ 23, 43, ECF No. 675. Yet Molner

did not object to the Debtors' Plan or Disclosure Statement, nor did he contest those proposed

findings or even opt to present contrary evidence.

In sum, Molner had notice and the opportunity to challenge a variety of orders that included

a finding of good faith by Debtors and others associated with the case or that the proposed actions

to be taken were in the best interests of the Debtors, their creditors, and other parties in interest.

All of these considerations track and illustrate the considerations that drove the preemption

holding of *Astor*. As Judge Lynch emphasized:

> [T]he adjustment of rights and duties within the bankruptcy process itself is
> uniquely and exclusively federal. It is very unlikely that Congress intended to
> permit the superimposition of state remedies on the many activities that might be
> undertaken in the management of the bankruptcy process.... [T]he highly complex
> laws needed to constitute the bankruptcy courts and regulate the rights of debtors
> and creditors also underscore the need to jealously guard the bankruptcy process
> from even slight incursions and disruptions brought about by state malicious
> prosecution actions.

325 F. Supp. 2d at 263 (citing *MSR Expl.*, 74 F.3d at 914).

The Court here adopts the reasoning of *Astor* and finds it dispositive in this case. Because

Congress has provided, in the field of bankruptcy, "a comprehensive federal system of penalties

and protections[,]" federal interests preclude "enforcement of state laws on the same subject." *E.*

*Equip.*, 236 F.3d at 120 (citations omitted). The core of Molner's claims all arose as a result of,

and culminated in, the Debtors' bankruptcy filing. Because Molner's causes of action "entail[] a

claim that could have been made, and for which a remedy is provided" within the bankruptcy

proceedings, preemption applies. *Astor*, 325 F. Supp. 2d at 262. The Court thus concludes that all

of Molner's claims are preempted because they share the central premise that Defendants

wrongfully seized control of the contemplated liquidation of AEF from him through a series of steps building toward and culminating in the bankruptcy filing. Accordingly, the Court grants the Motions to Dismiss and dismisses Molner's claims as preempted.[27]

**5.  Defendants' MTD for Failure to State a Claim**

Molner's claims also are dismissed for the independent reason that he fails to state a claim on which relief can be granted.

**Count I:       Fraud**

**a.  Summary of Parties' Arguments**

*i.   Reed Smith MTD Arguments*

Reed Smith and the Individual Reed Smith Defendants argue that Molner fails to plausibly allege the elements of fraud and further fails to meet the pleading particularity requirement of Rule 9(b). Reed Smith argues that Molner's fraud claim should be dismissed for failure to allege facts that plausibly support four of these elements: causation, scienter (intent), reasonable reliance, and the existence of cognizable damages. The Individual Reed Smith Defendants further object and state that Plaintiff's allegations are conclusory and describe conduct that is non-actionable.

First, the Reed Smith Defendants argue that the FAC fails to allege facts sufficient to plausibly allege causation. Specifically, the Reed Smith Defendants contend that Molner cannot show causation in light of his central allegation, i.e., that during the January 6 Call he gave the Fund Directors a clear choice to either support the Molner Plan and leave Molner in charge, or to

---

[27] Molner's breach of confidence and breach of contract claims (Counts IV and IX) address the provision of confidential information by Molner to the Defendants, and the Defendants' alleged wrongful sharing of such information to unauthorized recipients. *See* FAC, Counts IV and IX. Although the FAC leaves unclear precisely when and how this alleged wrongful conduct took place as it relates to Molner's causes of action, the FAC does not allege facts showing any entitlement to relief independent of the bankruptcy, and the gravamen of all of Molner's claims relate to what Molner claims was a "trap that would enable Defendants to sideline Plaintiff and assume control of the liquidation themselves[.]" *See* FAC 2, ¶ 2 (Summary of the Action). Thus, all of Molner's claims turn on the ultimate filing of the bankruptcy case.

have Molner resign so that the Fund could implement Molner's strategy (or any other strategy) without him. Reed Smith Mem. 17–18. The Reed Smith Defendants argue that Molner cannot have been caused harm by being deceived into participating in a strategic option that he proposed—that is, the Fund's implementation of any strategy it preferred, albeit without his participation. *Id.* at 18.

Second, the Reed Smith Defendants argue that Molner has not sufficiently alleged facts supporting a plausible inference of reasonable reliance. Reed Smith points to written agreements that Molner was either involved with, ratified, or approved, all assertedly belying or waiving Molner's allegations of reliance on the Defendants' oral promises. Reed Smith Mem. 18–19.

Third, the Reed Smith Defendants contend that Molner's alleged damages are non-cognizable on a fraud theory. These include Molner's claims for certain compensation he would have received under the ARP Services Agreement or based on expected returns on equity. Further, Reed Smith argues that Molner's allegations regarding reputational harm, lost business opportunities and emotional distress are even further attenuated, and thus not plausibly alleged. Reed Smith Mem. 20.

*The Individual Reed Smith Defendants*

The Individual Reed Smith Defendants reiterate the arguments set forth in the Reed Smith Memorandum in Support of Motion to Dismiss, as previously stated. Further, they address particular allegations as follows.

First, the Individual Reed Smith Defendants contend that Molner fails to allege any misstatements attributable to Mok, Sanders, Gwynne, or Siev. Specifically, the FAC merely and insufficiently alleges that Mok and Sanders "failed to act" or "break rank" with McCarroll, and

without specificity, that Gwynne and Siev "joined the fraud-in-progress." Indiv. Reed Smith Defs.'
Mem. 8.

Second, the Individual Reed Smith Defendants argue that the FAC's scattered and vague
references and allegations that they made statements of support for the Molner Plan, and would
work with Molner on its implementation, are inactionable and conclusory. Further, they state that
McCarroll's statements that Varga was "in the family" and could be "controlled" are not
representations of fact. Indiv. Reed Smith Defs.' Mem. 9–10.

Third, the Individual Reed Smith Defendants contend that Molner fails to adequately allege
that they acted with fraudulent intent. They argue that Molner's allegations as to all the Reed Smith
Defendants are conclusory, group pled, or directed exclusively at McCarroll. Reed Smith Mem.
10. Finally, the Individual Reed Smith Defendants maintain that Molner's allegations of fraudulent
intent or scienter rest entirely on the assertion that the Defendants had a fee-maximization profit
motive, but they contend, well-developed case law establishes that these types of allegations are
insufficient to plead scienter. Indiv. Reed Smith Defs.' Mem. 11.

In response to the Reed Smith MTD (and generally to all the MTDs), Molner argues that
the Reed Smith Defendants mischaracterize his fraud claim theory. *See, e.g.*, Pl. Opp'n to Reed
Smith MTD 15. In sum, he argues that Bree and Hanson lied to him by telling him that he could
not effect the Molner Plan without engaging a Cayman-based, licensed insolvency practitioner,
that they used their position of trust to convince him to reshape his liquidation plan and offered
him a process that they falsely said would allow Molner to remain in control. *Id.* at 14–15. Molner
further argues he satisfies all elements of his fraud claims. Pl. Opp'n to Reed Smith MTD 23. In
particular, he contends that he satisfied the "causation" element of fraud because he could have
appointed himself as sole liquidator. *See, e.g., id.* at 15. Finally, Molner contends that a fiduciary

relationship existed between him and the Reed Smith Defendants because they offered him advice and pretended to act in his interest, and that much of the advice and actions of the Reed Smith Defendants are the result of information they gained from the CICA. *See, e.g.*, *id.* at 16–19, 22.

The Reed Smith Defendants reply that Molner's opposition continues to impermissibly rely on group-pled assertions and presents an impermissible moving target by changing his account of what statements McCarroll made and when. *See* Reed Smith Reply 3–6. They further argue that Molner fails to refute critical elements of their MTD for failure to state a claim. *Id.*

### ii.    *Liquidator Defendants' MTD Arguments*

The Liquidator Defendants argue that the FAC fails to allege fraud with particularity against them and that the FAC's allegations against Varga—regarding his reputed willingness to cap his fees, play a limited role, and keep the liquidation in the Cayman Islands—does not allege fraud. Liq. Defs.' Mem. 3. Further, they state that these three asserted representations of or concerning Varga are nowhere to be found in the engagement letter that Molner approved, that Kinetic was retained by the Aramid Board, and that Molner does not explain how any statements by Varga were false. *Id.* at 3–4. Further, the Liquidator Defendants contend that Molner has sued Duff & Phelps based only on an allegation that the firm subsequently acquired Defendant Kinetic, without any allegation that Duff & Phelps assumed Kinetic's liabilities, which the Liquidator Defendants say would be required for Duff & Phelps to be liable. *Id.* at 5. Lastly, they note that Molner concedes that the Liquidator Defendants were not on the January 6 Call. *Id.* at 3.

Molner argues in response that Varga is liable because he repeated the lie to Molner about the need for a Cayman-based liquidator, *see* Molner Aff. ¶ 140, and that even though Shakespeare did not interact with Molner directly, he is nevertheless liable, *see* Pl. Opp'n to Liq. Defs.' MTD

11.[28] Further, Molner contends that he clearly asserts a legal basis for successor liability of Duff & Phelps for the wrongful acts of Kinetic. Pl. Opp'n to Liq. Defs.' MTD 14.

The Liquidator Defendants reply that Molner does not allege fraud against them with particularity, and that the FAC alleges neither a basis of liability against Duff & Phelps nor any misconduct at all by Shakespeare. Liq. Defs.' Reply at 1–3. The Liquidator Defendants also join the Reed Smith Defendants' Reply. *Id.* at 1.

### iii.   DMS Defendants' MTD Arguments

The DMS Defendants focus their arguments on issues of personal jurisdiction, service, and time-bar limitations, addressed *supra*. They also adopt the arguments of the Reed Smith Defendants, including those for failure to state a claim, by joinder. *See* Joinder to Reed Smith's Mem. of Law, ECF No. 80.[29]

### b. Applicable Law for Fraud-Related Claims

To state a claim for fraud under New York law, a plaintiff must adequately plead: "(1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 190 (2d Cir. 2023) (citation omitted). In short, "a plaintiff must allege a representation of material fact, falsity, scienter, reliance, and injury." *Zachmann v. Coleman Co.*, No. 20 CV 9146, 2022 WL 161480, at *7 (S.D.N.Y. Jan. 18, 2022) (internal quotation marks and citation omitted). If any one element is

---

[28] Molner's brief does not directly refute the Liquidator Defendants' claim that Molner's allegations against Shakespeare for fraud fail. Rather, Molner contends that Shakespeare "aided and abetted" fraud for personal gain. *See* Pl. Opp'n to Liq. Defs.' MTD 11. Regardless, this Decision addresses Molner's fraud claims as if Molner asserts them against Shakespeare.

[29] It is not clear from the FAC whether Molner includes the DMS Defendants in his fraud cause of action, because he excludes them in the header naming the applicable Defendants for his fraud claim but references them as a "Principal Defendant." FAC ¶ 289. For the sake of completeness and construing the FAC liberally in favor of Molner, the Court will consider whether Molner's fraud claim should be dismissed for failure to state a claim against the DMS Defendants.

insufficiently pled, a claim for fraud fails. *See Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.*, 939 N.Y.S.2d 745, at *9 (N.Y. Sup. Ct. 2011).

On a motion to dismiss for failure to state a claim for fraud under Rule 12(b)(6), a plaintiff must "assert facts that plausibly support the inference of fraud." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) (citation omitted). Further, a plaintiff must satisfy the heightened pleading standard in Rule 9(b). *Id.* at 171.

Rule 9(b) states:

In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Fed. R. Civ. P. 9(b). Thus, a plaintiff must carry two burdens – "the first goes to the pleading of the *circumstances of the fraud*, the second to the pleading of the defendant's *mental state*." *Loreley*, 797 F.3d at 171 (emphasis added). To allege with particularity the circumstances constituting fraud, a complaint must:

(1) detail the statement or meets the requisite particularity standard by detailing the statements (or omissions) that the plaintiff contends are fraudulent,
(2) identify the speaker,
(3) state where and when the statements (or omissions) were made, and
(4) explain why the statements (or omissions) are fraudulent.

*Loreley*, 797 F.3d at 171. Particularity is required so that each defendant is aware of the circumstances surrounding the fraud. *Aetna*, 404 F.3d at 579–80 (citation omitted) ("[s]weeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b).").

To allege with particularity a defendant's requisite mental state (scienter), a plaintiff must allege facts supporting the plausible inference that defendants possessed "knowledge of [their misstatements'] falsity," and "an intent to induce reliance." *Loreley*, 797 F.3d at 176 (citation

omitted); *see also Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169, 191

(Bankr. S.D.N.Y. 2010) (summarizing the requisite pleading standards relating to a party's mental

state, or scienter). Although mental states may be pleaded "generally," the relaxed pleading

standard is not a "license to base claims of fraud on speculation and conclusory allegations."

*Loreley*, 797 F.3d at 176 (citation omitted). Rather, a plaintiff must still allege facts "that give rise

to a strong inference of fraudulent intent." *Id.* (citation omitted); *see also Ochs v. Shearson Lehman

Hutton, Inc.*, 768 F. Supp. 418, 427 (S.D.N.Y. 1991) (citation omitted) ("A complaint may

adequately identify the statements alleged to be misrepresentations and properly indicate when,

where and by whom they were made, yet still fail Rule 9(b) scrutiny if the complaint does not

allege circumstances giving rise to a strong inference that defendant knew the statements to be

false," and "intended to defraud plaintiff."). An inference is strong if it is "cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." *Loreley*, 797 F.3d

at 176–77 (citation omitted).

A strong inference of fraudulent intent may be established either "(a) by alleging facts to

show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts

that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner

v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (citation omitted); *see also Hawkins v.

Coca-Cola Co.*, 654 F. Supp. 3d 290, 309 (S.D.N.Y. 2023) (citation omitted). "'[S]imple

knowledge that a statement is false' is insufficient to plead a strong inference of fraudulent intent."

*Valcarcel v. Ahold U.S.A., Inc.*, 577 F. Supp. 3d 268, 281 (S.D.N.Y. 2021) (quoting *Cooper v.

Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 115 (S.D.N.Y. 2021)).

Finally, "[a]s always, the ultimate question is whether Plaintiff's non-conclusory

allegations, taken together with reasonable inferences drawn therefrom, 'plausibly indicate

Plaintiff's entitlement to relief.'" *Newmont Mining Corp. v. AngloGold Ashanti Ltd.*, 344 F. Supp. 3d 724, 745 (S.D.N.Y. 2018) (citation omitted). In applying these fraud-specific pleading standards, the Court views the alleged facts in their totality, credits "all non-conclusory factual allegations in the complaint" and draws "all reasonable inferences" in Plaintiff's favor. *Loreley*, 797 F.3d at 171.

Applying these standards, the Court concludes that Plaintiff fails to plead with sufficient particularity facts giving rise to a "strong inference of scienter" as to any of the Defendants. As an alternative basis of dismissal, the Court concludes that Plaintiff fails to plead with sufficient particularity the "circumstances of fraud" as to all Defendants with the exception of McCarroll, Varga, Bree, and Hanson. The Court will address each of these pleading deficiencies in turn. For the reasons addressed below, applying these standards, the Court dismisses Molner's fraud claims against all Defendants in their entirety as insufficiently alleged, in addition to the Court's already-stated dismissal on preemption grounds.

### c. Application of Law

#### i. *Molner Fails to Adequately Allege Scienter*

Because adequate pleading of the elements of scienter are "essential to a cause of action for fraud," the Court first addresses whether Molner has met his burden of pleading each Defendant's mental state, or scienter, sufficient to give rise to a strong inference of fraudulent intent. *Zutty*, 939 N.Y.S.2d at *11. Applying the factors stated above, Molner's allegations fail to establish a "strong inference of fraudulent intent" or "scienter" on the part of any of the Defendants. *See Loreley*, 797 F.3d at 176. Specifically, the FAC and Molner Affidavit fail to adequately allege facts that show "both motive and opportunity to commit fraud," or to allege facts

that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 291 (citation omitted); *see also Hawkins*, 654 F. Supp. 3d at 309.

First, Molner does not plausibly allege "motive and opportunity to commit fraud" by the Defendants. Molner alleges that he initiated the January 6 Call in which he presented the Molner Plan. FAC 2, ¶ 5. There is no allegation that any of the Defendants (those on the call or those that emerged later) were aware before that call of Molner's proposal that they either "choose the Molner Plan" or "resign and the Fund would be free to implement Plaintiff's detailed strategy (or any other strategy) without him." FAC 3, ¶ 7. Thus, Molner's claims turn on the notion that during the very conversation with him in which he unveiled his plan, Defendants immediately responded by launching a scheme to defraud him, all turning on their expressing the view that a Cayman liquidation would require a Cayman liquidator. These alleged facts fail to give rise to a strong inference that the Defendants, individually or collectively, had the *opportunity* to plan to defraud Molner, and put all the events into place that culminated in this bankruptcy. *See* Molner Aff. ¶ 142 ("The central lie about the requirements under Cayman law for carrying out a voluntary liquidation were made on the January 6th call[.]"). It is not plausible, as that term is explained in *Twombly*, *Iqbal*, and *Nakahata,* nor is it even non-speculative, that one or more Defendants commenced the asserted scheme to defraud during the very same call with Molner in which they first heard his proposal—without any alleged coordination. *See Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556). It also is at least equally plausible that the complained-of response that a Cayman liquidator was needed was an innocent reaction grounded in practical experience or a misunderstanding even if it was inaccurate as a matter of Cayman law. In other words, the facts alleged do not give "rise to a strong inference that defendant knew the statement to be false[.]" *Ochs*, 768 F. Supp. at 427.

Second, even if Molner had plausibly alleged that the Defendants had the opportunity to commit fraud, Molner's allegations wholly fail to allege any sufficient *motive* on the part of the Defendants that gives rise to a strong inference of fraudulent intent. Molner's claim is that the Defendants were motivated by their desire to earn millions of dollars in fees from their future work in gaining control of the liquidation. But Molner gave the Defendants who were present on the call two choices—they could either agree with the Molner Plan or accept his offer to resign and "the Fund would be free to implement Plaintiff's detailed strategy (or any other strategy) without him." FAC 3, ¶ 7. Molner does not adequately allege a plausible strong inference of a motive to commit fraud by inducing Molner to remain while agreeing to retain a Cayman liquidator—because Molner emphasizes that he proposed a path in which Molner would depart, and the result of that choice would have been that Defendants could follow the exact same path he alleges motivated their supposed fraudulent scheme.

Molner offers another similar articulation of the Defendants' supposed motive "to sideline Plaintiff and assume control of the liquidation . . ."—which ultimately resulted in the bankruptcy case before this Court—and make millions of dollars in fees from their work. FAC 2, ¶ 2. Again, this ascribed motive is incongruous with Molner's central contention that he offered to resign and leave the Defendants to pursue whatever strategy they preferred. It would be illogical to seek to keep Molner involved if Defendants' asserted motivation was simply to run the liquidation as they saw fit, which was an option they already had available without recourse to any scheme of deceit. Yet this is Molner's central theory, from which all of Molner's intent allegations flow.

Apart from being logically incoherent, Molner's asserted motivation has been recognized as insufficient by case law holding that a mere desire for higher compensation or a profit motive is insufficient to give rise to a strong inference of fraudulent intent. *See Zutty*, 939 N.Y.S.2d at *11

(citation omitted) ("[A] desire for higher compensation . . . is found in virtually all commercial transactions, making it an ill-suited motive from which to draw an inference of intent to defraud."); *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 620–21 (S.D.N.Y. 2010) (internal quotation marks and citation omitted) (scienter element was not satisfied by alleging "receipt of compensation" and "the maintenance of a profitable business relationship"); *Hawkins*, 654 F. Supp. 3d at 309 (citation omitted) ("[I]t is well-settled that a company's general profit motive is insufficient to plead scienter."); *Bryant v. Silverman*, 284 F. Supp. 3d 458, 470 (S.D.N.Y. 2018) (citation omitted) ("General allegations that a defendant engaged in misconduct in order to maximize his profit do not adequately allege scienter."); *Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 234 (S.D.N.Y 2020) (citation omitted) ("[R]eceipt of incentive compensation, including performance-based bonuses, does not, by itself, establish motive.").

There is abundant case law to similar effect, also observing that, for example, although motive may be pleaded adequately where the plaintiff "assert[s] a concrete and personal benefit to the individual defendants resulting from the fraud," *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted), allegations that a defendant earned fees (or made partner or received bonuses) are commonly deemed attenuated, conclusory, and insufficient to give rise to a strong inference of intent to deceive, manipulate or defraud. *See, e.g.*, *id.* at 139 (citation omitted) ("[A] plaintiff must do more than merely charge that executives aim to prolong the benefits of the position they hold."); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) (citation omitted) ("The desire to earn management fees is a motive generally possessed by hedge fund managers, and as such, does not suffice to allege a 'concrete and personal benefit' resulting from fraud."); *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 593–94 (S.D.N.Y. 2006) (citation omitted) ("[D]esire of individual defendants to keep their jobs

or increase their compensation by artificially inflating . . . stock price is not sufficient to establish
motive."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) (citation
omitted) ("[G]eneralized allegations of intent to maintain lucrative business relationships and to
establish new ones do not set forth a motive for scienter purposes."). Rather, to be sufficient to
allege a fraudulent motive, the allegations must "entail *concrete* benefits that could be realized by
one or more of the false statements and wrongful nondisclosures alleged." *Shields v. CityTrust
Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (emphasis added). Thus, Molner's contentions
that various Defendants received higher salaries and bonuses, increased case assignments,
promotions, and additional business—all of which could also have been achieved by simply
accepting Molner's offer to resign and pursuing Defendants' preferred strategy—are unsupported,
conclusory, and fail to give rise to a strong inference of fraudulent intent.[30]

Lastly, the allegations in the FAC fail to evince strong circumstantial evidence of conscious
misbehavior or recklessness. If motive is not evident, "it is still possible to plead scienter by
identifying the circumstances indicating conscious behavior by the defendant, though the strength
of the circumstantial allegations must be correspondingly greater." *380544 Can., Inc. v. Aspen
Tech., Inc.*, 633 F. Supp. 2d 15, 29 (S.D.N.Y. 2009) (citing *Kalnit*, 264 F.3d at 138–39). However,
the alleged conduct must be "highly unreasonable" and "an extreme departure from the standards

---

[30] Specifically, Molner avers that "the Principal Defendants were subsequently able to make tens of millions of
dollars in fees that they would never have received had the Molner Plan been implemented"; "Gwynne, Siev, Mok
and Sanders continued to receive higher salaries and bonuses at Reed Smith"; "McCarroll 'shared the wealth' with
his colleagues through increased case assignments and influential support within the firm for additional bonus
allocation"; "In the case of Mok, her acquiescence even resulted in her both making partner and a subsequent
promotion to the position of Managing Partner . . . and her nomination to the firm's Global Regulatory Enforcement
Group;'" "Varga and Shakespeare profited"; "Hanson and Bree . . . in order to maintain and further nurture their
business relationship"; "Seymour chose to take no action, believing instead that not interfering would be better for
DMS's business and for him personally"; "Bree, Hanson, Seymour and DMS likewise kept quiet once they knew
about the fraud in order to maintain substantial business[.]"; "Reed Smith's only concern was getting paid"; "Reed
Smith and Kinetic profited handsomely"; the "motivation of the other Defendants to either help Varga and
McCarroll take control . . . was either fear, greed, or both"; "Bree personally made enough off the merger [from
DMS expanding its business] that he retired." *See, e.g.*, FAC ¶¶ 155, 182, 183, 186, 189, 218, 221, 223, 293, 308.

of ordinary care." *Id.* (citing *Honeyman v. Hoyt*, 220 F.3d 36, 39 (2d Cir. 2000)). Molner's allegations fail to exhibit highly unreasonable conduct or an extreme departure from how business professionals may proceed in structuring liquidation of a Fund that was, at the time, "embroiled in costly, protracted and complex litigation." FAC ¶ 55. The Court is not persuaded that Molner's allegations of the Defendants' mental state constitute strong circumstantial evidence sufficient to support an inference of fraudulent intent. Again, it is at least equally plausible that statements that a Cayman liquidator would be needed stemmed from common experience and an honest opinion of how Cayman liquidations are typically and best conducted. Thus, the allegations in the FAC fail to state a claim for fraud against all Defendants for lack of sufficient allegations of scienter.

    ii.   *Group Pleading and Molner's Allegations of the Circumstances of Fraud as to Specific Defendants*

The Court concludes that Molner also fails to state a claim against Mok, Sanders, Gwynne, Siev, Shakespeare, and Seymour because Molner fails to sufficiently plead with particularity the circumstances of fraud as to each of them—i.e., that even setting aside Molner's failure to state a claim for fraud at all, he also fails to plead facts sufficient to put each of these Defendants on notice of the actionable conduct Molner alleges they each engaged in. However, construing the FAC liberally, and without altering the Court's conclusion that dismissal is warranted on other grounds, the Court concludes that the FAC satisfies Rule 9(b)'s particularity requirements as to McCarroll, Varga, Bree, and Hanson (and, by principles of agency, their corresponding corporate entities Reed Smith, DMS, and Kinetic).

Molner's allegations against Defendants Mok, Sanders, Gwynne, Siev, Shakespeare, and Seymour are vague and conclusory, and fail to comply with the particularity requirements of 9(b) of the Federal Rules of Civil Procedure. Molner fails to differentiate with particularity among the acts or omissions of these Defendants. Even if the FAC was not otherwise deficient, the allegations

in the FAC fail to plead with the requisite particularity the fraud perpetrated by each of these Defendants such that they are aware of the circumstances surrounding the fraud. *See Naughright v. Weiss*, 826 F. Supp. 2d 676, 689 (S.D.N.Y. 2011) (citation omitted) (allegations of fraud require that "a plaintiff differentiate his allegations as to each defendant and inform each defendant separately of the specific allegations."). Even after seeing Defendants' arguments, Molner's Affidavit fails to cure this pleading deficiency in the FAC.

In one section of the FAC, Molner names "McCarroll and Varga" as the principal wrongdoers, along with Reed Smith and Kinetic. FAC ¶ 180. In another, he lumps Defendants Reed Smith, the Individual Reed Smith Defendants, DMS, Kinetic Partners, Geoffrey Varga, Bree, Hanson, Seymour, and DMS as the "Principal Defendants." FAC ¶ 289.[31] More specifically, Molner alleges as follows:

> [E]ach of the Principal Defendants falsely asserted to Plaintiff that, as a matter of Cayman law, a voluntary liquidation of AEF in the Cayman Islands would require the appointment of a voluntary liquidator who was a "Cayman-based, licensed insolvency practitioner". The Principal Defendants knew that representation was false and made it with the intent that Plaintiff would rely on it to his detriment. There is no such requirement under Cayman law.

FAC ¶ 290. Molner's 87-page FAC and briefs are replete with repetitive, occasionally inconsistent, and conclusory allegations, which are insufficient to meet the heightened pleading requirements of Rule 9(b). *See Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 346 (E.D.N.Y. 2014) (dismissing fraud claim for "kitchen sink"-style-pleading).[32] As another court has put it,

---

[31] Shakespeare is not explicitly included in the fraud (First) cause of action. However, because Molner references Shakespeare in his fraud cause of action, FAC ¶ 291, the Court will interpret Molner's pleadings liberally and assume the inclusion of Shakespeare in Molner's fraud cause of action.

[32] The FAC raises a number of alternative theories to support his claim of an elaborate scheme on behalf of the Defendants. *See, e.g.*, FAC ¶¶ 202, 206, 208, 291. However, because the heart of Molner's claims surround the alleged lie about the requirements under Cayman Law to appoint a liquidator, and because "[s]weeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)," the Court need not wade into all of Molner's conclusory allegations. *See Aetna*, 404 F.3d at 579–80 (citation omitted).

"such sweeping, undifferentiated allegations clearly do not satisfy Rule 9(b)." *Apace Commc'ns, Ltd. v. Burke*, 522 F. Supp. 2d 509, 517 (W.D.N.Y. 2007).

By way of a more detailed example, the FAC fails to differentiate between the actions, or inactions, of "Sanders and Mok" and "Gwynne and Siev" by consistently grouping them together in pairs, for example, as follows:

- "Mok and Sanders" "participated" in the January 6 Call, voiced support for the Molner Plan, and supported the "lie" told by McCarroll "during the period of January–May 2014." FAC 5 ¶ 7; 6 ¶ 10; ¶ 91;
- "Sanders and Mok" failed to act and used confidential information to "further the plan of McCarroll and Varga to assume control of the liquidation of AEF." FAC ¶ 186;
- "Sanders and Mok" were "actively in the loop" during the several months it took to craft various legal agreements. FAC ¶ 186;
- "Sanders and Mok" failed to "break rank" with McCarroll and point out that there was no requirement to hire a Cayman-based liquidator. FAC ¶¶ 185–86;
- "Mok and Sanders" knew (or should have known) that Bree and Hanson were lying . . . and said nothing." Molner Aff. ¶ 142; and
- "Mok and Sanders" (and Varga, McCarroll) reconfirmed their "understanding that the litigation strategy of the Moner [sic] Plan relied on keeping the liquidation of AEF in Cayman, with Plaintiff calling the shots." FAC ¶ 202.

The FAC likewise groups Gwynne and Siev together and fails to differentiate between them:

- "Gwynne and Siev" "joined in the lie" and "joined the fraud-in-progress in order to enrich themselves." FAC ¶¶ 91, 185;
- McCarroll recruited "them to add manpower and plot to transfer the liquidation out of Cayman" FAC ¶ 187; and
- "Gwynne and Siev knew McCarroll's intentions and that his plan to assume control of the liquidation of AEF was based on defrauding Plaintiff." FAC ¶ 187.

Even drawing all inferences in favor of Molner as is required, the Court could only identify two instances in the FAC of statements regarding Gwynne-Siev or Mok-Sanders individually. And even these were conclusory and fail to plead the circumstances of fraud as to each of them. Molner alleges that Siev "was closely involved in, assisted in, and supported Mr. McCarroll's actions and directives," and he "knew that part of McCarroll's plan was to win Plaintiff's confidence and trust,

as it was Siev who had helped McCarroll secure tickets to the January 13, 2014 Jay-Z concert, which McCarroll gave to Plaintiff." FAC ¶¶ 187, 246. Further, Molner avers that Sanders was "closely involved in, assisted in, and supported McCarroll's actions and directives." FAC ¶ 243.

These statements fail to allege when and where Gwynne or Siev made any actionable statement or omission and why Gwynne or Siev's statements or omissions were fraudulent; instead, Molner merely alleges in conclusory fashion that they "joined the fraud-in progress." *See* FAC ¶ 185. This is insufficient, even if the Court were to excuse the conclusory nature of many of these allegations. *See Loreley*, 797 F.3d at 171 (plaintiff must sufficiently allege circumstances of fraud, including stating when and where statements or omissions were made, and detailing and explaining why statements or omissions are fraudulent). Thus, the Court concludes that Molner fails to adequately allege the circumstances of fraud against Mok, Sanders, Gwynne, or Siev. *Aetna* 404 F.3d at 579–80 (citation omitted) ("[S]weeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)."); *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) (citation omitted) ("[W]here multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to satisfy the particularity requirement."); *Zutty*, 939 N.Y.S.2d at *9 (citation omitted) ("[C]omplaint for fraud [must] articulate the misconduct complained of, in sufficient detail to clearly inform each defendant of what their respective roles were in the incidents complained of[.]").[33] Molner's allegations improperly lump these Defendant-pairs together, are conclusory in form, and fail to plead the circumstance of fraud as to each with particularity.

---

[33] As a whole, Molner's lack of differentiation among Mok, Sanders, Gwynne, and Siev not only fails to meet the heightened particularity standards of Rule 9(b) but also fails to meet even the more lenient pleading requirements of Rule 8 sufficient to provide Mok, Sanders, Gwynne, or Siev "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citing 5 Wright & Miller, Federal Practice and Procedure ¶ 1202, pp. 94–

The allegations against Shakespeare and Seymour are likewise threadbare and conclusory. Molner alleges generally that Shakespeare knew of the alleged fraud by Varga because "Mr. Varga kept Mr. Shakespeare apprised of matters and decisions affecting the liquidation of AEF, as he was obligated to do." FAC ¶ 96. He further alleges that Shakespeare was the "shadow" JVL and Varga's "surrogate." FAC ¶ 184. They were "a package"—and the admitted "fact that Shakespeare had little contact with Plaintiff does not matter." FAC ¶ 184. Shakespeare "knew that Varga had misled Plaintiff into believing that Cayman law required a Cayman-based insolvency practitioner to act as a liquidator and acquiesced in that fraudulent representation." FAC ¶ 184. Further, "[h]e kept quiet and did as he was told[.]" FAC ¶ 184; *see also* ¶ 96.[34] Shakespeare allegedly "knew that he, Varga and Kinetic had further deceived Plaintiff by ostensibly agreeing to a limited role, pursuant to the broader Molner Plan, and that the Molner Plan specifically excluded any attempt to transfer the liquidation of AEF out of Cayman." FAC ¶ 184. But all of these allegations are unaccompanied by any supporting allegations of fact—such as a specific communication or directive or act.

Similarly, as stated *supra*, the allegations against Seymour are largely based on his role as "Hanson and Bree's direct superior." *See* FAC ¶ 166. The allegations in the FAC as to Seymour are broad and conclusory. *See, e.g.*, FAC ¶ 166 ("Seymour also knew that it was not a legal requirement to use a Cayman-based insolvency practitioner"); FAC ¶ 183 ("Bree and Hanson [] kept him timely informed . . . [and] could have directed Bree and Hanson to act consistent with

95 (3d ed. 2004)). *See, e.g., Ahmad v. Day*, 647 F. Supp. 3d 272, 280 (S.D.N.Y. 2022) ("In examining the [pleadings] [the court] ignore[s] the paragraphs that make allegations against all or some defendants in an undifferentiated manner as a group, including those with conclusory allegations[.]"); *Appalachian Enters., Inc. v. e Payment Sol., Ltd.*, No. 01 CV 11502, 2004 WL 2813121, at *7 (S.D.N.Y. Dec. 8, 2004) (internal quotation marks and citation omitted) ("[A plaintiff fails to satisfy rule 8, where the complaint lumps all defendants together and fails to distinguish their conduct[.]").

[34] Molner alleges that "for purposes of Cayman law, [Varga and Shakespeare are] equally liable for one another's acts." FAC ¶ 184. However, as previously noted and as the parties seemingly agree based upon their arguments and briefs, the Court is applying New York law to evaluate the causes of action in this proceeding.

their duties[.]"). The FAC is devoid of non-conclusory allegations of actions or inactions by Seymour plausibly alleging his knowledge of the circumstances of the asserted fraud with requisite particularity.[35]

The allegations regarding Shakespeare and Seymour fail to meaningfully "differentiate" them in a way tied to Molner's claims, *see Naughright v. Weiss*, 826 F. Supp. 2d 676, 689 (S.D.N.Y. 2011) (citation omitted); among other things, the FAC provides no detail about when or where Shakespeare's assertedly actionable "omissions" occurred nor, with respect to Molner's allegations that Shakespeare deceived Molner, that he agreed to the Molner Plan and a "limited role." *See Loreley*, 797 F.3d at 171 (Rule 9(b) requires, in part, detail of the statements or omissions the plaintiff contends are fraudulent and where and when the statements or omissions were made.). Molner does not plausibly allege, nor provide sufficient detail of the circumstances of fraud, that Shakespeare knew of the alleged fraud simply because Varga allegedly "kept Mr. Shakespeare apprised." *See* FAC ¶ 96. In fact, the Kinetic Service Agreement, which Molner attaches to the FAC, belies his assertion that Shakespeare "ostensibly" agreed to a limited role. *See* FAC Ex. H, "Introduction" ("While the liquidators will endeavour [sic] to work cooperatively with you . . . [their] duties to the stakeholders . . . and their statutory obligations under the applicable laws, must take priority over your wishes."). Particularly given this contractual language, the allegations in the FAC fail to allege the circumstances of fraud with particularity against Shakespeare.

However, construing the FAC liberally in favor of Molner, the fraud allegations against other defendants—McCarroll, Bree, Hanson, and Varga—are stated with sufficient particularity to inform them of the circumstances of the fraud alleged, or put another way, what each is alleged

---

[35] As an additional ground for dismissal with respect to Seymour, and as previously determined, the Court lacks specific jurisdiction over Seymour.

to have done, although they are substantively deficient for the reasons stated above. *See Loreley*, 797 F.3d at 171 (summarizing the first burden a fraud plaintiff must meet).

Molner alleges that McCarroll and Varga are "chiefly responsible" for the fraud upon Molner. FAC ¶ 180. Molner avers that "the basic fraud was lying to me about Cayman law requiring that I engage a 'Cayman-based and licensed insolvency practitioner,'" and this "lie" was repeated by McCarroll at his office on or around January 15, 2014. Molner Aff. ¶ 140.[36] *See also* FAC ¶¶ 12, 98, 99, 198. Molner further alleges that statement made on the January 6 call was untrue. *Id.* at 2, ¶ 2; ¶ 289.[37] These allegations detail the statements Molner contends are fraudulent, identify McCarroll as the speaker, state where and when the statements occurred, and aver that the statement that "hiring a Cayman-based insolvency practitioner was a legal requirement" is untrue. Thus, Molner's allegations of the circumstances of fraud against McCarroll are sufficiently particular to inform him of the nature of his alleged fraud. *See Loreley*, 797 F.3d at 172, 174 (considering whether allegations suffice to "inform each defendant of the nature of [their] alleged participation in the fraud.") (internal quotations marks and citations omitted).

Further, liberally construing Molner's allegations, the Court concludes that the Affidavit provides the required notice to Varga, although, again, the claims against Varga are dismissed for the reasons explained elsewhere in this opinion. Molner's Affidavit avers that the "lie" was

---

[36] Molner initially alleged that McCarroll was on the January 6 Call and misstated Cayman law at that time FAC 4, ¶ 1; 9, ¶ 193, but later avers instead that McCarroll "repeated the lie" on January 15. Molner Aff. ¶¶ 140, 143–44. Because the Court must draw all reasonable inferences in the pro se plaintiff's favor, and to eliminate the possible basis of a request for leave to replead, the Court will consider the allegations against McCarroll stated in the Affidavit. *See DiFolco*, 622 F.3d at 110–11.

[37] Molner also alleges that McCarroll committed a "fraud upon a fraud" and misrepresented to him that Varga could be controlled and is "in the family at the January 15 meeting. *Id.* ¶¶ 99, 198. This statement, and other related statement in the FAC, are conclusory assertions and Molner does not plausibly allege why those statements are fraudulent. *See Loreley*, 797 F.3d at 171 (stating that a plaintiff must "explain why the statements (or omissions) are fraudulent" to plead the circumstances of fraud with particularity). Because the Court finds that the allegations in the Affidavit with respect to McCarroll's statement on January 15 that a Cayman-based liquidator was required are sufficient, the Court does not need to further examine Molner's "fraud upon a fraud" claim against McCarroll.

76

"repeated to me by Jim McCarroll (at the meeting in his office on or around January 15th) and by Geoffrey Varga . . . ." Molner Aff. ¶ 140. This is sufficient for Varga to be informed of the nature of the allegations against him, even if it is not sufficient to state a claim on which relief can be granted. *See Loreley*, 797 F.3d at 172.

Finally, at least in terms of pleading the circumstances of fraud, the FAC alerts Bree and Hanson to the fraud allegations against them, however deficient they may be. Specifically, Molner alleges the statement he contends is fraudulent, avers that Bree and Hanson were the speakers, and states where and when the statements were made *See, e.g.*, FAC 4, ¶ 1. Although more attenuated, construing all inferences in favor of Molner, he also alleges why he contends they are fraudulent. *See* FAC ¶¶ 290, 292–300; *See Loreley*, 797 F.3d at 171 (stating that to allege with particularity the circumstances constituting fraud, the complaint must detail the alleged fraudulent statement, identify the speaker, state when and where the statement was made, and explain why the statement is fraudulent). Therefore, the Court concludes that Molner sufficiently alleges the circumstances of his (legally insufficient) fraud allegations against Bree and Hanson.

Thus in sum, the Court concludes that Molner fails to adequately allege the circumstances of fraud with particularity against Mok, Sanders, Gwynne, Siev, Shakespeare and Seymour, entitling these individuals to dismissal for this independent reason. The Court concludes, however, that this ground for dismissal does not apply to McCarroll, Bree, Hanson, and Varga, who are the subject of more concrete and particularized factual allegations.[38]

---

[38] The Court concludes that Molner's fraud allegations are sufficiently pled as to corporate Defendants Reed Smith, Kinetic, and DMS, because "the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *In re 1031 Tax Group, LLC*, 420 B.R. 178, 199 (Bankr. S.D.N.Y. 2009) (citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000)). In light of the multiple alternative bases for dismissal of Molner's claims, the Court need not delve further into the allegations against the various corporate Defendants.

**Count II:**      **Fraudulent Concealment**

Molner's failure to adequately allege scienter is fatal to his claims for fraudulent concealment, for the same reasons outlined with respect to Molner's fraud claims. *See Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010) ("Both common law fraud and fraudulent concealment require the Plaintiff to plead scienter.").[39]

For the reasons stated above, Molner's cause of action for fraudulent concealment is dismissed as against all Defendants.

**Counts III-IX: The "Remaining Claims"**

As discussed below, Molner's Remaining Claims as to all Defendants fail for at least one of two broad reasons. Some fail because Molner fails to plausibly allege the existence of a confidential or special relationship, or fiduciary duty (Count III–Constructive Fraud; Count IV–Breach of Confidence; Count VII–Breach of Fiduciary Duty; Count VIII–Aiding and Abetting Breach of Fiduciary Duty), and others fail because Molner does not plausibly allege one or more essential elements of the applicable cause of action (Count V–Unjust Enrichment; Count VI–Aiding and Abetting Fraud; Count IX–Breach of Contract). Finally, because Molner's claims are based upon the same underlying allegations of fraud, and Molner fails to plead the circumstances of fraud with particularity as against Mok, Sanders, Gwynne, Siev, Shakespeare, and Seymour (addressed *supra*), an additional reason exists to dismiss certain of the Remaining Claims as to this subset of the Defendants as discussed below.

---

[39] The elements of a fraudulent concealment claim under New York law are: "(1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages." *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 314 (S.D.N.Y. 2018) (citation omitted); *see also Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 582 (2d Cir. 2005).

**Remaining Claims that Fail for Lack of an Existing Relationship, Duty or Breach**

**Count III:      Constructive Fraud**
**Count IV:      Breach of Confidence**
**Count VII:     Breach of Fiduciary Duty**
**Count VIII:    Aiding and Abetting Breach of Fiduciary Duty**

### a. Summary of Parties' Arguments Relating to Fiduciary, Confidential, or Special Relationship

The Reed Smith Defendants argue that Molner fails to plausibly allege any fiduciary or confidential relationship between the Reed Smith Defendants and him. *See* Reed Smith Mem. 3. In particular, they argue that Molner admits Reed Smith did not formally represent him, and that their duties ran not to Molner but rather to the clients that retained them—the Committee and later the JVLs. *Id.* at 3, 22. The Reed Smith Defendants contend that no special relationship or duty arose from their joint efforts in seeking to implement the "Molner Plan," because those efforts were a product of Reed Smith's interactions with Molner in his capacity as Fund manager, not in his individual capacity. Additionally, they argue, Molner fails to plausibly allege the existence of any fiduciary relationship arising from the CICA, because the express terms of the CICA state otherwise. *Id.* at 23. Finally, they contend that any argument that a duty to disclose information existed due to any Defendants' "superior knowledge" fails because there were no "direct negotiations" between Molner and the Defendants, as would be necessary to find such a duty. *Id.* at 24. The DMS Defendants and the Liquidator Defendants adopt all of these arguments.

Molner asserts the Defendants were his "confidants and fiduciaries" who owed fiduciary duties to him and had trust relationships with him. *See, e.g.*, FAC ¶¶ 326, 334, 369; *see also* Pl. Opp'n to Reed Smith MTD 16–17, 24–26. In particular, he points to his allegations that he "worked with the Reed Smith and the Individual Reed Smith Defendants for years prior to 2014 and had revealed his confidences to them in the context of the Wimbledon Inquiry." FAC ¶ 226. Molner

further alleges that his relationship with the Reed Smith Defendants grew because they interacted "favorably" during the years that followed, with Reed Smith and McCarroll offering Molner concert and sporting event tickets and referring him business opportunities. *Id.*; *see also* Pl. Opp'n to Reed Smith MTD 18.

Molner further alleges that he developed a "trusting relationship" with Reed Smith following the Wimbledon Inquiry, as they interacted with him on an "intimate and regular basis for years" and used substantial amounts of his confidential information, which ultimately led to his exoneration from the claims against him. FAC ¶ 359. Molner alleges that his relationship with Reed Smith and the Individual Reed Smith Defendants "had most if not all aspects of an attorney-client relationship," although he acknowledges that no engagement agreement was ever signed between him and the firm. FAC ¶ 358. In support, Molner contends that Reed Smith gave him legal advice on occasion. Pl. Opp'n to Reed Smith MTD 26.

In his Affidavit, Molner attests that Reed Smith advised him during and after the Wimbledon Inquiry about how to proceed with appropriate caution in the Inquiry's aftermath. Molner Aff. ¶ 145. Molner alleges that following January 2011, Reed Smith had completed its investigatory mandate to complete the Wimbledon Inquiry but stayed on as legal advisor to the Fund. *Id.* Finally, he asserts that Reed Smith owed duties of good faith, confidentiality, care and loyalty to its client, AEF, and thus had a duty to take into account the interests of AEF's shareholders. *See* FAC ¶ 94. Molner explains, "[b]y explicitly voicing their support for the Molner Plan, advising directors to support it, then using their trust relationship with Plaintiff to become an unsolicited but essential party to the implementation of the Molner Plan, Reed Smith created a special relationship with Plaintiff[.]" FAC ¶ 94. Molner further alleges that it was reasonable for

him to trust the Liquidator Defendants and the DMS Defendants based upon their many years of

interacting with either Molner or with Reed Smith. FAC ¶ 326.

### b. Applicable Law

A claim for constructive fraud omits the common-law fraud element of scienter, and

instead includes a requirement that defendants maintained either a fiduciary or confidential

relationship with the plaintiff. *Aaronson v. Kellogg Co.*, No. 18-CV-5616, 2020 WL 2489087, at

* 8 (S.D.N.Y. May 14, 2020) (citing *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp.

3d 504, 524 (S.D.N.Y. 2014); *see also Tutor Perini Bldg. Corp. v. N.Y.C. Reg'l Ctr., LLC*, 525 F.

Supp. 3d 482, 515 (S.D.N.Y. 2021) (citation omitted).

To state a claim for breach of confidence, the plaintiff must plausibly allege that the

defendant owed the plaintiff a duty of confidentiality arising out of a fiduciary relationship. *Kane*

*v. Univ. of Rochester*, No. 23-CV-6027, 2024 WL 1178340, at *14 (W.D.N.Y. Mar. 19, 2024)

(citation omitted) ("The cases permitting breach of confidence claims makes clear that, the

gravamen [of such claims] is fundamentally the breach of the fiduciary duty of confidentiality.").

*See also Wallace v. Health Quest Sys., Inc.*, No. 20 CV 545, 2021 WL 1109727, at *12 (S.D.N.Y.

Mar. 23, 2021) ("[T]he sum of cases demonstrate a plaintiff must plead . . . [that] the defendant

assumed a duty of confidentiality.").[40]

Similarly, and as seems obvious, to state a claim for damages for breach of fiduciary duty

under New York law, a plaintiff must allege the existence of a fiduciary relationship. *Margrabe v.*

*Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (citation omitted); *Blum v. Spaha*

*Cap. Mgmt., LLC*, 44 F. Supp. 3d 482, 497 (S.D.N.Y. 2014). Further, "a claim for aiding and

abetting breach of fiduciary duty is dependent upon the underlying breach of fiduciary duty."

---

[40] The Defendants contend that Molner's breach of confidence claim should dismissed because it is subject to a three-year statute of limitations. Reed Smith Mem. 26 n. 17. The Court does not reach this issue.

*Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 613 (S.D.N.Y. 2011) (citation

omitted).[41]

"[A] fiduciary relationship arises when one has reposed trust or confidence in the integrity

or fidelity of another who thereby gains a resulting superiority of influence over the first, or when

one assumes control and responsibility over another." *Reuben H. Donnelley Corp. v. Mark I Mktg.*

*Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995) (citation omitted). In determining whether such a

relationship exists, "courts should look first to any applicable contract and then to the parties'

relationship more generally[.]" *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 497 (S.D.N.Y. 2017)

(citing *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005)).

A special fiduciary duty may arise when "one party's superior position or superior access

to confidential information is so great as virtually to require the other party to repose trust and

confidence in the first party." *Reed v. Luxury Vacation Home LLC*, 632 F. Supp. 3d 489, 515

(S.D.N.Y. 2022) (citation omitted); *see also JP Morgan Chase Bank, N.A. v. 29-33 Ninth Ave.*

*LLC*, No. 22-CV-3865, 2024 WL 68527, at *11 (S.D.N.Y. Jan. 5, 2024). Unilateral trust or

confidence will not "automatically create a fiduciary relationship; the trust or confidence must be

accepted as well." *Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.*, 261

F.R.D. 13, 26 (S.D.N.Y. 2009) (citation omitted). "Typically, a confidential relationship involves

a relationship of trust such as parent and child, husband and wife, guardian and ward, trustee and

cestui que trust, principal and agent, or attorney and client." *LBBW Luxemburg S.A. v. Wells Fargo*

*Sec. LLC*, 10 F. Supp. 3d 504, 524 (S.D.N.Y. 2014) (citation omitted).

---

[41] Molner asserts his claim for a breach of fiduciary duty against the Reed Smith Defendants, and he asserts a claim
for aiding and abetting a breach of fiduciary duty against all Defendants.

### c. Application

Molner's allegations fail to allege facts plausibly stating a fiduciary or confidential relationship between Plaintiff and the Defendants. *See, e.g.*, FAC ¶¶ 15, 64, 191, 358. Molner does not allege the existence of any contract between Reed Smith as fiduciary and Molner in his personal capacity. In fact, the CICA—an agreement from which Molner contends a confidential or fiduciary relationship emerged—expressly *disclaims* any fiduciary relationship. *See* FAC Ex. C, ¶ 16 ("This Agreement does not (ii) create a fiduciary relationship between the parties[.]"). Without the existence of a contract, the Court must look to the nature of Molner's relationship with Reed Smith.

First, Molner's work with Reed Smith during the Wimbledon Inquiry does not plausibly support the existence of a fiduciary or confidential relationship between Reed Smith and Molner in his personal capacity. The Wimbledon Inquiry was completed well before 2014 when events giving rise to the FAC began, and the subsequent interactions that Molner alleges all occurred during Reed Smith's representation of the Fund, and not Molner individually. The duties and relationships shown by the FAC thus existed between Reed Smith and its corporate client, not with Molner individually. *See Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 562 (2009) (citation omitted) ("It is well settled that a corporation's attorney represents the corporate entity, not its shareholders or employees.").

Nor does Molner plausibly show a fiduciary or confidential relationship by alleging that McCarroll "went on a charm offensive" – giving him event tickets and referring him business opportunities, seeking and winning Molner's trust. FAC ¶¶ 79–90. Neither Molner nor this Court has identified case law holding that the provision of corporate entertainment to an employee of a client entity gives rise to a fiduciary or protected confidential relationship running directly to the

employee in his or her individual capacity. Moreover, the mere existence of an individual's "[s]ubjective trust" does not give rise to a fiduciary relationship. *Musalli*, 261 F.R.D. at 26; *see also Solomatina v. Mikelic*, 370 F. Supp. 3d 420, 434 (S.D.N.Y. 2019) (citation omitted). Similarly, although Molner alleges that Reed Smith [McCarroll] gave him advice, "providing advice does not make one a fiduciary." *PetEdge,* 234 F. Supp. 3d at 500 (citation omitted). Nor are his allegations of an attorney client relationship plausible or justifiable for the reasons stated above, especially in the absence of any retainer agreement or even oral agreement that Reed Smith would serve as Molner's attorneys while it is undisputed that Reed Smith *did* represent the entity clients with which Molner was affiliated. *LBBW Luxemburg*, 10 F. Supp. 3d at 524 ("[T]he crux of a confidential relationship is justifiable trust[.]").

Molner's allegations describe his own level of trust in Reed Smith, but "reposing trust or confidence in a party that has superior access to confidential information is not sufficient to establish a fiduciary relationship—under New York law, there is no fiduciary relationship unless the trust or confidence has been <u>accepted</u> as well." *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d, 201, 206 (S.D.N.Y. 2016) (citation omitted); *see also Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) (internal quotation marks and citation omitted) ("Thus, for example, the fact that one party trusts the other is insufficient to create a fiduciary relationship."). Furthermore, the allegation that Reed Smith "obtained, solicited, reviewed, analyzed, and used substantial amounts of Plaintiff's confidences and confidential information," FAC ¶ 359, over the years while representing its corporate client does not plausibly suggest that Reed Smith agreed to represent Molner in his individual capacity. In fact and to the contrary, the CICA stated that information shared under the agreement "shall be used . . . to prepare and make recommendations to the full Board of AEF," and that "[t]his Agreement does not (i) affect the

independent and separate representation of any Party by the Parties' respective counsel; (ii) create a fiduciary relationship between the Parties . . .," and it identified as a purpose of the agreement analyzing "certain matters pertaining to the governance and business of AEF"—not for the purposes of serving Molner's personal interests. FAC Ex. C at 1; ¶¶ 3, 16.

Nor does Molner plausibly allege that Reed Smith entered a fiduciary relationship by providing him with advice. He alleges that McCarroll repeatedly gave him personal legal advice and that Reed Smith provided general advice regarding how to put the Molner Plan into place. FAC ¶ 360; Pl Opp'n to Reed Smith MTD 16. However, merely providing advice does not make one a fiduciary, nor does reliance on that advice impose a fiduciary duty. *See, e.g., PetEdge*, 234 F. Supp. 3d at 499. Molner further notes that the Reed Smith Defendants took affirmative steps that "shaped [his] thinking about how to put into action the plan of voluntary liquidation." FAC ¶ 360. But Reed Smith concededly represented the Fund as an entity and dealt with Molner as an employee or officer of the Fund in discussing the Molner Plan; nothing in the FAC suggests that any Reed Smith attorney assumed control and responsibility over Molner's personal interests or gained a resulting superiority of influence over him in his individual capacity. *See Mueller*, 225 F. Supp. 3d at 206 (dismissing case, in part, because plaintiff's reliance on defendant's advice did not create a special relationship of confidence and trust that may give rise to a fiduciary relationship).

At most, Molner alleges that he was reasonable in trusting Varga (and his firm Kinetic Partners/Duff & Phelps and Shakespeare), Bree and Hanson (and their firm DMS and Seymour), "because they were Reed Smith's clients going back many years, and Molner was familiar with them himself through his years of interacting with them when he managed ACP on behalf of the Fund and was in close communication with them." FAC ¶ 326. Likewise, Molner alleges that

85

"[b]ecause directors Hanson and Bree rendered fiduciary services to AEF in their capacity as full-time employees DMS (now part of Waystone), DMS/Waystone are equally liable for letting the fraud happen." FAC ¶ 182. But these allegations merely describe familiarity stemming from longstanding business dealings with entities associated with Molner—not anything that could plausibly give rise to a confidential or fiduciary relationship between Molner individually, on the one hand, and Bree, Hanson, or any of the Defendants on the other.[42]

Because the FAC fails to plausibly allege that the named Defendants owed fiduciary duties to Molner, his claim for aiding and abetting breach of fiduciary duty necessarily fails. *See In re Hydrogen, L.L.C.*, 431 B.R. 337, 352 (Bankr. S.D.N.Y. 2010) ("Because the Court has previously concluded that the Committee's breach-of-fiduciary-duty claim has been deficiently pled, it follows that the first element of the aiding and abetting claim—a breach of fiduciary duty—has also not been pled adequately."). The remaining allegations supporting a fiduciary relationship are either generalized, conclusory, or impermissibly group pled.

In sum, Molner has failed to plausibly allege the existence of a special relationship of confidence and trust or the existence of a fiduciary duty, and therefore his claims that require such allegation are dismissed. The claims dismissed on this basis are Constructive Fraud (Count III), Breach of Confidence (Count IV), Breach of Fiduciary Duty (Count VII), and Aiding and Abetting Fiduciary Duty (Count VIII) against all Defendants.

---

[42] Finally, Molner observes that Cayman law imposes a duty where a "special relationship" arises, *see, e.g.*, FAC ¶¶ 128, 159—but, as previously discussed, Molner's FAC asserts causes of action under New York law. Even liberally construing Molner's arguments, he concedes that a confidential relationship is required, which the Court has determined did not exist between Molner and any of the Defendants. *See* FAC ¶ 159 (stating that one of the requirements of a special relationship under Cayman law is a "relationship of confidence.").

**Remaining Claims that Fail to Plausibly Allege an Essential Element**

**Count V:        Unjust Enrichment**
**Count VI:       Aiding and Abetting Fraud**
**Count IX:       Breach of Contract**

Molner's remaining claims—for Unjust Enrichment, Aiding and Abetting Fraud, and Breach of Contract—also fail to adequately plead at least one essential element. This Decision addresses each in turn.

**Count V:        Unjust Enrichment**

### a. Summary of Parties' Arguments

Molner's claim for Unjust Enrichment is against all Defendants except the DMS Defendants and Seymour. Molner alleges that the Defendants deceived him into believing that the appointment of a Cayman-based insolvency practitioner was a legal necessity and were thereby unjustly enriched by being paid tens of millions of dollars for their representation of AEF or their work as crisis managers. *See* FAC ¶¶ 341–43.

The Reed Smith Defendants argue that Molner is seeking to disgorge fees paid to Reed Smith for their representation of AEF—fees that Molner did not pay. Thus, there was no "enrichment" at Molner's expense. *See* Reed Smith Mem. 28. Further, they contend that Molner does not allege an equitable basis for disgorgement because all post-petition fees for Reed Smith were approved by the Court, and other fees earned pertained to work Reed Smith performed for independent directors of the fund. *Id.* Finally, they maintain that Molner's unjust enrichment claim is simply an improper "catch-all" cause of action. *Id.* at 29. The DMS and Liquidator Defendants join in the arguments of Reed Smith.

Molner responds, in sum, that his claim for unjust enrichment is based upon the Defendants' tortious conduct, rather than based upon contract, and that his claim for unjust enrichment is thus consistent with New York Law. *See* Pl. Opp'n to Reed Smith MTD 30–31.

### b. Applicable Law

A claim for unjust enrichment in New York requires the plaintiff to allege that "(1) the defendant was enriched; (2) at plaintiff's expense; and (3) that it is against equity and good conscience to permit defendant to retain what is sought to be recovered." *Kaplan v. Reed Smith LLP*, 919 F.3d 154, 160 (2d Cir. 2019) (citation omitted).

Issue preclusion applies when the same issue of fact or law has been "actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Id.* at 159 (citation omitted).

### c. Application

Most centrally and dispositively, the FAC includes no plausible allegations that any of the Defendants were enriched at Molner's expense. Although Molner alleges that that the Defendants were enriched by collecting tens of millions of dollars in fees from the Fund during and before its bankruptcy, Molner does not allege that he paid any of those fees and he seems to acknowledge that he did not. *See, e.g.*, FAC ¶ 66 ("Reed Smith was engaged and paid by AEF."). Courts in New York routinely reject claims for unjust enrichment where the complaining party seeks to recover fees it did not pay. *See Mueller*, 225 F. Supp. 3d at 209 ("[A] plaintiff cannot recover under an unjust enrichment theory where the plaintiff did not pay the fees in question"; collecting cases).

This alone warrants dismissal, but the FAC is deficient in other ways. To the extent Molner seeks to be paid fees awarded during the bankruptcy case, he is impermissibly attacking this Court's prior determinations despite having had (but ignored) the opportunity to object to

applications for Court approval. In the Fund's bankruptcy case, the Court considered and granted

applications for awards of compensation and expenses to Reed Smith (including for work done by

the Individual Reed Smith Defendants), *see, e.g.*, ECF No. 822, and for the retention and

compensation of Varga and Shakespeare as joint liquidators, ECF No. 136. This Court's approval

during the bankruptcy of these applications resolved an issue that also is an essential element of

Molner's unjust enrichment claim—whether Reed Smith and the Liquidator Defendants were

entitled to be retained and compensated in connection with the bankruptcy. *See Kaplan*, 919 F.3d

at 160 (district court's fee order precluded subsequent unjust enrichment claim because entitlement

to proceeds was raised, litigated, and decided by prior fee order). Thus, Molner fails to state a

claim for unjust enrichment against all named Defendants.

**Count VI:      Aiding and Abetting Fraud**

**a.  Summary of Parties' Arguments**

Molner alleges that the Defendants knowingly participated in the breaches of fiduciary duty

by the Reed Smith Defendants and the DMS Defendants by "concealing their knowledge that Reed

Smith was actively working to ultimately defeat the Molner Plan, transfer jurisdictions, terminate

ARP's contract with the Fund and ultimately oust Molner[.]" FAC ¶ 370. Molner further alleges

that all the Defendants participated in Reed Smith's breach of fiduciary duties by helping "scuttle

the Molner Plan and put Varga and McCarroll in charge of the liquidation of AEF." FAC ¶ 371.

The Defendants argue that because all of Molner's principal fraud claims fail, the absence

of a primary violation compels dismissal of a claim for aiding and abetting fraud. *See* Reed Smith

Mem. 25. The Court agrees, despite Molner's argument that the Defendants either affirmatively

aided and abetted in "duping Plaintiff" or should have intervened. Pl. Opp'n to Reed Smith MTD

25.

### b.  Applicable Law

Aiding and abetting fraud has three elements: "(1) that an independent wrong exist; (2) that the aider or abettor knows of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong." *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 312 (S.D.N.Y.2009) (quoting *Landy v. FDIC*, 486 F.2d 139, 162–163 (3d Cir. 1973)). Under Rule 9(b), "'a claim for aiding and abetting fraud requires plaintiff to plead facts showing, the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission.'" *Id.* at 312 (quoting *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000)).

### c.  Application

This Decision previously concluded that Molner failed to adequately state a claim for fraud. Because a necessary element of a claim for aiding and abetting fraud is the existence of an independent wrong, specifically an underlying fraud, Molner's claim for aiding and abetting fraud fails against all Defendants. *See IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 29 (2d Cir. 2014) (citation omitted) (affirming dismissal and holding that "[Defendant's] aiding and abetting fraud claim fails in the absence of underlying fraud."). Moreover, even if the Court did not dismiss Molner's fraud claim, his claim for aiding and abetting breach of fraud is not sufficiently alleged for several reasons.

First, because Molner alleges that both McCarroll and Varga are named as "[t]he principal wrongdoers—those chiefly responsible for the fraud upon Plaintiff . . .," they cannot also be liable as an abettor to fraud. FAC ¶ 180; *see 380544 Can., Inc. v. Aspen Tech., Inc*., 544 F. Supp. 2d 199, 232 (S.D.N.Y. 2008) (citation omitted) ("[B]ecause [defendant] is alleged to be liable as a principal, rather than an aider and abettor, the claim for aiding and abetting must be dismissed.").

90

Further, Molner fails to allege actual knowledge of fraud with the requisite particularity necessary to satisfy the heightened pleadings standards of Rule 9(b). *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006) (complaint for aiding and abetting fraud must plead the circumstances that allegedly constituted fraud with particularity)); *see also Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 442 (S.D.N.Y. 2015) (internal quotation marks and citation omitted) ("Rule 9(b) applies to all averments of fraud."). Molner's allegations rely on improper group pleading, failing to specify what facts show what knowledge on the part of which Defendant. *See, e.g.*, FAC 5, ¶ 7; 6, ¶ 10; ¶¶ 91, 185–86, 202; Molner Aff. ¶ 142. This pleading approach is impermissible and insufficient. *See 380544 Can.*, 633 F. Supp. 2d at 35–36 (internal quotation marks and citations omitted) ("[P]leading knowledge for purposes of an aiding and abetting claim requires allegations of facts that give rise to a strong inference of actual knowledge."); *see also Aegean*, 529 F. Supp. 3d at 147 (internal quotation marks and citation omitted) (when fraud is alleged, "[t]he failure to isolate the key allegations against each defendant supports dismissal under the standards set forth in [Twombly] and [Iqbal]."). And, although Molner includes conclusory statements that McCarroll, Bree, Hanson, and Varga (and other Defendants) "knew" of the underlying fraud, he fails to plead facts with the particularity necessary to show a "strong inference" of their actual knowledge. *See, e.g.*, FAC ¶¶ 166, 182, 184, 187, 289, 308; *see also Lerner*, 459 F.3d at 292–93 (holding that plaintiff must allege with particularity facts that give rise to a "strong inference" of actual knowledge of fraud).

Further, Molner alleges no facts plausibly alleging that any of the non-principal Defendants engaged in conduct that would constitute substantial assistance to the alleged fraud. Substantial assistance exists "where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp.

2d 452, 470 (S.D.N.Y. 2001) (internal quotation marks and citation omitted). Substantial

assistance, as an element of aiding and abetting fraud, must also be pled with particularity. Despite

general complaints that a group of defendants stood by or failed to correct the alleged "big lie,"

Molner's allegations fail to state with requisite particularity that any of the Defendants

affirmatively assisted or concealed the alleged fraud, and, especially as to the Liquidator

Defendants, the facts far more strongly suggest that those parties simply agreed to implement the

liquidation that they were retained to carry out.

Thus, the Court concludes the Molner fails to state a claim for Aiding and Abetting

Fiduciary Duty against all Defendants and dismisses the claim.

**Count IX:      Breach of Contract**

### a. Summary of Parties' Arguments

Molner's claim for Breach of Contract is against Defendants Reed Smith, McCarroll, Mok,

Sanders, Gwynne, Siev, Bree, and Hanson. Molner's claim for breach of contract contends that the

Reed Smith Defendants, Bree, and Hanson breached the CICA, which is dated October 26, 2010.

FAC ¶ 375. Molner alleges that Bree and Hanson were parties to the CICA and were legally bound

by it. FAC ¶ 375. He concedes that Reed Smith and the Individual Reed Smith Defendants did not

sign the CICA, but contends that, because Reed Smith is named in the contract as counsel for Bree

and Hanson, they were therefore "counsel for all of Molner and ACP's counterparties in the

Agreement" and manifested an intent to be bound. *Id.* ¶ 377. Molner alleges that "Defendants then

used their cumulative and confidentially obtained knowledge of Plaintiff and the Fund in order to

wrest control of the liquidation of AEF from Plaintiff for their own benefit" and "deter Plaintiff

from doing anything to challenge, impede or take action in response to Defendants' wrongful

conduct." FAC ¶ 68*; see also* FAC ¶ 93. He further alleges that Reed Smith misused information

gained during their representation of AEF, pursuant to the CICA, and shared information with Kinetic, including information about indemnification, shareholders, and AEF's position in litigation. FAC ¶ 213. Finally, Molner alleges that McCarroll leaked information to Varga about the "fee cap" in violation of the CICA. FAC ¶ 109.

The Reed Smith Defendants argue in relevant part, joined by Bree and Hanson, that because the Reed Smith Defendants were not a party to the CICA, a claim for breach of contract against them cannot stand. They further contend that the FAC fails to plausibly allege misuse of any confidential information. Reed Smith Mem. 30–31.

Molner responds that the CICA makes clear that Reed Smith was only allowed to access confidential information in the context of the Wimbledon Inquiry, and that the Reed Smith Defendants subsequently misused this information as part of Reed Smith's scheme to thwart the "Molner Plan." Pl. Opp'n to Reed Smith MTD 32.

The Court agrees with the Defendants' contentions.

### b. Applicable Law

The elements of a breach of contract claim in New York are "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 350–51 (2d Cir. 2005) (citation omitted).

### c. Application

The purpose of the CICA was to facilitate the confidential sharing of information among the counterparties in the context of the Wimbledon Inquiry. FAC ¶ 67. Upon review of the entire FAC and the Molner Affidavit, even viewed in the light most favorable to Molner, Molner fails to plausibly allege any breach of the CICA.

First, the FAC fails to assert plausible, non-conclusory allegations that the named Defendants misused any confidential information. For example, Molner alleges, in a conclusory manner, that the "misuse of Plaintiff's confidential information – including, but not limited to, the particulars of the Molner Plan as first shared with directors of AEF on the Jan 6 Call . . .— constituted a blatant violation of the CICA." FAC ¶ 93. However, the Molner Plan was not introduced until 2014—nearly four years after the date of the CICA. There is no fact alleged showing that any use of information concerning the Molner Plan was even covered by the CICA, which, again, governed an inquiry that occurred in 2010.

Further, Molner avers that "Sanders and Mok used Plaintiff's confidential information to further the plan of McCarroll and Varga to assume control of the liquidation of AEF," FAC ¶ 186, and that McCarroll shared information with Varga about Molner's desire to cap the compensation of a joint liquidator in the amount of $750,000 in violation of the CICA. FAC ¶ 199. But this again is a conclusory allegation that does not identify what if any confidential information was shared in violation of the terms of the CICA, especially since the AEF liquidation and fee constraints long post-dated the CICA and the investigation that gave rise to it.

Finally, Molner alleges that Reed Smith used the information it obtained through its representation of AEF and shared the status of Molner's pre-existing indemnification, the disposition of shareholders, and the status of current litigation, and that the DMS Defendants joined the alleged fraudulent acts of Reed Smith "beginning on the Jan 6 Call and throughout the process that culminated in [the liquidation on May 7th]." FAC ¶ 213. Here, as with his other allegations, Molner does not plausibly allege how sharing any of this information violated the CICA as opposed to being information and advice permissibly provided in 2014 by Reed Smith as counsel to the Fund in order to assist with the plan to liquidate the Fund.

94

Thorough review of the FAC and the Molner Affidavit does not reveal any other allegation identifying any actual breach of the CICA. Molner therefore has failed to plausibly state a claim for breach of contract. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Thus, Molner's claim for breach of contract cannot stand against the named Defendants and is dismissed.

**Remaining Claims that Fail for Lack of Particularity—Defendants Mok, Sanders, Gwynne, Siev, Shakespeare, and Seymour**

In addition to dismissal of the Remaining Claims[43] against all Defendants, an additional reason exists to dismiss these Claims as to a subset of Defendants–Mok, Sanders, Gwynne, Siev, Shakespeare, and Seymour—because Molner fails to allege the circumstances of fraud with particularity against them, for the reasons stated previously.

First, Counts III (Constructive Fraud) and VI (Aiding and Abetting Fraud) are claims of fraud and thus must be stated with particularity pursuant to Rule 9(b). *See In re Platinum-Beechwood Litig.*, Nos. 18-cv-6658, 18-cv-10936, 2019 WL 1570808, at *15 (S.D.N.Y. Apr. 11, 2019) (Rule 9(b) applies for claims sounding in fraud whether "a plaintiff's claim is for actual fraud, constructive fraud, or breach of fiduciary duty.") (citing *Krys v. Butt*, 486 F. App'x 153, 159 (2d Cir. 2012) (aiding and abetting fraud)); *see also Tutor Perini Bldg. Corp. v. N.Y. City Reg'l Ctr.*, 525 F. Supp. 3d 482, 516 n.20 (S.D.N.Y. 2021) (constructive fraud). Further, although not categorized in this Decision as a "Remaining Claim," an independent basis for dismissal of Count II (Fraudulent Concealment) exists because fraudulent concealment also must be stated with particularity. *See Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 616 (S.D.N.Y. 2013)

---

[43] The Court previously defined the "Remaining Claims" as Counts III–IX.

(citing Fed. R. Civ. P. 9(b)) ("[C]laims for fraud, as well as fraudulent concealment, must 'state with particularity the circumstances constituting fraud[.]'").

Second, although certain of the Remaining Claims—Counts IV, V, and VII–IX—are not all denominated as fraud claims, they are all based upon the same underlying allegations of fraud and thus must be stated with particularity under Rule 9(b). "By its terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 442 (S.D.N.Y. 2015) (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)); *see, e.g.*, *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 606 (S.D.N.Y. 2011) ("[Rule 9(b)] applies to all claims that sound in fraud, as determined by the wording and imputations of the complaint, regardless of the label used in the pleading."); *Apace Commc'ns Ltd. v. Burke*, 522 F. Supp. 2d 509, 514 (W.D.N.Y. 2007) (applying Rule 9(b) where claims were based on allegations of fraud, although not "denominated as fraud claims."); *Tyman v. Pfizer*, No. 16-CV-06941, 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018) (citations omitted) (adopting report and recommendation that applied Rule 9(b) to unjust enrichment claim where gravamen of complaint was fraud).

Counts IV, V, and VII–IX all are premised on the same allegations on which Molner's fraud claims are based. Specific examples follow:

- Count IV (Breach of Confidence against All Defendants): "McCarroll's efforts to win the confidence of Plaintiff were successful and assisted McCarroll and Varga in their efforts to deceive Plaintiff . . ." [FAC ¶ 90]; "Reed Smith affirmatively created a relationship of trust and confidence . . . they then used [it] to manipulate the preparations for the commencement of the VL and to further lure Plaintiff into vulnerability." FAC ¶ 188.

- Count V (Unjust Enrichment Against Reed Smith, the Individual Reed Smith Defendants, Varga, Shakespeare, Kinetic Partners, and Duff & Phelps): "[t]he Unjust Enrichment Defendants obtained some or all of their profits . . . because

they deceived Plaintiff into believing that the appointment of a Cayman-based insolvency practitioner was a legal necessity . . . ." FAC ¶ 343.

- Count VII (Breach of Fiduciary Duty Against Reed Smith and the Individual Reed Smith Defendants): "[Each Defendant took] affirmative steps . . . to put into action the plan of voluntary liquidation for AEF." FAC ¶ 360.

- Count VIII (Aiding and Abetting Breach of Fiduciary Duty Against all Defendants): "[All Defendants] conceal[ed] their knowledge that Reed Smith was actively working to ultimately defeat the Molner Plan . . . ." FAC ¶ 370.

- Count IX: Breach of Contract Against the Reed Smith Defendants, Bree and Hanson: "[M]isuse of Plaintiff's confidential information . . . as first shared with directors of AEF on the Jan 6 Call . . . constituted a blatant violation of the CICA." FAC ¶ 93.

The centrality of Molner's fraud theory to these claims is made clear by his own summary of his Complaint, in which Molner explains that by this action he is seeking "to hold Defendants responsible for the acts of fraud that they perpetrated against him in 2014." FAC 1, ¶ 1 "Summary of the Action." Molner's allegations all sounds in fraud—his claims that the Defendants lied to him and "lure[d] [him] into a trap that would enable Defendants to sideline Plaintiff and assume control of the liquidation[.]" FAC 1, ¶ 2. Molner's claims accordingly must state with particularity the circumstances of fraud. *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("[The] wording [of Rule 9(b)] is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."). Because Molner's allegations, which are all premised on the same underlying allegations of fraud relating to "the big lie," fail to allege the circumstances of fraud with particularity, the Remaining Claims (Counts III–IX), as well as Count II, are deficient for the additional reasons stated herein and therefore dismissed as against Mok, Sanders, Gwynne, Siev, Shakespeare, and Seymour.

### 6. Leave to Amend

Plaintiff requests that if the Court grants the Defendants' Motion to Dismiss, Molner be granted leave to file a second amended complaint. *See* Pl. Opp'n to Reed Smith MTD 33. Leave to amend a complaint should be freely given "when justice so requires." *Hawkins v. Coca-Cola Co.*, 654 F. Supp. 3d 290, 309 (S.D.N.Y. 2023) (quoting Fed. R. Civ. P. 15(a)(2)). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (quotation marks and citation omitted). "Leave to amend, though liberally granted, may properly be denied" for "repeated failure to cure deficiencies by amendments previously allowed" or "futility of amendment," among other reasons. *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

As previously stated, Molner filed his initial Complaint long after he commenced this action, and, to avoid the need for further protracted proceedings, the Court directed Defendants to provide letters summarizing the legal deficiencies they perceived in Molner's initial Complaint, *see* Sched. Orders, ECF Nos. 50 and 57, to allow Molner to file a First Amended Complaint in an effort to cure those deficiencies. He did so. Moreover, after the filing of Defendants' Motions to Dismiss, Molner submitted an unauthorized, detailed affidavit setting forth additional facts that he asserts meet Defendants' objections, *see* Molner Aff., Ex. A, ECF No. 82. The Court has considered the Molner Affidavit's averments as, in essence, a supplementation that effectively creates a second amended complaint. *See supra*, at 8. Molner has no right to *a third* bite at the apple—he was made "aware of the deficiencies in his complaint when he first amended," *Nat'l Credit Union Admin. Bd v. U.S. Bank Nat'l Assoc.*, 898 F.3d 243, 257 (2d Cir. 2018) (internal quotation marks and citation omitted), and then his Affidavit comprehensively but unsuccessfully attempted to cure deficiencies spelled out in Defendants' moving papers. "Generally, a plaintiff's

failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone

sufficient ground to deny leave to amend." *Hawkins*, 654 F. Supp. 3d at 310 (citation omitted).

Taking into consideration the whole of Plaintiff's allegations, the protracted nature of this dispute

which dates back ten years, Molner's failure to timely raise his concerns during the bankruptcy

case, and Plaintiff's already-fully-informed opportunities to amend his Complaint, the Court

concludes that any additional attempt to further amend the FAC would be futile and unproductive.

*See Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citation omitted)

("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an

abuse of discretion to deny leave to amend").[44]

The Court has considered Molner's remaining arguments and finds them to be without

merit.

[*Remainder of page intentionally left blank*]

---

[44] At oral argument, Molner repeatedly suggested that he may have been able to further develop his claims or arguments if the Court had authorized discovery or not been otherwise restricted by the Court's admonition not to "overplead" (as addressed at prior conferences). *See, e.g.,* Hr'g Tr. 86:16–20; 86:6–8; 141:9–11, Dec. 14, 2023, ECF No. 97, *see also* Hr'g Tr. 42:22–25; 43:1–3, May 23, 2023, ECF No. 55; Hr'g Tr. 32:23–25; 33:1–6, June 28, 2023, ECF No. 61. To the contrary, the Court reminded Molner of the pleading requirements of Rule 8 at the same time it encouraged him to "avoid extraneous or purely inflammatory matter" when amending his then-existing 87-page complaint. *See* Hr'g Tr. 32:23–25; 33:1–6, June 28, 2023, ECF No. 61. Nowhere did the Court limit Molner's ability to plead facts necessary to support his claims. Nor is Molner entitled to further protract these proceedings by taking discovery; where, as here, a plaintiff fails to state a claim that can survive a motion to dismiss, he or she is not entitled to discovery in an attempt to bolster presently deficient claims. *See Trump v. Vance*, 480 F. Supp. 3d 460, 502 (S.D.N.Y. 2020) (denying plaintiff's request for discovery where amended complaint failed to state a claim) (citing cases).

## **CONCLUSION**

For the reasons stated above, the Court **GRANTS** Defendants' Motions to Dismiss in their entirety with prejudice and **DENIES** Plaintiff's request for leave to amend the FAC. The FAC is hereby dismissed.

IT IS SO ORDERED.


Dated: New York, New York
      September 4, 2024

_s/ David S. Jones_
Honorable David S. Jones
United States Bankruptcy Judge
